

Ministry of Security and Justice

> Return address Postbus 20301 2500 EH  The Hague

U.S. Department of Justice
Office of International Affairs
For the attention of  Ms J. Friedman
1301 New York Avenue
John C. Keeney Building
Washington D.C. 20530
UNITED STATES OF AMERICA

**Directorate General for the Administration of Justice and Law Enforcement**
Legal and Operational Affairs Department
Section for international affairs and legal assistance in criminal matters

Turfmarkt 147
2511 DP  The Hague
Postbus 20301
2500 EH  The Hague
www.rijksoverheid.nl/venj

**Contact**
Hellena Donner
*Senior legal advisor*

T  0031 (0)6 50292655
h.donner@minvenj.nl

Date            29ᵗʰ of September, 2016
Concerning   Request for the extradition of Senad Cejvan

Dear Mrs. Friedman,

With reference to Article 1 of the Extradition Treaty between the Kingdom of the Netherlands and the United States of America (as amended by the EU-US treaty of June 25, 2003), I hereby request the extradition of:

**Our reference**
UTL-U-2016086242

*Please quote date of letter and our ref. when replying. Do not raise more than one subject per letter.*

Name:        **Senad CEJVAN**
Date of birth:  July 20, 1987
Place of birth: Kotor Varos (Bosnia and Herzegovina)

CEJVAN is suspected of the murder of **Kavya Lekha GUDA** (date of birth: 12-02-1991), a U.S. citizen, on April 15, 2015 on the island of Saba (Kingdom of the Netherlands). As a result of the investigation into the murder of GUDA, CEJVAN is also suspected of threat, slander, defamation and child pornography.

Please find enclosed the request for extradition by the public prosecutor A. Doedens, the relevant documents and the applicable statutory provisions as a means of substantiating this request for extradition.

CEJVAN was arrested by US authorities on August 17, 2016 on the basis of a request for his provisional arrest, which was sent on August 6, 2016. CEJVAN is still in pre-extradition detention.

I thank you in advance for your co-operation in this case and look forward to receiving your decision on my request.

Yours sincerely,
For the Minister of Security and Justice,

*i.o.*

M. Niessink
*Head Department for international affairs and
legal assistance in criminal matters*



ATTESTATION OF AUTHENTICITY OF OFFICIAL RECORDS
VERKLARING VAN ECHTHEID VAN OFFICIELE BESCHEIDEN

I,   Hellena Donner
IK,  Hellena Donner

attest that my position with the Government of the Netherlands is senior legal advisor at the
department of Security and Justice,
verklaar dat mijn functie bij de overheid van Nederland is: senior juridisch
beleidsmedewerker bij het ministerie van Veiligheid en Justitie,

and that in that position I am authorized by the laws of the Netherlands to attest that the
documents attached hereto and described below:
en dat ik uit hoofde van mijn functie bevoegd ben krachtens de wetten van Nederland te
verklaren dat bijgevoegde documenten, die hieronder beschreven zijn:

1) are true copies of original official records which are authorized by the laws of the
Netherlands to be recorded or filed at the department of Security and Justice which is a public
office or agency,
kopieën van officiële bescheiden zijn die krachtens de wetten van Nederland geregistreerd
zijn bij het ministerie van Veiligheid en Justitie welke een overheidsdienst of instantie is,

2) set forth matters which are required by the laws of the Netherlands to be recorded or filed
and reported.
die zaken beschrijven die krachtens de wetten van Nederland moeten worden gerapporteerd
en geregistreerd.

Description of documents: request for the extradition of Senad Cejvan, documents from the
public prosecutor in Bonaire (the Kingdom of the Netherlands), the arrest warrant for Cejvan,
various police reports from the investigation into the death of K.L. Guda and the suspect
Cejvan and documents relating to his personal details.
Beschrijving der documenten: het verzoek om uitlevering van Senad Cejvan, documenten van
de officier van justitie in Bonaire (Koninkrijk der Nederlanden), het arrestatiebevel voor
Cejvan, verschillende proces-verbalen over het onderzoek naar de dood van K.L. Guda en de
verdachte Cejvan en documenten met betrekking tot zijn persoonsgegevens.

Signature/ Handtekening

*Donner*

Date/datum

3/10/2016





**Openbaar Ministerie**
Bonaire, Sint Eustatius & Saba

Aan: De minister van Veiligheid en
Justitie, De heer A. Van der Steur,

Contactpersoon          : mr. A. Doedens
Doorkiesnummer       : 00599 7810113
E-Mail                         : antoinette.doedens@omcarib.org
Onderwerp                  : uitleveringsverzoek aan VS betreffende Cejvan
Bijlage(n)                    : het verzoek inclusief bijlagen

Kralendijk, 19 september 2016

Excellentie,

In bijlage treft u aan een uitleveringsverzoek, gericht aan de Amerikaanse
justitiële autoriteiten.

Het betreft een lopend strafrechtelijk onderzoek op Saba/ Bonaire tegen de
verdachte **Senad Cejvan, geboren op 20 juli 1987, in** Kotor Varos (Bosnia and
Herzegovina) thans voorlopig in detentie te Verenigde Staten van Amerika.

Ik verzoek u vriendelijk om bijgaand uitleveringsverzoek te ondertekenen
zodat het de diplomatieke route kan volgen.

Voor verdere contacten over dit verzoek kunt u zich wenden tot de officier
van justitie in deze zaak, mevrouw A. Doedens, via het bovenstaande (in het
briefhoofd genoemde) telefoonnummer.

Ik ben u zeer erkentelijk voor uw medewerking.

Hoogachtend,

De Officier van Justitie,
Mr. A. Doedens



**Openbaar Ministerie**
Bonaire, Sint Eustatius & Saba

<u>Extradition Treaty between the Kingdom of the Netherlands and the United
States of America **'s-Gravenhage , 24-06-1980**</u>

**From: The Public Prosecutor's Office of Bonaire, St. Eustatius and Saba
(Kingdom of the Netherlands)**

Contact          :     Mrs. Antoinette E.M. Doedens, Public Prosecutor
Phone numbers:     + 599 717 8626 (office)
                             + 599 781 0113 (cellular)
E-mail           :     antoinette.doedens@omcarib.org
Reference     :     HECTOR investigation
Concerns     :     extradition request S. Cejvan, geboren op 20 juli 1987.

**To:     United States Department of Justice
         Office of International Affairs
         Criminal Division
         Attn: Mrs. Judith H. Friedman
         Senior Trial Attorney
         1301 New York Avenue NW
         Washington DC 20005, USA**

Bonaire/Saba, September 19, 2016

Dear Ms. Friedman,

Referring to our request to the United States of America (USA) for the
provisional arrest for the purpose of extradition dated August 6, 2016 , of
**Senad Cejvan, born on 20 July 1987,** in Kotor Varos (Bosnia and
Herzegovina), **(Annex A Copy of Identification),**

I hereby request your cooperation regarding the  extradition of **Senad Cejvan,**
to Bonaire. The objective of said extradition is the legal pursuit of criminal
acts, and (at a later point in time) the infliction of a term of incarceration for
having committed criminal offences.

Following our request for the provisional arrest of Senad Cejvan on August 6,



2016, we were informed by the United States that Cejvan had been arrested on August 17, 2016.

Cejvan is a suspect in three investigations, which are Hector, Palm Island and Brazile.

In the main investigation named HECTOR, Senad Cejvan is suspected of:
- Murder, article 302 Criminal Code BES islands, or
- Manslaughter article 300 Criminal Code BES islands, or
- (Aggravated) Assault (premeditated) resulting in death, article 313, 314 or 315 Criminal Code  BES islands and/or Rape (article 248 Criminal Code BES),or
- Involuntary manslaughter article 320 Criminal Code BES

**of the deceased  Kavya Lekha GUDA, a U.S. citizen, born on February 12, 1991, in India.**

**This crime was committed in the early morning of April 15, 2015.**

Following  the Hector investigation it has been found that, Senad Cejvan is also suspected of:
- Threat, article 298  Criminal Code BES islands,
- Slander/Libel, article 273 Criminal Code BES islands,
- Defamation, article 278 of the Criminal Code BES islands, and
- Child pornography, article246bis Criminal Code BES  islands.

I hereby refer you to Affidavit 1 (Annex B) for the summary of the facts and the suspicion of **Senad Cejvan, born on 20 July 1987.**



**Petition**

Based on the 2004 U.S.-Netherlands Extradition Agreement and its Annex, and based on our request to the for the provisional arrest for the purpose of extradition dated August 6, 2016, I hereby request the extradition of **Senad CEJVAN, born on the 20th of July 1985 in Kotor Varos (Bosnia and Herzegovina) for the crimes outlined in affidavit 1 (Annex B).**

A.E.M. Doedens
Public Prosecutor

Mr. A.E.M. Doedens
van Justitie

Mr. A.E.M. Doedens
Officier van Justitie





### Request III:

To be allowed to use all information that comes from requests I and II in a court case against the suspect that will be prosecuted for the victims death.

Of course this MLAT will also be send to you through the official channels.

Sincerely yours, and thanking you in advance.

M. Overmeer,
Public Prosecutor.



**Openbaar Ministerie**
Bonaire, Sint Eustatius & Saba

## Affidavit 1

**Senad Cejvan, born on 20 July 1987,** in Kotor Varos (Bosnia and Herzegovina) is a suspect in three investigations, which are Hector, Palm Island and Brazile.

In the main investigation named HECTOR, Senad Cejvan is suspected of:
- Murder, article 302 Criminal Code BES islands, or
- Manslaughter article 300 Criminal Code BES islands, or
- (Aggravated) Assault (premeditated) resulting in death, article 313, 314 or 315 Criminal Code  BES islands and/or Rape (article 248 Criminal Code BES),or
- Involuntary manslaughter article 320 Criminal Code BES

**of the deceased  Kavya Lekha GUDA, a U.S. citizen, born on February 12, 1991, in India.**

**This crime was committed in the early morning of April 15, 2015.**

Following  the Hector investigation it has been found that, Senad Cejvan is also suspected of:
- Threat, article 298  Criminal Code BES islands,
- Slander/Libel, article 273 Criminal Code BES islands,
- Defamation, article 278 of the Criminal Code BES islands, and
- Child pornography, article246bis Criminal Code BES  islands.

As a result, two other investigations, Palm Island (Threat, Slander, Defamation) and Brazile (Child pornography), have been initiated.


**HECTOR INVESTIGATION (Murder, manslaughter, Assault)**

**Summary of the facts**

On April 15, 2015, a criminal investigation named the Hector investigation, was initiated, led by the public prosecutor of Bonaire, Sint Eustatius and Saba.



This investigation followed on the discovery, that day April 15th, of the body of a young woman, who was found lying on her bed in her residence. The body was of a 24-year-old medical school student named **Kavya Lekha GUDA, a U.S. citizen (born February 12, 1991, in India),** having lived at Clement Sorton Street 6, The Bottom, Saba (Dutch Kingdom). GUDA was last seen alive in the first hours of April 15, 2015; so she must have died between these hours and the discovery of the body later in the morning of April 15th.

GUDA, while born in India, was a U.S. Citizen. Before her death, GUDA was a student at the Saba University School of Medicine (SUSOM).

The initiated investigation into GUDA's death showed that GUDA had died a violent death. In particular, the forensic autopsy performed on Guda's body by the NFI (Dutch Forensic Institute) in the Netherlands revealed that the victim had died either by strangulation or suffocation.

### Suspicion Senad Cejvan
At the time of the murder, Senad CEJVAN, a Bosnian national and U.S. resident, was also a student at SUSOM and was living on SABA.

On April 15th at approximately 00.00, Cejvan, departed by car (he got a lift) from a nightlife venue on Saba with a few fellow students, including Guda. They got out of the car in the vicinity of Guda's residence. He accompanied Guda home, along with a female fellow student named A. Thapa. Cejvan was heard as a witness on April 15th, 2015 and April 17th, 2015. As a witness, Cejvan stated that he had heard that Guda asked Thapa to stay with her over the night. Thapa did not want to stay, but wanted to go home. So Cejvan did know Guda would be alone that night. Cejvan waited in the hall of Guda's residence, then he brought Thapa home.

He tried to kiss Thapa in Thapa's residence. Thapa did not want this. After talking for a while, he left Thapa's residence. Thapa later stated that she thought that Cejvan had left her at approximately 02.30 AM. Cejvan however, stated that it wasn't until 04.00 AM that he left her after which he walked his



usual route, straight to his own apartment. Thapa did indeed change her statement after being pressured by Cejvan but she is still continuously in doubt about it.

Witness Ogbomo saw Cejvan at 04:00 AM. At that time Cejvan was seen walking at a location, which is situated between his residence and that of the victim Guda. If Cejvan had walked straight to his residence, it would not have been possible for him to be seen at that particular location. The place where the suspect was seen is in the direct vicinity of the victim's residence and the presence at the location can be explained if he was walking from the direction of the victim's residence.

Cejvan stated, as a witness, that while he was walking up the stairs to his apartment, he had seen aforementioned witness Ogbomo and had spoken with him briefly.

According to the DNA investigation, a Y-chromosomal DNA-trace was found inside the victim's anus. Determination of geographic origin showed that this Y-chromosomal DNA-trace finds its origins in the southeast part of Europe, after which it spread towards Western Europe. The suspect is originally from the area of geographic origin (Bosnia) of the found Y-chromosomal DNA-profile.

On May 20, 2015, CEJVAN left Saba. It looked like he was leaving in a hurry, because he left several personal possessions behind (such as clothes, suitcases, and toiletries). Part of these possessions were confiscated during a house search led by the investigative magistrate. These belongings (including a toothbrush) were examined for a usable Y-chromosomal DNA profile. This examination revealed that the Y-chromosomal DNA profile found on the toothbrush confiscated from CEJVAN's residence was a match for the Y-chromosomal DNA profile trace found in the victim's anus.

Further investigation showed that the same Y-chromosomal DNA trace was present on a sleeve of a jacket belonging to the victim and on the dress of the



victim. There is a strong suspicion that the sleeve of the jacket was used to choke/strangle the victim. The jacket was lying underneath the victim and one sleeve was completely stretched out. In addition, it cannot be excluded that the victim was possibly raped by the suspect; the investigation did not reveal a relationship between Guda and CEJVAN, other than being classmates.

There was only one anonymous message that suggests there could have been a relationship between GUDA and CEJVAN. This message was sent anonymously on April 18, 2015, to the internet page www.sxmislandtimes.com by a person named "Truth seeker". This person seems to have information that possibly only the murderer could know. Truth seeker wrote:
*" Wouldn't be surprised if it was her really creepy Bosnian ex-boyfriend that raped and strangled her to death (..)"* .
Cejvan was born in Bosnia and the writer (probably) indicates that GUDA had a relationship with a Bosnian.
Remarkable is that on the 18th of April, nobody (not even the investigation team) knew yet that Guda was murdered by strangulation. Only the possible perpetrator or someone near the perpetrator could have this information in order to write this message. "Unfortunately, as of this date, investigators have not been able to identify Truthseeker".

Please see the attached **police report**, at <u>Exhibit 1 (with 31 annexes)</u>, which provides further explanation of the facts.

**PALM ISLAND INVESTIGATION (**Threat, Slander/Libel, Defamation),

Shortly after the death of Kavya L. Guda, email messages were sent to several students from a falsely-created email address. The names of other students and teachers were often misused by these falsely-created email addresses. The above-mentioned email messages contained threatening and slanderous texts, initially directed at a female student of the Saba University School of Medicine, named **Fazeelah Ibrahim**.



Investigation into these emails revealed that Senad CEJVAN could have been involved in sending these threatening and slanderous emails. CEJVAN appeared to have had a relationship with Fazeelah Ibrahim. Ibrahim ended this relationship on the evening of April 14, 2015 (the evening before Kavya Guda was murdered), and she subsequently began a relationship with another SUSOM student named **Mauricio Ordaz**. No other persons had any knowledge of this relationship between Ordaz and Ibrahim. However, when CEJVAN saw Ibrahim and Ordaz leave Ordaz's residence together in the morning of May 9, 2015, he apparently figured it out, because less than 2 hours later, the first slanderous email was sent, causing Ibrahim to file a report for defamation that day (article 273 Criminal Code BES).

Besides the above-mentioned emails, two other Gmail accounts were used in which slanderous and threatening texts were involved. The following message was sent from the email address pxj90schild@gmail.com on May 9, 2015, with Ibrahim as the intended target:
*"Attached is a picture of a sexual predator. Had three drunk taken guys last night. Girls watch out for your boys, guys watch out for STD's".*

CEJVAN was questioned as a suspect regarding this act on May 15, 2015. However, he did not wish to make a statement. He was, nevertheless, dismissed from the medical school immediately. After his appeal was declared unfounded, he suddenly left Saba without giving notice to anyone and, as mentioned, leaving behind several personal belongings in his apartment.

In the following weeks and months, Ibrahim kept receiving many slanderous emails. The following message was sent to Fazeelah Ibrahim on May 16, 2015 from the email address fax.ibrahim@gmail.com:
*"Hey guys, I just want apologize for all the drama from last week. Sometimes when I got horny like that things tend to get out of controls. Thank God for the Dr. Lewis and his experience in handling little girls. If there wasn't for him at least half of the male students would've been sucked to death in their beds. You know what they say about old guys ? They really do last for two hours.*



*Catch me if you can :D*
*Fazeelah Ibrahim*
*P.S. Did you hear about the stabbing that is happening tonight ?"*

This message was not only sent with name of Fazeelah Ibrahim in it as the sender, but was also sent to Fazeelah Ibrahim herself to her (real) email address.

On the 29th of May 2015, Ibrahim filed a complaint for unlawful stalking (article 313A Criminal Code BES).

Then, besides Ibrahim, also other students and even school staff of the Saba University School of Medicine received slanderous and/or threatening emails.

On June 22, 2015, the following email was sent to all students of the aforementioned school from the email address jglewis0@gmail.com:
*"Happy Monday everyone,*
*I hope that you all had productive weekend as much as I did. Some of you asked me to take them of my list, unfortunately I won't be able to do that. Those of you who were messing with my operations have been blacklisted. Thanks to our self service administration the punishment is coming. My august project will include a pipe filled with explosive surprise. The first one will be mailed to 177 S Bauer Point Circle, Spring, TX 77389.*
*Catch me if you can*
*Devil's enabler"*

Because CEJVAN was staying in the United States at the time, efforts were made to interrogate him there. Cejvan, however, was not willing to cooperate, so no interrogation took place in the United States.

During the investigation the investigating team found several images/photos in the laptop of Cejvan that were used in the slanderous and threatening above-mentioned emails.



Please see the attached **police report**, <u>at Exhibit 1 (with 31 annexes)</u>, which provides further explanation of the facts.

**BRAZILE INVESTIGATION (child pornography)**
During the investigation named Palm Island the laptop of Senad CEJVAN was confiscated on May 15th, 2015. A police detective of the Dutch Police Department against Child Pornography has (as an expert) evaluated 9528 pictures on CEJVAN's Apple Laptop. She has determined that all these pictures are child pornography. 706 pictures are unique. This means this pictures are not known by the police (in other investigations). In the child pornography collection, it is remarkable that there are images of mainly women who are committing sexual acts with children. These children are girls between the ages of 0 and 12 years. The sexual acts entail among other things touching of the vagina of children, licking the sexual organs of children, penetration of the vagina or anus of children with tongue, fingers or with other items.

There are also pictures in which children are touching the genitals of women or penetrating with a finger in the vagina. In some pictures there are adult men and young girls holding their penis in their mouth, or an adult man penetrating a young girl's vagina.

You can also observe violence and compulsion on some images. In some pictures, children are strapped.

A part of the pictures are originated from the Philippines. There was an investigation of these pictures in 2015. You can see a baby of 1.5 years old, sadistically, being sexually abused.

Figures:
-penetration: about 35% of the pictures
-touching the genitals: about 40% of the pictures
-posing in a sexual way: about 25 % of the pictures



-younger than 12 years: 100%, younger than 2 years: about 5 %
-boy: about 5% of the pictures
-girl: about 95% of the pictures
-pictures accessible on the computer: 9528

Please see the attached **police report**, <u>Annex C</u>, which provides further explanation of the facts.

Seeing the above-mentioned facts, the investigatory judge on Bonaire formally gave his approval on June, 2016, to ask the United States to take CEJVAN into custody. On August 6, 2016, I, as the public prosecutor in Bonaire, in charge of the investigation, issued a warrant for the arrest of Senad CEJVAN. According to the Code of Criminal Procedure, the Public Prosecutor is the authority authorized by law to order the arrest of a suspect.

**Petition**
Based on the 2004 U.S.-Netherlands Extradition Agreement and its Annex, and based on our request to the for the provisional arrest for the purpose of extradition dated August 6, 2016, I hereby request the extradition of **Senad CEJVAN, born on the 20th of July 1985 in Kotor Varos (Bosnia and Herzegovina) for the crimes outlined above.**

Enclosed please find the documents to be specified hereinafter as a means of substantiating this extradition case :

1. Copy Identification **Senad Cejvan, born on 20 July 1987,** in Kotor Varos (Bosnia and Herzegovina) (Annex A)
2. Affidavit 1 (Annex B)
3. A procès-verbal (police report) in which the facts, and the suspicion are expounded upon (Annex C and <u>Exhibit 3</u>);
   3a. A proces-verbal about the crime scene (exhibit 3 annex 1)
   3b. The report of the forensic autopsy (exhibit 3 annex 2)

   3c. The statement of Cejvan as a witness, d.d. April 15 th 2015 (exhibit 3 annex 3)



3d. The statement of Cejvan as a witness, d.d. April 17 th 2015 (exhibit 3 annex 4)

3e. The statement of witness A. Thapa, d.d. April 15th 2015 (exhibit 3 annex 5)

3f. The statement of witness A. Thapa, d.d. May 26th 2015 (exhibit 3 annex 6)

3g. The statement of witness A. Thapa, d.d. June 19th 2015 (exhibit 3 annex 7)

3h. A Proces-verbal about the walking route of A. Thapa (exhibit 3 annex 8)

3i. The statement of witness A. Thapa, d.d. June 12th 2015 (exhibit 3 annex 9)

3j. The statement of witness E. Ogbomo, d.d. May 2nd 2015 (exhibit 3 annex 10)

3k. A Proces-verbal about the walking route of E. Ogbomo (exhibit 3 annex 11)

3l. The statement of witness V. Rombley, d.d. May 5th 2015 (exhibit 3 annex 12)

3m. Email from Cejvan d.d. April 23rd 2015 (exhibit 3 annex 13)

3n. The statement of witness V. Ordaz, d.d. November 20th 2015 (exhibit 3 annex 14)

3o. A Proces-verbal from the police-intelligence unit (exhibit 3 annex 15)

3p. A process-verbal about I messenger chats between Cejvan and Ordaz (exhibit 3 annex 16)

3q. Official complaint of Fazeelah Ibrahim (exhibit 3 annex 17)

3r. The statement of witness B. Shaffer d.d. May 28th 2015 (exhibit 3 annex 18)

3s. The statement of witness B. Shaffer d.d. November 19th 2015 (exhibit 3 annex 19)

3t. The statement of witness V. Ordaz d.d. November 20th 2015 (exhibit 3 annex 20)

3u. The statement of witness V. Ordaz d.d. June 12th 2015 (exhibit 3 annex 21)



3v. The statement of witness V. Ordaz d.d. May 9th 2015 (exhibit 3 annex 22)

3w. The statement of witness J. Lewis d.d. May 14th 2015 (exhibit 3 annex 23)

3x. A Proces-verbal about the house of Cejvan (exhibit 3 annex 24)

3y. A process-verbal about the departure of Cejvan (exhibit 3 annex 25)

3z. A Proces-verbal about the house search of the house of Cejvan (exhibit 3 annex 26)

3aa. A Proces-verbal about the refusal of Cejvan to make a statement (exhibit 3 annex 27)

3ab. The report of the DNA-investigation d.d. April 29th 2015 (exhibit 3 annex 28)

3ac. The report of the DNA-investigation d.d. July 10 th 2015 (exhibit 3 annex 29)

3ad. The report of the DNA-investigation d.d. September 25th 2015 (exhibit 3 annex 30)

4ae. The report of the DNA-investigation d.d. November 11th 2015 (exhibit 3 annex 31)

4. The request for the preventive arrest of S. CEJVAN, dated August 6 , 2016 (annex D);

5.  The Order of Pre-trial detention of the investigating magistrate (annex E)

6. The warrant for S. CEJVAN's arrest, dated August 10, 2016 (annex F);

7. The applicable stipulations of the Criminal Code of BES Islands regarding the violation and the corresponding sanctions; (annex G);

8. A process-verbal about the child pornography (annex H)

Thanking in advance for your cooperation as the extradition of Senad CEJVAN to Bonaire, I hereby remain,



10. Relevant articles Criminal Code BES (annex J)

Thanking in advance for your cooperation as the extradition of Senad CEJVAN to Bonaire, I hereby remain,

Signed for a sworn affidavit September 19th, 2016
A.E.M. Doedens
Public Prosecutor

Mr. A.E.M. Doedens
Officier van Justitie

**Public Prosecution Service Bonaire Sint Eustatius, Saba**



PRO JUSTITIA

Police Corps Dutch Caribbean

--------------------------------------------------------------------------------------- ----------

Police (Judicial) Report of suspicion (serious objectios)

--------------------------------------------------------------------------------------------------------

| Police Report number | : | 201606271153. AMB |
|---|---|---|
| Investigation | : | Hector/Palm Island/Brazile |
| Relating to | : | Serious objections against suspect S. Cejvan |
| Police Officer | : | Gerrit Jan Kapsenberg en Robert den Hollander, respectively Chief Inspector and inspector of the National Police, Unit Rotterdam, temporary working for the Police Force Dutch Caribbean , Department  Incident Focused Investigation. |

## POLICE ( JUDICIAL)  REPORT

I, police officer, declare the following:

INTRODUCTION  of CASE "HECTOR".

The investigation "HECTOR" has started after discovering a dead body of an American medical student in Saba,  whose name later seemed to be: **Khavya Lekha Guda**, born on  the 12th of February 1991 in India.  The way the body was discovered, created the presumption that this was not a natural death, but that the victim was probably killed by a crime.

Due to this a crime investigation has been started  under the name Hector. Ongoing this investigation a suspicion arose against two persons, namely Omar Elkadry and Senad Cejvan. Both of them were during that time students at the Saba University School of Medicine (SUSOM).

Initially the investigation was mainly focused on the involvement of Elkadry,  since most of the facts and circumstances pointed mostly in his direction. This has led during the investigation of raising the suspicion against Cejvan.  Meanwhile new investigation findings resulted, in being more probable, that S. Cejvan is (also) involved  in the unnatural death of K.L. Guda.

In this judicial report, the facts and circumstances are being described , from which the suspicion has arisen that S. Cejvan, according to additional details below, is the unknown offender (perpetrator) who has committed this.

1

**Dhr. Glenn M. Albertina**
Beëdigde Tolk & Juridisch Vertaler
(Ned-Eng/Ned-Spa) Civiele- en Strafzaken

Adres: Kaya Hulanda 36
Kralendijk, Bonaire
Tel: (+599) 717-6460
Cel: (+5999) 563-5735
Fax:(+599) 717-6460

**SUSPECT**

| | | |
|---|---|---|
| Name | : | CEJVAN |
| Forenames | : | Senad |
| Birth date | : | 20 July 1987 |
| country of birth | : | Former Yugoslavia |
| Address | : | Sonia Richardson's Appartments nr. 2 (room no. 3) |
| residence | : | The Bottom, Saba |
| Nationality | : | Bosnie-Herzegovina |

FACTS AND CIRCUMSTANCES

## REPORTING AND INITIAL OBSERVATIONS

On the 15th of April  2015,  about 11.08 hours a notification concerning the above mentioned has been received by the police of Saba. At the spot the Police officers have seen in the house, in the bedroom, and a woman lying down on the bed. They saw that the woman was lying down on her stomach. It was obvious that the lower body of the woman was naked, that her arms were turned towards her back and that her face was laid in the quilt.

At the height of the left wrist an injury has been noticed. It could not been determined if this was a recent or older injury. Close to the vagina of the corpse traces of blood could be seen. Seeing the remarkable position of the body, the injury, blood close to the vagina and missing of the underwear, the chance will be considered that the victim died due to a crime.

Source:  Judicial report – findings 201504151700                          Attachment 01

## JUDICIAL AUTOPSY

On Tuesday 21st of April  2015 a judicial autopsy has been made at the NFI on the body of Guda.  The conclusion of the pathologist follows below.

By means of the autopsy on the body of  K. L. Guda, 24 years of age, the death can be explained well due to complications caused by action of external mechanical oppressive violence,, whether or not combined with blunt crashing violence on the neck (manual strangulation, ligature strangulation by hanging or ligature strangulation  otherwise than within the scope of hanging).

2

Although no injuries were found on the mouth/nose, given the position in which she was found with the face down in the pillow, an additional component of suffocation caused by obstruction of the mouth/nose will not be excluded.

Source:     NFI report pathology K.L. GUDA, nr. 2015-097                    Attachment 02

## WITNESSES IN GENERAL

After discovering the corpse different witnesses have been heard. Based on the statements of these witnesses there was tried to reconstruct the last hours of the victim. The witnesses who have been heard were mainly the co-students of the SUSOM. Statements of among others witnesses Angelica Thapa, Senad Cejvan, Brianna Shaffer en Priya Alex, revealed that the victim Guda on the evening of 14th of April 2015 went out to different places on Saba. Guda should have left house on the 14th of April 2015, around 21.00 hours and she returned home at her apartment on the 15th of April 2016 between 00.00 hours and 00.45 hours.

Guda had arrived home that night together with the witnesses Thapa and Cejvan. A little later the woman neighbour of Guda named Mehall Akhter joined the company. Short before 01.00 hours the witnesses Thapa and Cejvan have left the house of Guda, where after Guda and Akhter had stayed behind.

It can be concluded from the statement of Akhter that she had left the house of Guda somewhere between 01.00 hours and 01.30. According to Akhter Guda was at that moment still "perfectly fine". Moreover different witnesses have stated that Guda was somewhat tipsy that evening.

### Witness S. Cejvan:

As cited above, Cejvan is one of the last person who has seen the victim Kavya Guda alive in the night of 14 to 15 of April 2015. Cejvan has been heard twice as witness and he summed up that he had dropped by in the evening 2015 at Scout's place and Guido"s due to a farewell party of his roommate. Guda was here too. Cejvan said that he had spoken with Guda that evening and they noticed she was a little "sad" because she did not want to go to school any longer I in connection with her mother's illness. Furthermore Cejvan had noticed that Guda was "a little tipsy" , but according to him she was not really drunk.

On the 15 th of April , around 00.30 hours was Cejvan together with Guda, Thapa, Shaffler, Yassine and Rene Torres and they drove back from Guido's to the Bottom. In the Bottom Cejvan together with Thapa and Guda had walked to the house of Guda., where they went inside for a while. Guda probably had asked Thapa if Thapa did want to stay by Guda. But Thapa as a

3

matter of fact did not do that., because she did not have her medicine with her.

Cejvan and Thapa then went walking to the house Thapa , where they remain standing outside according to Cejvan for about 15 to twenty minutes. Then Thapa shoud have invited him to her house. Cejvan  then went inside . Cejvan  stated that he left the house of Thapa again around 04.00 hours and went to his own house. He stated related to this specifically ( after being asked in connection with this) that he did not walk towards the neighborhood of the house of Guda any more.

Cejvan gives (after being asked) in his second statement  a possible motive of the death of Guda. Cejvan stated, that he knew that Guda had sleeping problems and that the remembered a conversation between Thapa and Guda. Guda had asked Thapa at that time sleeping pills , Thapa had refused to give her these. Cejvan had made the observation that a combination of sleeping medication together with alcohol can lead to overdose.

Source: Judicial report witness S.Cejvan,nr. 2015 04151245          Attachment  03
        Judicial report witness S. Cejvan, nr. 2015 04171530, witn  Attachment  04


Witness A. Thapa:

Angelica  Thapa has been heard as witness several times. Thapa declared also that she had gone out on the evening of 14 April  2015  due to the occasion on the upcoming departure of Kavya Guda. She stated on April 15 2015, around 00:15 with others by Brianna Shaffer car to be brought home with others to The Bottom (from Windwardside) with the car..

Observation by the  officer:

From  Windwardside to The Bottom  in a car takes normally  about 15 minutes.

In the Bottom, near the home of Guda, Thapa along with Senad Cejvan and  Guda and stepped out of the car of Shaffer. Thapa said that she and Cejvan with  Guda  walked  up to the  room of, Guda asked Thapa if she wanted to stay overnight.  Thapa thought this was not a good idea,  because she is taking medication, she does not sleep well  at night and beause she is still wearing  her contact lenses. Thapa said to have gone back inside shortly with Guda. Cejvan would have remained outside in the hallway.

Hereafter Thapa and Cejvan went walking together  to the home of Thapa.  Because Thapa  was not feeling well  Cejvan  still went inside by  her, and they have  been talking about  one hour and a half.. When they were sitting together on the couch  Cejvan tried to kiss her . Thapa told Cejvan that she does not accept that. After about 15 to 20 minutes Cejvan then left and Thapa assumes that he took the same road on his way back, since he could not walk  in another direction.  Thapa said initially that Cejvan that night, according to her had gone away from her  about 02:30, meanwhile Cejvan explained that this was

4

about 04:00. Since she did not look at the clock, she assumed that in fact, cause she had no reason to doubt about the time that Cejvan had mentioned. In a given statement Thapa says moreover that from childhood she is very bad in estimating time.

Thapa also stated that when Cejvan went home, her neighbor Kelly (Ogbomo) had seen him leave. She knew this because Cejvan the next morning was teased by Kelly that they have "something" together. But Thapa further stated that they did not have anything together.

| Source: | Judicial report witness A, Thapa 2015 | attachment 05 |
|---|---|---|
| | Judicial report witness A, Thapa 201550526 1910 | attachment 06 |
| | judicial report witness A Thapa 20150619. 1600 | attachment 07 |
| | judicial report findings          20150613, 1430 JR B | attachment 08 |
| | judicial report intervieuw witnessA , Thapa 20150612 1300 Thapa | attachmen t 09 |

Witness   Kelly Ogbomo:

On May 2, 2015 is Efehi Kelly Ogbomo heard as a witness. Ogbomo was heard because he was named by Thapa as the person that has seen Cejvan that night of 15 April 2015 when he left the house of Thapa. Ogbomo lives in the same apartment complex as Thapa. Ogbomo stated that he went to school around 4:00 pm on April 15, 2015 to study for an exam. Normally in daylight he would, so he declared, use (shorter) path through the bushes. Since it was still dark around 04:00, Ogbomo walked via the road. Ogbomo further stated that the path is also not accessible through the bushes after 19:00 because there is a a gate which will be closed each evening by a certain Julio..

He also stated further - so still about 04:00 – he had met Cejvan to be in the vicinity of that house. He was surprised to see Cejvan and think Cejvan was also surprised to see him. Cejvan asked what Ogbomo was doing there at that time and Ogbomo replied that he went to school to study.

Source: PV (Judicial report) witness hearing E.K. Ogbomo, no. 20150502.1020.202 Appendix 10

ROUTE AND PLACE OF MEETING CEJVAN

During questioning of Ogbomo on a a satellite photo the walking route he followed that night was drawn and also which way he normally follows (through the bushes or so-called goat path).

Because of this image it can not be made clear where Ogbomo exactly had encountered Cejvan that particular night, he participated on May 19, 2015 to a further place indication of the route and the place where he had met Cejvan. Of this the police officers S. Konijnenberg and P. Mercera, both police investigators and working in the TGO Hector case, had made a judicial report .
minutes.

Source: PV (judicial report) findings place designation witness Ogbomo, No. 20150519.1100 11 Annex I.

5

Thapa said later that he assumed that Cejvan  went back via the same way that night that he took together with her.  Thapa has seen Cejvan leave through the front door. Cejvan had never been before to  by Thapa , so Thapa assumes  Cejvan does not even know that there was a gate on the other side of the building. That fence is  always closed  iin the evening according to Thapa.

Source: PV witness examination A. Thapa 20150526.1910 Appendix 06

That the gate was closed that night, was confirmed by witness  Julio Victor Rombley. He is a maintenance worker at the apartment complex where Thapa and Ogbomo  are residing and he closes each day the aforementioned fence leading to the  goat path. He declared that he closed  on April 14, 2015, around 21:30 the referred gate.

Source: PV witness examination J.C. Victor Rombley, no. 20150505.1610.202 Annex 12

Based on the above it can be seen that Cejvan could have walked only  on the way to his own home (and not via the goat). From the statement and place indication of Ogbomo can be seen that the location where he had seen Cejvan was an illogical place.  After all, this location is more than 13 meters past the house of Cejvan and is on the route between the home Guda and his own home. Ogbomo saw then that Cejvan then from had walked from that location to his own (Cejvan) home.


**TIME "WAKE UP" of Cejvan on April 15, 2015**

By a lecturer from the Medical School  Senad  Cejvan was asked by e-mail  if he  would be able to relate as much as possible the events of the night of 14th of April 2015. By the user of the e-mail address  of Senad Cejvan was sent a response. The e-mail is  stated that he (Cejvan) about 8 hours (AM) woke up when Mauricio Ordaz got home, who was preparing for his flight that morning.

Source: PV findings 20150525.0930 13 Appendix 1

Mauricio Ordaz explained that he came home that morning at 07:00 am, after which he took a shower. Cejvan was still in his room. After showering, he went to eat some food. At about 07:30 then Cejvan came out of his bedroom.

It stroke  Ordaz that Cejvan  was very awake. He had expected Cejvan would sleep longer because he was free that day . Cejvan showed that morning according to Ordaz  little emotion.

He also stated that Cejvan had told him the next morning (April 15, 2015) that he that night with Thapa had gone home. Cejvan told him that Thapa was  "easy" and thus he gave the impression that he had had sex that night with her. He himself had the idea that Cejvan was showing off a a little bit. Cejvan further gave him no details, but he thought it was strange, because Cejvan  in fact did not know Thapa at all.

Source: PV witness examination M. Ordaz 201511201106.ORDAZ Appendix 14

6

**CeEJVAN  AS  AN OFFENDER ON THE INTERNET**

On April 18, 2015 appears on  Internet page www.sxmislandtimes.com  a press  article about the death of victim Guda. More specifically, believed in the message that Guda  was  killed by a crime.

This message is responded to by an as yet unknown person under the alias "TRUTHSEEKER". The following is the intended reaction of TRUTHSEEKER:

Would not be surprised if it was really her creepy ex-boyfriend Bosnian That raped and strangled her to death and fled back home to Bosnia. This will be swept under the back Because this med school is more interested in money than protecting Their med-school students. Hopefully the POS comes back to his ongoing studies. This is an easy case to solve, just some common sense, video surveillance, DNA and the whereabouts of person / s of interest and there will be enough evidence to convict the sicko  (psycho) That did this. "

Translated from the Dutch State in the first sentence of this reaction, the "TRUTHSEEKER" would not be surprised if it's the really scary / creepy Bosnian ex-boyfriend of the victim was having raped her and strangled.

Observation officer:

Senad Cejvan holds a passport from Bosnia-Herzegovina.

**INFORMATION PROVISION TCI**

On May 22 in 2015 an official report was received from the Criminal Information  Team (TCI) which includes the following information:

"A student of the Medical School to Saba called Cenad recently had a brief relationship with a fellow student named Kavya '

This information was moreover entered by a person who wished to remain anonymous via a telephone report to the TCI.

It can be assumed that with the name Cenad in fact is meant Senad Cejvan, and with the name Kavya, it is meant Kayva Guda.

Source: PV ICI 29/2015 Annex 15

During the investigation it has not been  shown in any way that Cejvan would have had a (brief) relationship with Guda.


Source: PV findings  20151124.1200 AMB Appendix 16

**TERMINATION RELATIONSHIP CEJVAN**

7

Witness F. Ibrahim

Research has shown that S. Cejvan had a brief relationship with a fellow student F. Ibrahim. This relationship came in the night of 14 on April 15, 2015 with an argument to an end.

When S. Cejvan came to find out on the 9th of May 2015, that Ibrahim had a relationship with his roommate M. Ordaz. From that moment Ibrahim received through her e-mail several defamation mails and emails messages. Ibrahim filed a report , , which is related further in the investigation Palm Island.

Source: PV declaration F. Ibrahim 2015004981 Appendix 17

Witness B. Shaffer:

Brianna Shaffer is heard as a witness on May 28, 2015. She stated that she saw around midnight on April 15, 2015 that Cejvan and Ibrahim outside at Gjuido's were embroiled in an argument. The quarrel was related according to her to the fact that Cejvan felt offended that Ibrahim was talking with Peter Johnson and that made him angry. It was assumed that Cejvan was jealous when he saw Ibrahim talking to another man. It was known about Cejvan that he reacted strangely and was obsessed by women in their class who reach late at night from the gym.

Source: PV findings 201505281900.AMB Appendix 18

Source: PV interrogation 201511191102.Shaffer Annex 19

Witness M. Ordaz:

On November 20, 2015 the witness Mauricio Ordaz was heard. He stated among other things that Cejvan and Ibrahim from February 2015 had more contact with each other. After they have had no contact with each other for some time, they began to talk again together in April 2015. He heard from Ibrahim that she and Cejvan had tried to have sex but that this did not work, so Cejvan got upset after the last exam of genetics. This should have been according to the witnesses on 9 or April 10th. Furthermore Ibrahim had told him that she and Cejvan had spoken to each other that evening the 14th of April 2015 outside the yard of Guido's . According to him, the aim was that Ibrahim did not really want something with Cejvan.

After Cejvan had learned that Ibrahim had started a relationship with witness Ordaz, Cejvan had told him that Ibrahim had to be careful, because of what happened to Kavya.

Source: PV (Judicial report) witness examination M. Ordaz 201511201106.Ordaz Annex 20

Source: PV (judicial report) witness examination M. Ordaz 20150622.1705 Appendix 21

Source PV questioning witness Mr. Ordaz 2015004981          attachment e 22

**Witness J. Lewis:**

On May 14 2015, the witness  Dr. James  was heard. Lewis said that Ibrahim had told him that she had had a brief relationship with Senad Cejvan. Once this relationship was broken, she had a relationship with Mauricio Ordaz. Cejvan knew nothing of this relationship untill Saturday, May 9th 2015. That night Ibrahim slept in the room of Ordaz. When they left together about 12.15 pm the room, they met Cejvan. Apparently  Cejvan  became very emotional . He indicated that he did not want to see this and he had shown clearly  that he was pretty upset.

Source: PV witness examination J. Lewis 20150514.1500           Appendix 23..

The investigation has shown that S. Cejvan  had little contact with others on Saba.. He behaved often aloof and would be in certain situations obsessed in women. To our knowledge he has had in addition to the brief relationship with F. Ibrahim, no (sexual) relationship with a woman on Saba. During his altercation with Ibrahim in the late evening on April 14, 2015, he also responded offended. Cannot be excluded  that this may have  influenced his behavior, later that evening / night.

**DEPARTURE CEJVAN SABA**

On May 9, 2015 is another investigation launched under the name "Palm Island". That investigation was launched in response to a declaration of defamation (written) by the before mentioned student F. Ibrahim. She explained that there are several emails and messages were circulated among a large number of the Medical School students, reason why  her honor and reputation were affected. Senad Cejvan in the case Palm Island  is considered a suspect.

The assumption of several students that Cejvan was responsible for sending these emails and messages, was for the Medical School school enough to suspend him on May 15, 2015. As a result of this suspension, the residence status of Cejvan lapsed on Saba. This Cejvan has been canceled and notified by the Immigration and Naturalization Service, he had to leave the Saba within four weeks.

According to information of the Border Management System of the Royal Military Police revealed later that Cejvan on May 20, 2015 had left by plane from  Saba to St Maarten and then to Miami, United States.

The investigation did not reveal that Cejvan  had told someone about his departure from Saba .Misses S. Richardson , the owner of the apartment hired by Cejvan,  declared on May 18, 2015, that she herself had seen  Cejvan f on May 8, 2015 for  he had changed of apartment that day.  She also stated that she had looked into his apartment and that all his personal belongings were still there.

On Friday, June 5th, 2015 under the leadership of the supervisory judge, Mr. S. Sorton, a search conducted in the house of the suspect S. Cejvan at the address Sonia Richardson's apartments No. 2 room 3 at The Bottom of Saba. During this search were found several personal property in the said apartment, such as suitcases, clothing and others. The following goods were confiscated in the apartment, namely:

- 1 Electric toothbrush;

1 Toothbrush;

Razor in one container;

1 Hats / caps of the Nike brand.

Source: PV findings                20150529.1405 Appendix 24

Source: PV  findings                20150613.1600 Annex 25

Source: PV findings                20150609.1100 Annex 26

**CEJVAN REFUSES FURTHER COOPERATION:**

Through a legal assistance request on July 16 2015  it was tried to hear CEJVAN  in the United States. To that end, an appointment had been made with him that day  by phone  for further interrogation on the 17th July 2015. However that same day on July 17, 2015 the lawyer  of Cejvan named J. Allen, called with the announcement that Cejvan does not wish to cooperate  and does not want to give additional statement .

Source: PV  findings                                    20150929.0945 Annex 27

NFI RESEARCH   1st DNA RESEARCH

On the victim Guda on Saba  the medical examiner Dr. G.P.R. Koot in the presence of employees

of Forensic Investigation conducted a ( zedenkit) collective sexual  investigation. The samples are in this "zedenkit".and are subjected to  various DNA tests at the Dutch Forensic Institute (NFI).

The following samples were secured and sent to the NFI:

1. Outer labia

2. Inner labia

3. Deep vaginal

4. around  the anus

5. In the anus

6. Inside jaw of teeth + tongue base

 7. Inside of teeth upper jaw

8. Between of teeth and lip

9. Vertical ironing between teeth

In the samples 01 / m 05 semen was found. From the first DNA test a DNA profile was found in the samples 01 and 04, which matched the DNA profile of 0. Elkadry.

Note officer:

Should be noted that 0. Elkadry had a sexual relationship with Guda. On April 14, 2015 he, as he said himself, yet had sexual intercourse with Guda. The above is supported by statements from witnesses.

Source: NFI report ""zedenkit" research and DNA nr. 2015.04.20.021 Appendix No. 28.

(Request 002 and 003)


Y-chromosome DNA research

Upon the samples 02, 03 and 05 is a Y-chromosome DNA test was performed. Of the male component of the DNA in the sample 05 is a Y-chromosomal accumulated mixing profile was found. It is a DNA-head profile, and a DNA-derived secondary profile. The derived DNA profile head turned from an unknown man.

Source: NFI report Y-chromosomal DNA analysis, No. 2015.04.20.021 Appendix 29 (application 005).

**STATUS SENAD  CEJVAN  NAV DNA RESEARCH**

The outcome of the set Y-chromosomal DNA analysis DONE by the NFI in the sample 05 (from the sampling of the anus of the victim Guda) the investigation of a second or other suspect was reopened.

**DETERMINATION GEOGRAPHICAL ORIGIN DNA UNKNOWN MAN**

Following the results of Y-chromosomal DNA analysis a research was done on September 25th 2015 to the geographical origin of the main donors of the male cell material in the sample 05 (in the anus). From the sampling the so called haplotype could not been determined, but haplogroup could have been confirmed. It showed that the DNA head profile originates from **the south eastern  part of Europe** and will expand into Western Europe.

Note  officer:

Senad Cejvan is indeed living in the United States, but comes from Bosnia and

therefore, from the area of the geographical origin of the DNA profile head.

[Source: NFI report determining geographical origin No 2015.04.20.021 (application 013) 30 Appendix 1.


Comparing  Y-chromosome DNA test:

At the apartment of S. Cejvan Saba seized goods, including a toothbrush a DNA test has been performed by NFI t. From the DNA of the head of the toothbrush is an auto somaal and a Y-chromosomal DNA profile obtained from a man.

Comparative studies have shown, that the obtained Y-chromosomal DNA profile matches of the toothbrush with the derived Y-chromosomal DNA profile of the unknown man. (Derived from sampling 05 of the anus of the victim.).

A statistical evaluation of the outcome of the match found for the purpose of determining the probative primarily is not performed. If a reference sample of a person is available to which the Y-chromosomal DNA profile matches with the Y-chromosome DNA profiles of the above-mentioned 2 tracks (linked to the unknown man), then a such statistical evaluation will be still carried out..

Source: NFI report comparing Y-chromosomal DNA analysis, Appendix 31 No 2015.04.20.021 (request 016 and 017).

**POLICE POLICE INFORMATION USA**

On December 8, 2015 the American authorities provided the information (Police Police) that Senad Cejvan on September 23, 2015 had left via the airport of Chicago in the United States. The same day , according to the same information, Senad Cejvan arrived at the airport of London (England). Subsequently Senad Cejvan travelled from the airport of London to the airport of Warsaw (Poland), where he arrived on September 24, 2015. From that moment Senad Cejvan arrived in Poland it was not known if he has stayed in Poland or that he continues his journey to another country.

POLICE POLICE INFORMATION POLAND

On December 14, 2015 based on "police police" information the Polish authorities were asked to determine whether the accused Senad Cejvan stayed in Poland and, if so, whether he follows a course. On January 27, 2016 the message was received from Polish authorities that the accused Senad Cejvan since October 1, 2015 is a student at the Silesian Medical University, located at ul. Medykow 18 in Katowice (Poland). Furthermore, the Polish authorities indicated that Senad Cejvan should live in a student home at ul. Medykow 24, room number 412.

BLUE NOTICE INTERPOL (1)

Based on the above travel movements was the suspect Senad Cejvan, at our request, identified by Interpol through a so called "blue notice". The aim of this "blue notice" is Joel monitoring the travel movements of Senad Cejvan without notifying him here. On January 3, 2016 Senad Cejvan was checked at the border crossing in Stara Gradiska (Croatia). Apparently Senad Cejvan, as he himself has told, from Dabovice (Kotor Varos, Bosnia and Herzegovina), where he had visited his parents on their way to Poland where he studied. Senad Cejvan drove a car at this border crossing of the Nissan brand, type Note with the number plate GA5161W. The car turned out to be on the name of a Polish leasing company.

**RESEARCH  OPEN  SOURCES**

Based on the above mentioned  verification/control a survey  was carried out  on Monday, January 18th, 2016 on the Internet (open source). On the Internet search engine "Google" the following query was entered "Senad Cejvan Medical School  Poland". From the results of this inquiry, it emerged that a person called Senad Cejvan reports had "ge-liked" on a Facebook account from the Medical University of Silesia. Based on this information, a study was set up on the Facebook page of the Medical University. On this Facebook page a small amount of 100 photos were foundabout  an entrance examination at the university. On one of these pictures the accused Senad Cejvan was recognized.

**OTHER RESULTS DUTCH FORENSIC INSTITUTE**

As previously described in the anus of the victim K.L. Guda a DNA trace was found from a currently unknown man. This DNA trace was compared with the DNA profile obtained from a toothbrush  which was confiscated in the apartment of the suspect S. Cejvan . The DNA-profile coming out of the anus of the victim, and the DNA-derived profile of this toothbrush proved to match with each other.

Based on the above, there are additional studies by the Dutch Forensic Institute in The Hague conducted on the stretched sleeve of a jacket and the dress worn by the victim Guda. It is suspected that the (stretched) sleeve of the jacket has been used to stifle the Guda victim. Both the dress of the victim and on the cuff of the stretched sleeve of jacket DNA was found of the unknown man whose DNA profile matches the DNA profile from the head of the toothbrush out of the apartment of Senad Cejvan. The DNA profile of the unknown man in the dress of the Guda victim was classified by the Dutch Forensic Institute as a "sperm".


BLUE NOTICE INTERPOL (2)

Based on the aforementioned "Blue notice" from Interpol, the research team Hector was informed by the  US authorities on  Friday, June 24, 2016 about  the fact that the accused S. Cejvan had left the country Polenby now and through Germany (Frankfurt ) and Canada (Toronto) was heading for the St. Louis airport in the United States. I, officer,  have the strong suspicion that the accused S. Cejvan in St. Louis will visit his sister who is resident there . This sister was then residing at the 4409 Niagara Drive St. Louis (Missouri) 63129 United States of America.

CASE PALM ISLAND

The result of the investigation has shown that S. Cejvan had a short relationship with a fellow student F. Ibrahim. This relationship came to an end on the evening of the 14th to the 15th of April 2016 by means of a quarrel. When S.Cejvan came to find out on the 9th of May 2015, that Ibrahim had a relationship with  his roommate M. Ordaz, Ibrahim receives several defamation e-mails and messages  via her e-mail. Ibrahim filed a police report  of defamation. In one of these e-mails she was threatened with  explosive attacks on the house of the parents of Ibrahim in the U.S. of America.

Besides  during the period after she had filed a police report of defamation, several e-mails were sent from and to her. The messages were sent systematically  and spoiled her name , but were also offensive and contained vulgar language.

Reason why she filed a police report concerning offense.

In connection with these facts a separate investigation was started under the name "Palm Island".


**CASE BRAZILE**

On the 15th of May 2015 S. Ceyvan was heard as suspect in the case Palm Island. During this interrogation  Cejvan made use of his right to remain silent. During and short after this interrogation some of his data carriers were confiscated. One of these data carriers was a laptop of the brand Apple. An investigation made in the confiscated laptop has delivered  two photos  on which complete naked girl could be seen. This girl was clearly a minor child. Based on this the laptop was handed to the disposition of the department  Prevention Child pornography and child sex tourism of the police, unity Rotterdam. During the investigation on this laptop  a total amount of 9479 photos , under which plenty double images were found, on which the images of naked minor girls and boys appeared, whether they  were posing sexually or not with adult men and women. In total  it seems to be more than 600 unique photos. In connection with these findings the public prosecutor  A.E.M. DOEDENS had decided to start a separate investigation  under the name "Brazile".

**SUSPICION**

The above related facts and circumstances, there are now serious concerns that Senad Cejvan has committed the night of 14 on April 15, 2015 to:

**Murder, Article 302 of the Criminal Code BES, or;**

**Homicide, Article 300 of the Criminal Code BES, or;**

**(Heavy) assault (premeditated) and resulting in death, Article 313, 314, 315**

or 316 of the Criminal Code BES.
**In possession of child pornography , article 246 bis of the Criminal Code BES**
**defamation, article 273 Criminal Code BES**

**INTENTION DNA RESEARCH Cejvan**

seen from above, there are serious objections against Cejvan.

To further investigate the involvement of Cejvan, it is necessary,  to get a  DNA sample of him. From this DNA sample has a Y-chromosomal DNA profile to be manufactured, which is to be compared with the

head profile of the Y-chromosomal DNA mixed profile of the sampling ZAAC3088NL # 05-derived Y-chromosomal DNA profile of the unknown man.

**ATTACHMENTS**

Attachment  01   PV (judicial report) findings first pol appearance PD nr. 201504151700

Attachment  02   NFI report  preliminary findings autopsy K.L. GUDA, nr. 2015-097

Attachment  03   PV interrogation witness  S.Cejvan nr. 2015 04151245

Attachment  04   PV interrogation witness S.Cejvan, nr. 20150417 1530 GET/WITN

Attachment  05   PV  interrogation witness A  Thapa, nr. 2015(15th April 2015)

Attachment  06   PV interrogation witness A, Thapa  nr. 20150526. 1910

Attachment 07   PV interrogation  witness A, Thapa nr. 20150619 1600

Attachment  08  PV  findings, nr. 20150613 1430

Attachment 09  PV interrogation A. Thapa, nr. 201506121300. Thapa

Attachment 10  PV interrogation witness E.K.Ogbomo, nr. 20150502. 1020.202

Attachment 11  PV findings, route and place indication, witness Ogbomo, nr. 20150519.11 00

Attachment  12   PV interrogation witness J. C. Victor Rombley, nr. 20150505.16 10202

Attachment  13  PV findings, nr. 20150525.0930

Attachment 14. PV interrogation witness M. Ordaz, nr. 2015 11201106.Ordaz

Attachment  15  PV TCI 29/2015

Attachment  16  PV findings, nr. 2015 1123. 1200 AMB

Attachment  17  PV police report F.Ibrahim (case Palm Island), nr. 201500 4981

Attachment  18  PV  findings, nr. 201505281900. AMB

Attachment  19  PV interrogation B. SHAFFER, nr. 201511191102. Shaffer

Attachment  20  PV interrogation M. Ordaz, nr. 201511201106. Ordaz

Attachment  21  PV interrogation witness M. Ordaz, nr. 20150622. 1705

Attachment  22  PV interrogation witness M. Ordaz, nr 2015004981

Attachment  23  PV interrogation witness J. Lewis

Attachment 24  PV  findings, nr. 20150529. 1405

Attachment  25  PV findings nr 20150613.1600

Attachment 26  PV findings, nr. 20150609.1100

Attachment   27  pv FINDINGS, NR. 20150929. 0945

Attachment  28   NFI report investigation (zedenkit) DNA, nr. 2015.04.20.021 request 002 and 003

Attachment  29   NFI report Y chromosomal  DNA investigation, nr. 2015.04.20.021 request 005

Attachment  30   NFI report  determination of geographical origin nr. 2015.04.20.021 request 013

Attachment  31   NFI report comparative y chromosomal DNA investigation, nr. 2015.0.20. 021 request 016 and 017

Which by us is made this official report on oath and office promise that we concluded and signed in Rotterdam on the 28th of June 2016.

The  Police Officers,

**Dhr. Glenn M. Albertina**
Beëdigde Tolk & Juridisch Vertaler
(Ned-Eng/Ned-Spa) Civiele- en Strafzaken

Adres: Kaya Hulanda 36          Tel: (+599) 717-6460
Kralendijk, Bonaire              Cel: (+5999) 563-5735
Email: g.albertina@flamingotv.net    Fax:(+599) 717-6460

15

25/00-2016

**PRO   –   JUSTITIA**

**Caribbean  Netherlands  Police  Force**

**Dhr. Glenn M. Albertina**
Beëdigde Tolk & Juridisch Vertaler
(Ned-Eng/Ned-Spa) Civiele/en Strafzaken

Adres: Kaya Hulanda 36
Kralendijk, Bonaire
Email: g.albertina@flamingotv.net

Tel: (+599) 717-6460
Cel: (+5999) 563-5735
Fax:(+599) 717-6460

## Continued  Judicial  Report  of suspicion (serious objections)

| | | |
|---|---|---|
| **Official  report  number** | : | 201606271153. AMB |
| Investigation | : | Hector |
| Subject | : | Serious concerns versus  suspect  S. Cejvan |
| Officer | : | Robert den Hollander,  superintendent of the National Police Unit Rotterdam, temporarily employed by the Police Corps Caribbean Netherlands, Department of Specific Direct Investigation |

### JUDICIAL  REPORT

On the 24th of November , 2015  G. J. Kapsenberg,  Superintendent of Police , made up a Judicial report , of suspicion (serious concerns)  with the number  23112015 1645. AMB (serious concerns) against the defendant:

| | | |
|---|---|---|
| Name | : | **CeJVAN** |
| First Name | : | **Senad** |
| Date of Birth | : | July 20, 1985  : |
| Country of origin | : | Former Yugoslavia |
| Adress | : | unknown |
| Location | : | Unknown |
| Nationality | : | Bosnia-Herzegovina |

*ORIGINAL*

In sequel of the above mentioned Judicial report of suspicion, I , officer, declare the following:

SUSPICION BEING IN POSSESSION CHILD   PORNOGRAPHY

On May 15, 2015 S. Cejvan was heard in the case of Palm Island heard as a suspect. During this hearing S. Cejvan used his right to remain silent. During and shortly after this hearing, a number of data carriers of the accused S. Cejvan were confiscated (seized). One of these data carriers was a laptop of the Apple brand.

An investigation among the seized laptop yielded two photographs on which you could have seen a g a completely naked young girl . This girl was obviously underage. After this a copy of the confiscated laptop was provided to the Department of Combating Child Pornography and Child sex tourism of the Police , Unit Rotterdam. During the investigation on this laptop, a total of 9479 photographs, including many duplicate images, were found on which appeared the images of naked minor boys and girls with or without sexual poses with adult men and women. In total it resulted to be more than 600 unique pictures. In connection with these findings, the Public Prosecutor Mr. E.A.M. Doedens had taken the decision due to this to start a separate investigation under the case name of BRAZILE .

**POLICE  - POLICE INFORMATION USA**

On December 8, 2015, the US authorities provided the information (Police Police) that Senad Cejvan on September 23, 2015 had left through the Chicago airport in the United States. The same day came, according to the same information, Senad Cejvan to the London (England) Airport. Subsequently Senad Cejvan traveled from London City Airport to Warsaw Airport (Poland), where he arrived on September 24, 2015. From the moment Senad Cejvan arrived in Poland it was not known at that time if he has stayed in Poland or that he traveled to another country.

**POLICE   POLICE INFORMATION POLAND**

On December 14, 2015 based on "polifie police" information the Polish authorities were requested to ascertain whether the suspect Senad Cejvan stayed in Poland and, if so, whether he is following a course. On January 27, 2016 a message was received from the Polish authorities that the accused Senad Cejvan is a student since October 1, 2015 at the Silesian Medical University, located at ul. Medykow 18 in Katowice (Poland). Furthermore, the Polish authorities indicated that Senad Cejvan should live in a dorm at ul. Medykow 24, room number 412.

**BLUE NOTICE INTERPOL (1)**

Based on the the above travel movements was the suspect Senad Cejvan, at our request, identified by Interpol through a so called "blue notice". This "blue notice" was / is intended to monitor the travel moments of Senad Cejvan without notify him. On January 3, 2016 Senad Cejvan was checked at the border crossing Stara Gradiska (Croatia). Apparently Senad Cejvan, as he himself had said, came from Dabovice (Kotor Varos, Bosnia and Herzegovina), where he had visited his parents on hi way to Poles where he studied. Senad Cejvan drove at this border a family car of the brand Nissan, type Notas with the number plate GA5161W. This car resulted to be on the name of a Polish leasing company.

**Dhr. Glenn M. Albertina**
Beëdigde Tolk & Juridisch Vertaler
(Ned-Eng/Ned-Spa) Civiele-/en Strafzaken
Adres: Kaya Hulanda 36
Tel: (+599) 717-6460
Cel: (+5999) 563-5735
Fax:(+599) 717-6460

ORIGINAL

**RESEARCH OPEN SOURCES**

Based on the above mentioned control an investigation was made on Monday the 18th 2016 on the internet (open sources In the survey machine of the Internet "Google" the following query was entered "Senad Cejvan Medical School Poland". The results of this inquiry, emerged that a person called Senad Cejvan reports had "ge-liked" on Facebook account of the Medical University of Silesia. Based on the this information an inquiry was made on the Facebook page of this Medical University. On this Facebook page were some 100 pictures found of a exam at this university. On one of these pictures was the suspect Senad Cejvan was recognized.

**OTHER RESULTS DUTCH FORENSIC INSTITUTE**

As mentioned before in the Judicial Report registered with the document code 231120151645. AMB (Judicial report of suspicion (serious objections)) a DNA trace had been found into the anus of the victim KL Guda of a currently unknown man. This DNA trace was compared with the DNA profile obtained from a toothbrush which was confiscated in the apartment of the suspect S. Cejvan . The DNA-profile coming out of the anus of the victim and the DNA profile from this toothbrush matched with each other. Based on the above mentioned the Dutch Forensic Institute in the Hague had done additional investigations /studies on the stretched sleeve of a jacket and the dress worn by the victim Guda. It is suspected that the (stretched) sleeve of the jacket is used to strangulate the victim Guda . On the dress of the victim as well and on the cuff of the stretched sleeve of jacket DNA was found of the unknown man whose profile matches the head of the toothbrush which came out of the apartment of Senad Cejvan. The DNA profile of the unknown man on the dress of the victim Guda had been classified by the Dutch Forensic Institute as "sperms".

**BLUE NOTICE INTERPOL (2)**

Based on the aforementioned "Blue notice to Interpol, the research team Hector was informed on Friday, June 24th, 2016 by the US authorities of the fact that the suspect S.Cejvan meanwhile had left Poland and is on his way through Germany (Frankfurt) and Canada (Toronto) heading for the St. Louis airport in the United States of America. I, officer, have the strong suspicion that the accused S. Cejvan will go to visit his sister in St. Louis who is resident there.. This sister was that time living at the 4409 Niagara Drive St. Louis (Missouri) 63129 in the United States of America.

Which by me is made this official report on oath and office promise that concluded and signed on June 28, 2016 at Rotterdam.

The officer,

R. den Hollander

legal office promise

Dhr. Glenn M. Albertina
Beëdigde Tolk & Juridisch Vertaler
(Ned-Eng/Ned-Spa) Civiele- en Strafzaken
Adres: Kaya Hulanda 36
Kralendijk, Bonaire
Emall: g.albertina@flamingotv.net
Tel: (+599) 717-6460
Cel: (+5999) 563-5735
Fax:(+599) 717-6460

ORIGINAL

Appendix 1

**P R O – J U S T I T I A**
**Police Force of Caribbean Netherlands**

## Official Police Report on Findings first Investigation Crime Scene

| | |
|---|---|
| Act Police Number | :. |
| Official Police Report Number | : 201504151700 |
| Code of Document | : DOC_201504151700.BEV |
| Investigation | : HECTOR |
| | |
| Concerning | : General Overview of the first criminal investigations on crime scene |
| | |
| Prosecution Number | : [ ] |
| RC-Number | : [ ] |
| | |
| Reporting Officers | : **William DE BOER**, top sergeant of the Royal Dutch Military Police and **Gregory Felomeno Jonathan LA CROES**, Police Officer, both working at the Police Force Caribbean Netherlands, stationed at the basic law enforcement services in  Saba; |

## OFFICIAL REPORT

We, the Police Officers, **William de BOER**, top sergeant of the Royal Dutch Military Police and **Gregory LA CROES**, Police Officer, both working at the Police Force Caribbean Netherlands, stationed at the basic law enforcement services following give the following statement:

*Note of the reporting officer de BOER:*
-   The actions are rendered in chronological order as much as possible.

## REASON FOR INVESTIGATION

On Tuesday, April 15, 2015 at approximately 11:08 hours, a call came in at the Saba Police Station from the telephone number 416 3737 of an unknown woman who reported that a dead woman was found in an apartment building of Ian George, located at #6, Clement Sorton Street in the BOTTOM.
After this, the police patrol was first dispatched to the scene. The police patrol consisted of the police officers Giromus and Melaan. In addition, the Assistant Prosecutor, who is also the  Prosecutor on call, the Chief of Police W.E.H. BAKER went to the scene. The police patrol and the medical examiner at the scene, Dr. G. KOOT, established that a lifeless body was lying in an apartment in the Clement Sorton Street.

A separate official report was drawn up of the findings at the scene.
Source: Official Report Findings 20150416.0920.052
Source: Official Report Findings 201504161350

## Investigation process

**First Investigation home**
**First measure crime scene**

On Wednesday, April 15, 2015, at approximately 11:15 hours, I the reporting officer, de BOER together with the reporting officer LA CROES, entered the residence and examined it more closely. We, the reporting officers, looked around. At that moment I noticed that the medical examiner, Mr. KOOT and the head nurse, N. WILSON, were already in the residence.

Appendix 1

I, the reporting officer, **LA CROES**, took the following actions at the scene of the crime.

- Photographically recording of the entrance to the residence
- Photographically recording of number of the apartment
- Photographically recording of the situation inside the residence
- Photographically recording of how the situation was inside the bedroom
- I photographically recording of how I, the reporting officer, found the dead body on the bed inside the bedroom *(the dead body was lying on her stomach)*
- Photographically recording of an injury on the left wrist of the dead body
- Together with the medical examiner, we turned over the dead body
- I, the reporting officer, saw several corpse stains on the front of the dead body
- On the upper body there were more corpse stains on the dead body
- Photographically recording of the front of the dead body
- Photographically recording of the two (2) texts on the mirror in the bed-room
- After I, the reporting officer, confiscated the dead body, I put a label on the left thumb of the dead body together with the medical examiner.

I, the reporting officer, **DE BOER** made the following observations:

- The residence is located on the first floor of the apartment building;
- The residence can be reached by a staircase at the front of the road;
- The residence consists of a living room and an open kitchen.
- In addition, the residence has an adjacent bed-room with a toilet and a shower.
- The residence has one (1) entrance door.
- The victim was lying on her stomach on her bed in the bed-room.
- The victim was lying with her head towards the pillow end.
- Her head was lying downwards on the bed, with her face down.
- Both arms of the victim were lying partly next to the body and were lying bent on her back.
- The victim was wearing a dress with a flowery design; this dress covered her upper body. Her lower body was naked and the victim did not have on any underwear;
- There were no visual traces of violence visible on the body of the victim.
- Her upper body displayed several corpse stains.
- There was a tiny (possibly an older) injury visible on the left wrist of the body.
- There were no blood traces visible.
- No indication that the bed-room, living room and kitchen had been searched.
- No indication that items or furniture had been misplaced and/or moved in the residence.
- No visible signs of house breaking at the door nor at the windows.
- The windows were not locked; these windows were slightly open.
- On the outside of the windows there were mosquito frames.
- The light in the bedroom was on.
- The air-conditioning was on.
- A table fan in the living room was on.
- The other areas in the residence: bathroom, living room and kitchen were obviously not searched.
- In the living room, there was unopened mail on a desk.
- In the residence, there were several valuable items, such as two (2) phones, one I-pad, a purse, a laptop with an external hard-drive.
- On the desk in the living room, next to her schoolbag, there was a purse and a black taser (stun gun).
- At first sight no medication was found.

*General impression*
The entrance to the residence was by a staircase which came out on the first floor of the apartment building. The residence is only accessible by these stairs. Obviously, the residence was not searched. The valuable items such as the two (2) telephones, an I-pad and a laptop were still in the residence. The

closets were not ransacked. The residence had a rather neat impression.
The victim was lying on her bed, in a sleeping position, on her stomach with her arms bent on her back.

*Comments reporting officer* **de BOER:**
The scene of the crime and the victim were visually examined by the assistant forensic investigator LA CROES and photographs were made of the items found.

The medical examiner KOOT conducted a preliminary medical examination at the scene. During this examination the medical examiner turned the victim around. It is possible that the medical examiner had done this before when he found the dead body.

The preliminary finding of the doctor was a natural death, no visual traces of violence were found on the dead body.

On Wednesday, April 15, 2015 at 11:45 hours, the Assistant Public Prosecutor, W.E.H. BAKER confiscated the dead body.

The secured items were confiscated by the Assistant Public Prosecutor W.E. BAKER and taken to the police station.

The items were confiscated pursuant to Article 122 of the Code of Criminal Procedure.

Seeing that telephone communication was not possible and there was an urgency, since it was known that the medical students were leaving Saba and the action of the investigating judge and the Public Prosecutor could not be awaited, the Assistant Public Prosecutor confiscated the items.

Of this, a separate official report was drawn up.

*Source: KVI IBN Items*
*Source: Official Report Confiscation items in residence.*

## **Actions mortal remains**

On Wednesday, April 15, 2015 at 11:45 hours, the Assistant Public Prosecutor, W.E.H. BAKER confiscated the dead body.

On Wednesday, April 15, 2015 at 11:55 hours, the Assistant Public Prosecutor W.E.H. BAKER gave permission to transfer the dead body from #6, Clement Sorton Street to the local hospital in THE BOTTOM.

On Wednesday, April 15, 2015 at approximately 11:55 hours, the ambulance arrived on site.

On Wednesday, April 15, 2015 at approximately 11:56 hours, four (4) staff members of the ambulance service entered the scene of the crime.

On Wednesday, April 15, 2015 at about 12:00 hours, the mortal remains were recovered and transferred to the hospital morgue in THE BOTTOM, where the body arrived at approximately 12:15 hours. Immediately thereafter, the clothing of the deceased was removed with the help of the nurses Naomi Wilson and Lisette Riley. The clothing was seized by the sergeant first class of the Royal Dutch Military Police, B. PLESSIUS.

On Wednesday, April 15, 2015 at approximately 12:45 hours, the morgue was locked and the keys were handed over to me, the reporting officer, LA CROES. This took place in consultation by phone with senior colleague F.O. ABDUL and the medical examiner Dr. G. KOOT.

Appendix 1

On Wednesday, April 15, 2015 at approximately 15:00 hours, I, the reporting officer LA CROES, consulted by telephone the colleague of the forensic police, inspector M.O. ABDUL, concerning any further action of the dead body. It was then decided to preserve the mortal remains in the refrigeration until the arrival of the forensic police on Saba.

**Confirmation Identity of victim**
It appeared from the investigation that the victim is:

<u>**Kavya Lekha GUDA**</u>
Born in India on February 12, 1991
Residing at #6, Clement Sorton Street, The Bottom, Saba, Caribbean Netherlands.

The victim is a US Citizen.
Her family is residing in the United States of America.
44450 Cavisson CT, Fremont California, United States of America.
Telephone No. 510-468-94539

*Source: witnesses' statements*
*Source: copy passport*
*Source: administration data from Saba University*

Whereof this official report was drawn up by us under oath of office, which we concluded and signed on April 15, 2015 in Saba.

The reporting officers,

**W. DE BOER**
(promise)
Signed *(Signature Illegible)*

**G.F.J. LA CROES**
(oath)
Signed *(Signature Illegible)*



•••••••••••••••••••••••••••••••••••••••••••••••
*Official and True Translation into English of original Dutch document*
*(Official Report Hector Appendix 1)*
*Drs. L. A. Richardson, sworn translator*
*St. Maarten, 14 September 2016*



**Appendix 2**

Radiology Department          H.M. de Bakker          V. Niehe
Bleulandweg #10               H.M.D. Beekhuis          M.C.P. van Oerie
2803 HH Gouda                 S.I. Duraku              Prof. Dr. P.M.T. Pattynama
Tel.: 0182-505015             A.D. van Engelen         J.W.I. Peeters
Fax.: 0182-505538             Y. Karamermer            M. Stam
E-mail:radiologie@ghz.nl      Dr. M.R. Meijerink       B.H. Tania

To:     The Honorable Mrs.
        V. Soerdjbalie-Maikoe, Forensic pathologist
        Netherlands Forensic Institute
        Postbox 24044
        2490 AA The Hague                                Date Investigation: 20-04-2015


Patient data:
015-097..............

PIN:
Date of Birth: 20-04-2015, Unknown

**Investigation(s):**      CT  NFI head/neck
                           CT  NFI total body romp
                           CT  NFI total body pelvis/legs


**Clinical data**:


**Questions:**


**Report:**
CT skull: around the skull and towards the face no indication of soft tissue swelling. The bone setting shows an intact skull cap. No fracture. Also towards the face there is no indication of fracture. In all sinuses liquid surface can be seen. The parenchyma setting displays diffuse swelling of the brain. (Edema). No indication for intracranial or intraparenchymatous bleeding. No corpus alienum.(foreign body)

CT CWK: the cervical vertebra are standing in line normally. No fracture. Also the hyoid bone is intact. See for further assessment the radiological investigation of the thyroid - hyoid bone explant. Postmortem gas formation in the spinal canal.

CT Thorax: the bone setting shows normal aspect of the thoracal vertebrae. The ribs are intact. There is no suspicion of fracture.
The lung setting shows normally developed lungs. No indication of pneumothorax. On both sides the lung parenchyma shows extensive alveolar consolidations, which match edema very well. Extensive air borne figures are visibly located intra-cardially, ventrally. Little pleura liquid on both sides. No corpa aliena. (foreign bodies)

1

**Appendix 2**

Radiology Department
Bleulandweg #10
2803 HH Gouda
Tel.: 0182-505015
Fax.: 0182-505538
E-mail:radiologie@ghz.nl

H.M. de Bakker
H.M.D. Beekhuis
S.I. Duraku
A.D. van Engelen
Y. Karamermer
Dr. M.R. Meijerink

V. Niehe
M.C.P. van Oerie
Prof. Dr. P.M.T. Pattynama
J.W.I. Peeters
M. Stam
B.H. Tania

CT Abdomen: postmortem gas formation intra-abdominal, namely also in the liver vessels and equally inter- and para-spinal and also rather extended in the long back muscles, particularly caudal. There are no other particulars on the organs. No fluid in the stomach. No corpus alienum. (foreign body)

CT pelvis: pelvis skeleton is intact.

CT upper extremity on both sides: intact ossal structures.

CT lower extremity on both sides: small condensation island in the left femur cap. There were no further particulars on ossal structures.

Yours Sincerely,

H.M. Bakker de, Radiologist
Ext. 5270
Henri.de.Bakker@ghz.nl
Textually approved: H.M. Bakker de, 29-04-2015, 11:24

End of report

**Appendix 2**

Radiology Department
Bleulandweg #10
2803 HH Gouda
Tel.: 0182-505015
Fax.: 0182-505538
E-mail:radiologie@ghz.nl

H.M. de Bakker
H.M.D. Beekhuis
S.I. Duraku
A.D. van Engelen
Y. Karamermer
Dr. M.R. Meijerink

V. Niehe
M.C.P. van Oerle
Prof. Dr. P.M.T. Pattynama
J.W.I. Peeters
M. Stam
B.H. Tania

To:     The Honorable Mrs.
        V. Soerdjbalie-Maikoe, Forensic pathologist
        Netherlands Forensic Institute
        Postbox 24044
        2490 AA The Hague                              Date Investigation: 26-04-2015

Patient data:
015-097..............

PIN: D9000040115  BSN:
Date of Birth: 20-04-2015 Unknown

**Investigation(s):**        CT  NFI os hyoid

**Clinical data**:

**Questions:**

**Report:**
See report of the conventional photo's.

Yours Sincerely,

H.M. Bakker de, Radiologist
Ext. 5270
Henri.de.Bakker@ghz.nl
Textually approved: H.M. Bakker de, 29-04-2015, 11:24

End of report

3

**Appendix 2**

Radiology Department
Bleulandweg #10
2803 HH Gouda
Tel.: 0182-505015
Fax.: 0182-505538
E-mail:radiologie@ghz.nl

H.M. de Bakker
H.M.D. Beekhuis
S.I. Duraku
A.D. van Engelen
Y. Karamermer
Dr. M.R. Meijerink

V. Niehe
M.C.P. van Oerie
Prof. Dr. P.M.T. Pattynama
J.W.I. Peeters
M. Stam
B.H. Tania

To:     The Honorable Mrs.
        V. Soerdjbalie-Maikoe, Forensic pathologist
        Netherlands Forensic Institute
        Postbox 24044
        2490 AA The Hague                                   Date Investigation: 26-04-2015

Patient data:
015-097.............
PIN: D9000040115  BSN:
Date of Birth: 20-04-2015 Unknown

**Investigation(s):**     Os Hyoid for NFI (Netherlands Forensic Institute)

**Clinical data:**
**Questions:**

**Report:**
Radiological investigation of hyoid bone – thyroid in Gouda Hospital.

Report:
The removed thyroid was photographed in eight projection directions. At the same time, a CT was made
There is a physiological joint between corpus and cornu majus of the hyoid bone. The cornu minus on
the right is missing in the preparation. Intact osseous structures without any indication of a fracture.

The thyroid near the cornu superius on both sides is calcified rather crumbly. This makes reliable
fracture diagnostics almost impossible. In addition, ligamentous calcification left ventricle of cornu
superius.

Yours Sincerely,

H.M. Bakker de, Radiologist
Ext. 5270
Henri.de.Bakker@ghz.nl
Textually approved: H.M. Bakker de, 29-04-2015, 11:36

End of report

*Official and True Translation of Dutch Radiological report*
*Drs. L. A. Richardson, sworn translator.*
*St. Maarten, 16 September 2016*





4

# Appendix 2

## VUmc

Department of Pathology
Head Prof. Dr. G. A. Meijer
Mailbox 7057, 1007 ME Amsterdam
Telephone: (020) 444 4097/4078
Fax:          (020) 444 4586

**TFI15-6504**

NFI DIAGNOSIS
Name:  Nfi S15-97, X

---

### AUTHORISED REPORT

| | | | |
|---|---|---|---|
| Name | : NFI  S15-97, X. | Applicant | :  *(US)* |
| Date of Birth | : 12-02-1991 (24 years old) | Department | : ELGP |
| Gender | : Female | | |
| Address | : Pathology | **Application Date:** | |
| Pace of Residence | : | Date receipt | : 22-04-2015 |
| Patient Number | : 9947133 | Date response | : 08-05-2015 |
| | | BSN | : Not issued |

---

### CLINICAL DATA:

**Macroscopy**
*Macro*

| | |
|---|---|
| NFI case Number | : 2015.04.20.021 |
| NFI autopsy number | : S15 -97 |
| Date of Birth | : 12-02-1991 |
| Age | : 24 years old |
| Gender | : Female |
| Date of Death | : probably 15-04-2015 |
| Date autopsy | : 21-04-2015 |
| Date receipt material VU: 22-04-2015 | |
| Postmortem changes | : moderate/strong |
| Other information | : found dead in residence in Saba |

| CAS | Lesion | Localization | Nature violence | Age |
|---|---|---|---|---|
| B PM? | Red HV | Neck R | Punch | Age of wound? |
| D PM? | Brownish purple HV | Sideways L thigh | Punch | Age of wound? |
| E PM | Strip/band shaped HV red | Inner side L forearm | Punch | Age of wound? |
| C | Control | Stomach | | |

**Microscopy:**
*Micro*

# **Appendix 2**

## **VUmc**

Department of Pathology

Head Prof. Dr. G. A. Meijer

Mailbox 7057, 1007 ME Amsterdam

Telephone: (020) 444 4097/4078

Fax:       (020) 444 4586

**TFI15-6504**

NFI DIAGNOSIS

**Name: Nfi S15-97, X**

*Microscopic Description:*

Casette B:   Skin with high dermal extravasation of erythrocytes without PMN.

Casette D:   Skin with mid dermal extravasation of erythrocytes without PMN.

Casette E:   Skin with focal extravasation of erythrocytes without PMN, high dermal.

Casette C:   Skin without abnormalities.

*Immunohistochemical description:*

|       | Casette | | | |
|-------|---|-----|------|---|
|       | B | D   | E    | C |
| F8    | 0 | 0   | f1/2 | 0 |
| Fibr  | 1 | ½   | ½    | 0 |
| CD62p | 1 | 0   | f1   | 1 |
| MPO   | 0 | 0   | 0    | 0 |
| MIP-1 | 0 | 0   | 0    | 0 |
| CD-45 | 0 | ½   | 0    | 0 |
| CD68  | 0 | ½   | 0    | 0 |
| Fe    | 0 | ½   | 0    | 0 |

CD45/CD68, coupe D. diffuse increase of CD45/CD68 in the dermis not specifically related to the extravasation of erythrocytes.

*F8 (Factor 8), Fibr (fibronectin).*

1 = minor positive staining in extravasate of erythrocytes

2= moderate positive staining in extravasate of erythrocytes

3= strong positive staining in extravasate of erythrocytes

*CD62p*

1=CD62p positive material in lumen vessels

2-minor/moderate CD62p positivity in extravasate of erythrocytes

3=strong CD62p positivity in extravasate of erythrocytes

*CD62e*

1=staining of CD62e in the endothelium

2=staining of CD62e in extravasate of erythrocytes.

*MPO (neutrophilic granulocytes), CD45 (lymphocytes, CD68; macrophages):*

1=minor blending/mixing MPO/CD45/CD68 in the area of extravasation of erythrocytes

2=moderate blending/mixing MPO/CD45/CD68 in the area of extravasation of erythrocytes

3=strong blending/mixing MPO/CD45/CD68 in the area of extravasation of erythrocytes

*MP-1 (the MPO positive cells)*

1-minor positivity of MPO cells for MIP-1

2=moderate positivity of MPO cells for MIP-1

3=minor positivity of MPO cells for MIP-1

**Appendix 2**

# VUmc

**TFI15-6504**

Department of Pathology

NFI DIAGNOSIS

Head Prof. Dr. G. A. Meijer

Name:  Nfi S15-97, X

Mailbox 7057, 1007 ME Amsterdam

Telephone: (020) 444 4097/4078

Fax:        (020) 444 4586

*Fe ferric stain:*

1 = minor positivity

2 = moderate positivity

3 = strong positivity

*Literature:*

*Already published articles on dating of injury (wound):*

GN Rutty (ed.), Essentials of Autopsy Practice, Chapter: The Chronical Dating of Injury; page 167-181.

Springer Report London Limited 2008.

Cecchi R.  Estimating wound age: looking into the future. Int J Legal Med. 2010; 124: 523-535.

van de Goot FR, Korkmaz HI, Fronczek J, Ulrich MMW, Begieneman MPV, Rozendaal R., Witte B., Krijnen PAJ.

Niessen HWM. A new method to determine wound age in early vital skin injuries; a probability scoring system using expression levels of Fibronectin, CD62p and Factor VIII in wound hemorrhage.

For Science International, 2014: 244: 128-135.

**Conclusion:**

Conclusion

Consult, NFI 15-97, dating of injury; skin biopsies:

Cassette D (sideways L, thigh) skin with a vital wound reaction of progressing ageing, one could think of a few days old, in view of the ferrous macrophages.

Casette E (inner side L forearm); skin with a questionable vital wound reaction.

Casette B (Neck R): skin without convincing features of a vital wound reaction.

Casette C (control, stomach): skin without abnormalities.

N3: No macroscopic photo of lesion D.

**Prof. Dr. HWM Niessen, pathologist, VU Medical Center, Amsterdam**

Place: Amsterdam

Date: 08-05-2015

Contact details:

Telephone: 020-4444003

Email:jwmniessen@vumc.nl

*Prof. Dr. J.W.M. Niessen  6705*   08-05-2015   13:50.00

**Translator Note: VUmc : VU University Medical Centre**

*Official and True Translation into English of VUmc Report Dutch*

*Drs. L. A. Richardson, sworn translator.*

*St. Maarten, 16 September2016*





Page 3 of 3

Appendix 2

(LOGO)
Netherlands Forensic Institute (NFI)
*Ministry of Security and Justice*

# Pathology study as a result
# of a possible unnatural death

May 20, 2015

Case Number              2015.04.20.021
Application Number        001
Autopsy Number            2015-097
                          Public Prosecutor's Office of Bonaire
                          Chief Public Prosecutor
                          H.J.E. Hambeukers, LL. M.

# Report

**Netherlands Forensic Institute**

Mailing Address
Mailbox 24044
2490 AA The Hague

Visiting Address
Laan van Ypenburg 6
2497 GB The Hague
Tel. (070) 888 66 66
Fax. (070) 888 65 55

www.forensischinstituut.nl

Appendix 2

## Case details

Case Number                  2015.04.20.021
Application Number           001
Autopsy Number               2015-097
Application Date             17 April 2015

IJ (Investigation Judge) Number          -
Prosecutor's office number   BES 0006/TR/15/5
Police registration number   2015.04.15=001

Deceased                     K.L. Guda

Processing of exhibits       Material that has not been transferred to another
of this (partial) examination   department of the Dutch Forensic Institute, will be
                             preserved.

Other information

Copy to                      Police Force of Bonaire, M. C. Abdul

Appendix(es)                 Appendix 1: External and internal examination
                             Appendix 2: Report Post-mortem radiological
                             Examination (total body CT scan) Groene Hart Hospital
                             in Gouda (H.M. de Bakker, radiologist).
                             Appendix 3: Report CT-scan larynx-hyoid explant
                             Groene Hart Hospital in Gouda (H.M. de Bakker, radiologist).
                             Appendix 4: Report examination wound dating VUMC
                             Amsterdam (Prof. Dr. J.W.M. Niessen, pathologist).

General Information          Tel: (070) 888 68 88
Detailed information         Secretariat Medical Forensic Research
                             Tel: (070) 888 69 08

                             Dr. V. Soerdjbalie-Maikoe
                             Physician and Pathologist

Appendix 2

1.       Deceased

|  |  |
|---|---|
| Received from | Police Force Caribbean Netherlands |
| Date receipt | 21 April, 2015 |

|  |  |
|---|---|
| Full Name | Kavya Lekha GUDA |
| Date of Birth | February 12th, 1991 |
| Place of Birth | India |

The deceased was found dead in Saba at #6, Clement Sorton Street in apartment # 1, on April 15, 2015, exact time unknown.
The body was shown to me and then handed over by Mrs. M.L. van der Heiden of the Police Force Caribbean Netherlands and after examination was returned to her.


2.       Information obtained

According to the reporting officer, the body of K.L. GUDA, 24 years old, would have been found in the apartment she resided in on Saba. She would have been a medical student and moved from India to Saba for her studies. She would have been found in the prone position in bed, with the lower body part naked, with the arms a somewhat positioned towards the back and her face in the pillow.  No injuries were visible during the external examination. However, on account of the manner in which the body was found and not being able to indicate a natural death, the coroner advised to conduct a judicial autopsy, which was also ordered by the public prosecutor in Caribbean Netherlands. The body was transported to the Netherlands and 6 days later the autopsy was carried out.

3.       Question

At the request of the Public Prosecutor in Kralendijk (Bonaire), the cause of death was investigated as well as any other matter that may be of interest.


4.       Research

See appendix 1.


5.       Results

The complete findings of the external and internal examination are represented in appendix 1; below please find a **summary**:

While conducting the autopsy on the body of K.L. Guda, born on February 12, 1991, the following was found:

A. **Externally and internally:**

1. The day prior to the autopsy, a post-mortem radiological examination (total-body CT scan) was conducted in the Groene Hart Hospital in Gouda. You will receive a report thereof as appendix 2 (H.M. de Bakker, radiologist). According to the radiologist no fractures were found on the bone-structure. There were changes in the brains and lungs, corresponding to fluid accumulation (edema), see also under A16. In addition, from a radiological perspective, there were liquid levels in all cavities (sinus) of the face, post mortem gas formation in the vertebral column, air collections in the heart and in the chest cavities, gas accumulation in the abdominal cavity, liver and muscles of the vertebral column, that match post mortem changes. From a radiological perspective, there was a small dense islet in the left femoral head (left head upper leg). During the autopsy, in this area nothing particular was found on the skin and soft tissues on this level.

2. At the time of the autopsy DNA samples were secured (according to the reporting officer, DNA sampling would have already been conducted in Saba, but it was not clear in which manner and which areas samples were taken from).

3. During the autopsy the corpse of a woman was examined.

4. The nails were recently cut short and in connection with that there was a superficial damage of 0.6 cm long to the cuticle of the left pinky.

5. There were no injuries to the genitals. The hymen still had a thin skin left. The opening of the vagina was dilated. There was some bloody moisture on the labia majora and the endometrium was bloody. During a light microscopic examination there were no indications of pregnancy. In order to exclude or indicate an early pregnancy (which does not show any visible changes with a light microscopy), the results of the biochemical research on pregnancy hormones have to be awaited. After its completion, the findings will be provided in the report of the toxicological examination (under B).

6. The anus was dilated. There were no injuries to the anus.

7. There was little rigor mortis to the lower limbs. There was no rigor mortis to the jawbone muscles and the arms. There were red and purple corpse stains on the body, upwards, sideways, and locally forward (on the face, the neck and the chest high. The corpse stains (vibices) had several pointed changes in them. There were pointed changes on the left temple muscle (post mortem phenomenon).

8. In the conjunctiva of the eyelids, above and beneath on both sides, there were large bruises (ecchymoses) and many pinpoint bruises (petechiae).

9. On the flexor side of the left forearm there was a band-shaped imprint with a pale center. The imprint was about 0.8 cm wide and maximally about 4 cm long. Its borders were red and upon incision, there was no convincing hemorrhage, but a bit of redness. Samples were taken for the wound dating research in cassette E. See for reporting thereof appendix 4 (Prof. Dr. J.,W.M. Niessen, VUMC Amsterdam). According to this expert, it had to do with a piece of skin with a questionable vital wound reaction.

10. On the neck, a bit to the right of the center, at 142 cm from the foot soles and 3 cm right from the center, there was a red skin discoloration of 0.5x0.3 cm, which showed a hemorrhage (confirmed after making an incision). Samples were taken for the wound dating research in cassette E. See for reporting thereof appendix 4 (Prof. Dr. J.,W.M. Niessen, VUMC Amsterdam). According to this expert, this had to do with a piece of skin without convincing features of a vital wound reaction.

11. Neck: *Externally there were no injuries on the neck.*
    Internally, in the neck there were various scattered hematomas; there was a hematoma of 1x0.3 cm located in the front of the superficially slanted neck muscle left, well above the joining to the sternum. Forward in the neck muscle halfway to the left, a hematoma of 1.5x0.4 cm was found. A little to the left of that, there was another hematoma of 0.5x0.4 cm. There was in the deep neck muscle halfway to the right, a hematoma of 0.5x0.3 cm. In the deep muscle above the thyroid, there was a hematoma of 1.5x0.5 cm. There was a hematoma of 0.5x0.4 cm deep on the upper border of the larynx on the level of the thyroid cartilage. There was a hematoma of 0.8x0.3 cm in the muscle of the mouth floor on the right to the back. There was a hematoma in the soft tissues around the superior horns of the larynx (cornu superius) to the left and right of about 0.6x0.4 cm. There was a hematoma of 1x0.3 cm on the upper border of the hyoid bone, left. There was excessive mobility of the superior horn of the larynx left, but no fracture on the spot or anywhere else on the larynx (this was confirmed upon further radiological examination of the larynx-hyoid bone explant, see appendix 3 and upon further macroscopic and light microscopic examination of larynx-hyoid bone explant). There were no fractures visible on the hyoid bone.

12. On the right elbow and sideways on the left forearm, two superficial skin injuries with hematomas could be found. There was on the side of the left thigh a brownish purple skin discoloration of subcutaneous hematoma (confirmed upon incision), which is sampled for the wound dating research in cassette D. See for reporting thereof appendix 4 (Professor Dr. J.W.M. Niessen, VUMC in Amsterdam). According to this expert, this referred to a piece of skin with a vital wound reaction of progressing age, possibly a few days old considering the presence of ferrous macro layers.

13. Internally, in the soft tissues of the back (in fatty tissues and superficial muscle) there was a hematoma of 2x1 cm.

14. There were in the middle of the neck, on the right cheek, the stretch side of the right wrist, discolorations, which did not display any hematoma's upon incision. Consequently, these were not related to injuries, but probably to corpse stains.

15. Despite the longer period between finding the body and the autopsy (6 days), the internal organs could still be properly evaluated. In the LDH macro-enzyme test, (which could still be adequately evaluated), the heart muscle did not show any signs of damage suffered to the heart muscle of minimally 2 to 3 hours old.

16. There were signs of liquid accumulation in the lungs and in the brains (a tightened dura mater and some swelling of the parahippocampal gyrus).

17. Related to the postmortem retrieval of material for the toxicological study, there was a cut on the extensor side of the left thigh with stitches around the wound margins.

18. Research conducted additionally: alcohol and toxicological study and biochemical examination (detection of pregnancy hormones).

## 6    Interpretation of results

During the autopsy, injuries under A11, particularly, hematomas inside the neck were established, which in life were caused as a result of the effect of external mechanically constrictive force, whether or not combined with a violent blow to the neck. The mechanically constrictive force (strangling) can be produced by manual strangulation, one or more times tightly wrapped object(s) around the neck (ligation strangulation) by hanging or ligation strangulation other than within the context of hanging. Since there was no necklace around the neck,  the production of the injuries under A11 is on the assumption that they were more likely brought about by manual strangulation rather than by ligature strangulation (by strangling or ligation strangulation rather than in the context of hanging).

Therefore, the death can be well explained as death by asphyxiation, resulting from the aforementioned force suffered to the neck.

For the time being, no evidence of other possible cause of death has been indicated.

The hematomas in the conjunctiva (ecchymoses) under A8 may match an accompanying phenomenon of aforementioned constrictive force suffered to the neck. These hematomas are no expression of postmortem changes in corpse stains in the face.

The pin-pointed hematomas in the conjunctiva (under A8) of part thereof could very well also match as a supporting phenomenon of said experienced constrictive force to the neck, but they can also be explained as postmortem phenomenon (of pointed changes in corpse stains, which were also located in the face.)

According to information obtained she would have been found with her face down in the pillow. In the event, in life she was placed with her face down in the pillow (pressed down/held down), an additional component of asphyxiation based on such grounds is also very well possible resulting from obstructing the mouth/nose.

There were no injuries to the mouth/nose, but that does not exclude suffered obstruction of the mouth/nose.

The finding under A9 corresponds with the strapping suffered on left forearm, such as by a (tightfitting) watch, bracelet or another strapping structure of for example a cable tie (tie-wrap) used for tying up. During the incision during the autopsy, there were no convincing hematomas in this injury, but some redness. During the wound dating research, this injury displayed a questionable vital reaction. Based on these analyses, it can be concluded that this injury was produced either before the time of death, around the time of death, or after the time of death. Any other statement on the probability with respect to these 3 possibilities is not possible.

The injury under A10 to the neck was brought about by the impact of an externally mechanical punch (pressing) force such as by squeezing the neck. It can be brought about in the same scenario as aforementioned violence to the neck, but it does not have to be so. During his examination, the wound dating expert did not find any convincing features of vitality related to this injury (under A10) during his examination, in other words there is no conviction that it was brought about in life. However, in view of the convincing hematoma which was observed upon incision of

this injury during the autopsy, according to the undersigned, this injury was caused in life or around the time of death.

Furthermore, during the autopsy there were injuries under A12 and A13, which in life were caused by an impactful externally mechanical punch, clashing force which can be brought about by punches (striking, falling, running into something). According to the wound dating expert, the injury on the left upper arm was an older wound, perhaps a few days old.
These injuries under A12 and A13 have not contributed to the occurrence of death.

The established signs of liquid accumulation in the brains and in the lungs (under A16) may be complications of asphyxiation as a result of total lack of oxygen and secondary tissue damage and liquid accumulation in the organs, postmortem changes, or a combination of both.

From a macroscopic and light microscopic point of view there were no morbid abnormalities which could have explained the occurrence of death or could have been of any significance.

In order to examine any toxicological contribution to the death or as a partial cause of death, a toxicological analysis was initiated. You will receive reporting thereof after its completion at a later date.

Finding under A15 to the womb corresponds to a menstrual bleeding. During the autopsy and light microscopic examination, there were no symptoms of a pregnancy present. Nevertheless, it was decided to have a pregnancy hormone test done. Reporting thereof will follow after its completion at a later date (under B)

The postmortem changes under A7 correspond very well with a postmortem period of days, (counting backwards from the time of the autopsy). The positioning of the corpse stains matches the position of the body when it was found (in the prone position with the face down).

Findings under A4 as well as findings under A17 correspond with changes in the context of postmortem sampling to the body.

There were no injuries to the anus/the genitals. That does not exclude experienced sexual acts. During the autopsy a sampling of DNA was secured. The dilation of the anus corresponds with a postmortem phenomenon.

## 7   Conclusion

During the autopsy of the body of K.L. GUDA, 24 years old, the death can very well be explained by complications of the impact of an externally mechanic constrictive force, whether or not in combination with a violent punch to the neck (manual strangulation, ligation strangulation by hanging or ligation strangulation other than by hanging).

Although there were no injuries to the mouth/nose, in view of the position in which she was found face down in the pillow, an additional component of asphyxiation by obstructing the mouth/nose cannot be excluded.

In order to examine any toxicological contribution to or as a partial cause of death, a toxicological analysis was initiated. You will receive reporting thereof after its completion at a later date.  Although for the time being, there were no indications of pregnancy, an investigation into possible (early) pregnancy was nevertheless embarked upon, the result of which will be elaborated in the report of the toxicologist.

## 8   Additional Information

The following investigation material was stored for (any possible) analysis:

- o   For determination of alcohol and toxicological analysis: urine 2x, contents of stomach, gall and gallbladder, liver tissue, brain tissue, lung tissue, hair, blood from the heart 2x, blood to determine CO, femoral blood, vitreous on both sides.
- o   For any DNA examination: a piece of and a piece of heart muscle, blood FTA and a piece of the lining of the uterus.
- o   For any DNA sampling to genitals; a DNA-set.
- o   For any possible comparative analysis: hair.
- o   For further PA-examination: pieces of tissues.
- o   For further examination: larynx/hyoid bone-explant.
- o   For dating of wound research: 4 areas of the skin.
- o   Stored: urine - 80 degrees, blood from the heart, -80 degrees,
- o   Radiological images were stored in the Groene Hart Hospital in Gouda.
- o   Photographic documentation: the pictures taken during the autopsy were made available to the client.

During the judicial autopsy, the Netherlands Forensic Institute secures human material. The material secured for a toxicological analysis was not used completely during this research. Until further notice, the remaining material will be stored for 12 months after signing of the toxicologist report in accordance with the agreement with the Public Prosecutor's Office. With respect to the material that was secured during the autopsy for the remaining examinations, the following will apply: all the (remaining) material will be stored  until further notice (as was agreed with the Public Prosecutor's Office).

Appendix 2

Signature

I declare to have drawn up this report completely and truthfully and to the best of my ability as a NFI-expert[1] forensic pathology, registered as a legal expert in the Netherlands Registry of Legal Experts for the expertise area of Forensic Pathology.

Place                    The Hague
Date                     May 20, 2015

Name Rapporteur          Dr. V. Soerdjbalie-Maikoe
                         Physician and Pathologist

---

[1] A NFI expert is educated and examined by the NFI (Netherlands Forensic Institute), after which the NFI grants to him/her the authority to draw up and sign expert reports. Whilst conducting the research, he/she makes use of the NFI infrastructure, guidelines and quality assurance system.

Appendix 2

(LOGO)
Netherlands Forensic Institute (NFI)
*Ministry of Security and Justice*

## Appendix    1    External and Internal examination

| | |
|---|---|
| Case Number | 2015.04.20.021 |
| Application Number | 001 |
| Date Report | May 20, 2015 |
| Autopsy Number | 2015-097 |

The intake, external and internal examination and preliminary reporting started in The Hague on April 21, 2015 at approximately 9.10 hours and were completed at approximately at 13:15 hours.

Technical assistance was provided by Mr. E.H. van Houten and Mr. M. Manise. Forensic photography was carried out by Mr. P.L. Varkevisser.

**External examination**

1.  At the beginning of the autopsy a DNA sampling set was secured. This was kept in the NFI.
    The corpse was delivered in an unsealed body bag.
    A name tag was affixed to the right big toe. There was no SIN-sealing.
    The dead body was that of a female who had a body length of 158 cm and a body weight of 66 kilogram.
    The body did not have on any clothes.
    The body had on the following jewelry: in both earlobes there were no metal pierce-earrings. These had been removed and handed to the police.

2.  The bone muscles still had rigor mortis (stiffness of death). There was no rigor mortis on the jaw muscles nor on the arms.
    There were red and red purple corpse stains on the arms, partly fixed and partly removable, positioned forward (on the face, the neck and the chest), sideways and backward on the body. There were many pin-pointed changes in the corpse stains, the so-called vibices. (Strongly pronounced zones corpse stais). There were no other postmortem changes.

3.  The body showed corpse stains and pin-pointed changes in them; also see point 2. See for injuries: point 6 further on in this report.
    The ear canals were free.
    The eye-lids on the left were closed; on the right they were a bit open.
    The eye colour was dark, could not be further evaluation.

Appendix 2

The pupils could not be evaluated.
The white of the eye was strongly veined.
The conjunctiva of the eye-lids was strongly veined with locally pin-pointed changes. (vibices)
The hair on the head was black, about 35 cm long.
The nostrils contained, more on the left than on the right, some brown yellowish liquid
The partition of the nose was intact.
The lips were pinkish red.
The gum was flawless.
There was nothing particular in the mouth.
The denture was natural.

4. On the neck there were corpse stains with pin-pointed changes in them, see also point 2.
The same thing can be said of the chest.
The stomach was flawless.
The arms and legs: see point 6 for injuries to the arms. The legs did not show anything particular.
The neck: see point 6.
The back was not damaged.

5.   The external genitals were those of a female. There was a bit of bloody liquid on the labia majora. There were no injuries.
The anus was postmortem dilated. There were no injuries.

6. Injuries/findings:
- On the neck right, at 142 cm from the edge of the sole and 3 cm right of the center line, there was a reddish skin discoloration of 0.5 x 0.3 cm, which upon incision showed hematoma. A piece of skin is removed for wound dating research in cassette B.
- In the middle of the neck there was a vague green skin discoloration of 1.5x1 cm, which upon incision did not show any hematoma. Thus this was not an injury.
- On the right elbow there was an obliquely elongated superficial scar of 2 cm long and 0.2 cm wide.
- On the extensor side of the left thigh there was an oblique cut of 13 cm long with stitches around the wound edges.
- On the side of the left thigh there was a brown purple spotted skin discoloration of 3 x 1 cm which upon incision showed little hematoma. A piece of skin was taken for wound dating research in Cassette D.
- On the side of the left lower arm there was a small superficial skin damage of 0.3 x 0.2 cm with redness.

- On the flexor side of the left forearm there was a band-shaped imprint with a pale center. The imprint was approximately 0.8 cm wide and about 4 cm maximum long. The edges were red and upon incision there was no convincing hematoma; but some redness. DNA samples were taken for wound dating research in cassette E.
- In connection with postmortem sampling of the nails, the nails were cut short and consequently there were signs of recently cut nails.
- On the left pinky there was an injury on the cuticle over a length of 0.6 cm with redness.

7.  There were no scars nor tattoos.

    **Internal examination**

8.  The subcutaneous fatty tissue on the abdominal wall was 40 mm and 75 mm on the chest wall.
    The mammal glands were developed normally.
    There were no fire- shaped abnormalities.
    The muscles of the front fuselage shell were red brown and normally developed.

9.  The peritoneum was normal, grey, flat and shiny.
    The position of the diaphragm was on both sides next to the 4th rib.
    The mutual location of the abdominal organs was undisturbed.
    The fatty tissues in the abdominal cavity were not increased.
    The area behind the abdominal cavity did not display any
    The stomach was collapsed and had a normal flat shiny surface.
    The small intestine had a normal diameter and a normal flat shining surface.
    The so-called appendix was present.
    The large intestine had a normal diameter and a normal flat shining surface.
    This was also the case with the rectum.
    The urinary bladder was collapsed.

10. The distance between the edges of the lungs was 2 cm.
    The left lung was free.
    The right lung was free.
    In the chest cavity there was a thin layer of liquid on the left and right side.
    The pleura's were normal grey and shining.
    The partition was intact.
    The pericardium was intact.

11. The heart:
    The heart weighed 195 gram.
    There was liquid blood in the heart cavities.

Appendix 2

The muscle wall of the left ventricle was weak.
The muscle wall of the right ventricle was weak.
The surface of her heart was intact.
The coronary arteries were collapsed in a normally membranous manner.
From a macroscopic perspective, there was no calcification.
The valves were smooth and membranous.
The oval ventricle was closed in a normal fashion.
The atrial appendages were free.
The inner lining of the heart was intact.
The heart muscle was red-brown and symmetrical.
In the LDH-macro-enzyme test no signs of recent (consisting of minimum about 2 to 3 hours) or older heart muscle damage were noted.
The muscle wall of the left ventricle was approximately 11 mm.
The muscle wall of the right ventricle was approximately 3 mm.
The ventricle partition was approximately 11 mm.

12. There was a normal fatty thymus.

13. The lungs:
The right lung weighed 465 grams.
The left lung weighed 520 grams.
The surface was brown.
The bronchial tubes were free.
The blood vessels were free.
On cross section, the lung tissue was moist.

14. The diaphragm was intact.

15. The spleen:
The spleen weighed 95 grams.
The spleen surface and capsules were red brown.
The dimensions were 9 x 6 x 3 cm.
On cross section, the spleen tissue was full of blood.

16. The liver:
The liver weighed 1230 grams.
The surface and the cap were red brown.
On cross section the liver tissue was elastic.
The gall bladder contained a few millimeters of gall.
The bile ducts had normal patency.

17. The pancreas had a normally lobed feature.
18. The stomach: contained about 10 ml of pasty stomach contents including rice grains.

Appendix 2

The wall was smooth.
The mucous membrane was changed postmortem with green discoloration.
The duodenum and the intestines were filled with feces of normal consistency.

19. The adrenal glands:
    The cortex was pale and orange yellow.
    The adrenal medulla was brown.

20. The kidneys: the kidneys were about the same size.
    The kidneys weighed together 210 grams.
    The fatty capsules were not increased.
    The cortex was brown.
    The medulla was striped.
    The kidney tissue was elastic.
    The renal pelvis was intact.

21. The ureters were thin.

22. The urinary bladder contained approximately 10 ml of urine.
    The wall was smooth.
    The mucous membrane was intact.

23. The sexual parts: there was a normal pear-shaped womb and ovaries and fallopian tubes without any abnormalities.
    The womb displayed bloody womb mucous membrane.

24. The coronary artery was intact.
    From a macroscopic perspective there was no calcification.
    The large arteries and the large veins were smooth.

25. The lymph nodes were not enlarged.

26. The dermis of the cranium was intact.
    There were no hematomas.
    Temple muscle: the left muscles showed pronounced changes.
    The right temple muscle was smooth.

27. The cranial bones: there were no fractures.
    The skull cap was 6 mm thick in the center front, 4 mm on the side and 5 mm in the back.

28. The meninges:
    The hard meninges were greyish white and was under increased pressure.
    The soft meninges had collapsed in a normal transparent manner.

Appendix 2

29. The brains:

The brains weighed 1220 grams.

The surface showed a somewhat flattened winding pattern.

The basal brain vessels had collapsed in a normal membranous manner.
There was no brain fluid.

The cerebrum, the cerebellum and the brainstem did not display any other
particulars, except for he flattened brain windings and the par hippocampal
gyrus.

The pituitary gland was not enlarged.

30. The neck:

Neck muscles and subcutaneous tissue:

Internally in the neck there were several scattered hematomas: a
hematoma of 1 x 0.3 cm was located forward in the superficially oblique
neck muscle left, somewhat above the stitch to the chest bone. Forward in
the neck muscle half way to the left, there was a hematoma of 1.5 x 0.4 cm.
A bit to the left of that there was another hematoma of 0.5 x 0.4 cm. In the
deep neck muscle halfway to the right there was a hematoma of 0.5x0.3 cm.
In the deep muscle above the thyroid there was a hematoma of 1.5x0.5 cm.
There was a hematoma of 0.5 x 0.4 cm deep on the edge of the larynx
around the thyroid cartilage on the left. A hematoma of 0.8x0.3 cm could be
found in the muscle of the mouth floor, to the right in the back. There was a
hematoma of about 0.6x0.4 cm in the fatty/soft tissues around the top
cones of the larynx (cornu superius) to the left and to the right. But, a
hematoma of 1 x 0.3 cm could be found on the top edge of the hyoid bone,
to the left.

There was excessive mobility of the superior horn of the larynx on the left,
but no fracture on the spot or elsewhere on the larynx (upon further
examination of the larynx-hyoid bone explant, see appendix 3 and upon
further macroscopic and light microscopic examination of the larynx-hyoid
bone explant). The hyoid bone did not have any fractures. The neck cervical
vessels were intact.

The adenoids were not enlarged.

The oral cavity and the pharynx, esophagus, larynx and trachea were not
blocked.

The esophagus was smooth.

The trachea contained some liquid.

The mucous membranes were smooth.

The thyroid gland was normally butterfly-shaped.

The adrenal glands were not enlarged.

31. The tongue did not display any particulars.

A hematoma could be found on the floor of the mouth, see point 30.

Appendix 2

32. The bone structure: as far as it was examined (ribs, skull, vertebral column)
there were no fractures.
The larynx/hyoid bone- explant did not have any fractures (see point 30).
The remaining bone structure was not examined during the autopsy.

33. The subcutaneous tissues on the back: right below, a bit next to the middle,
there was a hematoma in fat and a superficial muscle of 2 x 1 cm.

**34. Microscopy:**
   A. Cross section through the vertebrae made up of trabecular bones with
on the edge pre-existent connective tissue. Between the trabecular
bones fatty and cell marrow can be seen in the relation of 1:2
approximately. Normal forms of hematopoiesis. Megakaryocytes of a
normal size and lipidomics. Little autolysis. There were no fire shaped
abnormalities. F to O: cross section through the left and right ventricle
of the heart and in conducting system in region. In the epicardial fatty
tissue cross sections through coronary artery branches can be seen.
There were no signs of atherosclerosis. There was a normal order of
cardiomyocytes. There was little cardiomyofibrosis in the sense of
localization of mature fatty cells around some blood vessels. There were
no signs of necrosis, no signs of myocarditis. Locally congested blood
vessels.
   B. P. Kidney: cross section through the liver with a normal built up. Signs of
congestion. Q and R concern cross sections through the kidneys with a
normal built up. Autolysis, as a result of which the evaluation was
limited. Local congestion. S and T. cross sections through the adrenal
glands with a normal built up. Signs of autolysis and signs of congestion
in both cortex and marrow.
U: cross sections through the spleen with a normal built up. Little
autolysis. V to Z: cross sections through the right and left lung with signs
of congestion and edema. No inflammation. Locally the edema is thicker
than elsewhere.
AA: concerns a cross section through the uterus with a normal built up
from the endometrium and myometrium. No hearth formed
abnormalities. The endometrium varied in the width and showed signs
of autolysis, as a result of which evaluation was limited. Therefore, any
atype of gland ducts cannot be evaluated. As far as we can be
evaluated, no bleedings.
AB and AC have to do with ovaries with normal structure for her age. No
fire-shaped abnormalities.
Follicles in different phases and stroma. Autolysis of covering epithelium
of the follicles.

Appendix 2

AD is a cross section by the pancreas, totally autolytic. AE: hypophysis
with a normal built up. Nothing particular. Neuro and adenohypophysis
are hardly visible.

AF: cross sections through neck fatty tissues, which parts consisting of
striated muscle tissue, connective and fatty tissue with expanded
hematoma (hemorrhage) , both in the connective tissue as in the fatty
tissue and in between the normal looking muscle cells. No signs of
myositis. The same image in AG coupe.

AH is a cross section through the thyroid with a normal built up from
mixed large follicles with in it with in between fibrous connective tissues
with blood vessels. No abnormalities.

AI: is similarly muscle tissues of the neck with a normal built up. In this
cross section, there is no hemorrhaging visible. No myositis.

AJ. Also cross section through the thyroid and on the edge piece of
thyroid gland and a lymph node on the edge. Furthermore, a lymphoid
aggregate with localized papules, suggesting the thymus. Probably, the
remainder had to do with tiny lymph nodes.

AK: cerebellum with normal built up. Signs of congestion and signs of
edema DO postmortem gas accumulation. Purkinje cells with flattened
cytoplasm and sometimes irregular nuclei and nucleus membrane,
corresponding to hypoxia or autolysis.

AL: On the end of arachnoid with some sclerosis. Hippocampus with
signs of constriction. Here also cells with some flattened cytoplasm, DD
edema or rather postmortem change. (autolysis).

AM is the other hippocampus with the same image as described above.
AN and AO: brainstem and spinal cord with a normal built up. Signs of
constriction and signs of edema or postmortem change (autolysis).

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

The undersigned, Drs. L. A. Richardson, sworn translator and interpreter, hereby declares that
the above document is an accurate English translation of the Dutch Pathology Study of NFI,
Autopsy No.  2015-097, and was done to the best of her ability
St. Maarten, 20 September 2016

Appendix 3

**POLICE FORCE CARIBBEAN NETHERLANDS**
**Department**     : **Basic law enforcement service**
**Island**          : **Saba**

**Official Police Report Number: 201504151245**
**Case Number**      : **2015/**

## O F F I C I A L   R E P O R T
## OF INTERROGATION WITNESS

I, the reporting officer, **Kevin Johannes Petrus Theodorus JANSSEN**, sergeant first class of the Royal Dutch Military Police, stationed at the Basic Law Enforcement Service in Saba, interrogated on Wednesday April 15, 2015 at approximately 12:45 hours, at the police station in The Bottom, Saba, a person as a witness, who declared to be:

**Witness**
Name                                      : **CEJVAN (male)**
First names                               : Senad
Date of birth                             : July 20, 1985
Place of birth                            : Kotor Varos
Country of birth                          : Bosnia
Nationality                               : Bosnian
Address                                   : Sonya Richardson Apartment #2
Place                                     : The Bottom, Saba, Caribbean Netherlands
Telephone number                         : 416 9514
Personal details according to : personal declaration

The statement of the witness was taken in the English language and written down in the Dutch language.

After I, the reporting officer, JANSSEN communicated to the witness why I wanted to interrogate him, he stated as follows:

**Witness statement:**

Kavya GUDA was a friend of mine. I have known her for about 1 year. We started the Medical School together in May 2014. I got acquainted with her in the library. The two of us were in the same semester.

I can say that Kavya was a social person. In my opinion, everybody liked her. She liked being among people. I do not know if Kavya had a boyfriend but I assumed she did. She was particularly

Appendix 3

very close with "Omar". Omar is also a medical student. Omar was not hanging out that evening or, at least I did not see him that evening.

Yesterday, April 14, 2016, I went with my roommate, Mauricio ORTIS, to Windwardside. First we went to Sea Witch to eat something. However, there the kitchen was closed. Then we went to Scout's Place. I think we were at Scout's Place at approximately 21:30 hours. I think we stayed there until 23:00 hours. After that, we went to Guido's. Everybody was going to Guido's. I think there were in total about 20 persons there. Both locals and medical students were there.

Kavya GUDA was also here. I do not know exactly what time she arrived at Scout's, but I think it was somewhere halfway between the period I was there. Kavya came to Scout's Place from Topogigo together with Angelica and some other persons.

I even spoke a bit to Kavya at Guido's. I can say that Kavya was "a little bit tipsy". I could notice that she had had a couple of drinks. However, she was not drunk. I can say that Kavya seemed a bit "sad". She told me that her mother was ill and that she would not be going to school anymore. She did not tell me what exactly her mother had.

At about 23:00 hours we all went to Guido's. I stayed there until about 00:30 hours. I got a ride back with Brianna to The Bottom. It was a blue car. The car was parked in front of the Satel building, next to Scout's Place. I think there were 6 persons in the car. These persons were Brianna, Rene Torres, Angelica, Yassine, Kavya and me.

After that, we all went to The Bottom. Brianna dropped us all off at the road to our home in Clement Sorton Street and then she drove back to Windwardside.

Kavya was really "close" with Angelica at the time we were walking back to the house. Angelica is a good friend of Kavya. Kavya even asked Angelica if she wanted to stay with her. Kavya, I and Angelica were in Kavya's apartment for a little while. Perhaps about 5 minutes. I saw and heard that Mehak AKHTER, the neighbor and also a schoolmate, would drop by later. She wanted to speak to Kavya before she left. She did not say why. Mehak appeared to be just a nice person, she is "a sweet girl". Bu this, I mean that she is a friendly person. At the time we left, Kavya seemed "happy". According to me, she had on he same clothes she was wearing on the evening we were out. However, I cannot remember this exactly. I had also been drinking. In any case, Kavya was wearing a white dress with something like red flowers on it. That evening, I had drunk about 11 or 12 beers.

Angelica and I left afterwards. I then walked Angelica home. We spent about 15 to 20 minutes talking outside in front of her home, after which she asked me if I also wanted to come inside. Then I went inside with her. I left there to go home to sleep at about 04:00 hours. Overall, I am residing between Kavya and Angelica. Angelica is a good friend of mine.

Appendix 3

Last semester, I think in November, Kavya returned to the US for a medical procedure. I never asked her what kind of "surgery" she underwent. I do not know if she took medication. In any case, she never told me that she had medical problem or that she took medication. According to me, Kavya also did not have any enemies either. She is not that kind of person at all. As far as I know, she did not have a sexual relationship with anyone either. I can furthermore say that last night there was nothing "unusual".

At any rate, I will remain on Saba for at least 3 months more. I use my break to continue studying here.

After I, the reporting officer, K.J.P.T. JANSSEN, read out the statement to the witness, he persisted in it, and signed it with me, the reporting officer.

**K.J.P.T. JANSSEN**                                         **S. CEJVAN**

Signed: *(2 signatures illegible)*

**(reporting officer)**                                        **(witness)**

This official police report was drawn up under oath by me, the reporting officer, signed and concluded on Saba on Wednesday, April 15, 2015.

**THE REPORTING OFFICER:**
(Signed: *Signature Illegible*)
**Sergeant first class**
**K.J.P.T. JANSSEN**
**(oath of office)**



*Official and True Translation into English of original Dutch document*
*(Official Report Hector Appendix 3)*
*Drs. L. A. Richardson, sworn translator*
*St. Maarten, 14 September 2016*

Attachment 4

**PRO   -   JUSTITIA**
**Police Force Caribbean Netherlands**

### OFFICIAL REPORT OF WITNESS TESTIMONY

| | | |
|---|---|---|
| Official Police report number | : | 201504171530.GET |
| Investigation | : | Hector |
| Concerning | : | Witness S. Cejvan |
| Reporting officer | : | Steven Adolph Daniel Senior, senior police officer, employed at the Police Force Caribbean Netherlands, Incident Targeted Search Unit |

### OFFICIAL POLICE REPORT

I, the reporting officer, declare the following:

Continuing the investigation in the case Hector, the man Senad Cejvan, born on July 20, 1985 in Bosnia, was heard again as a witness on Friday, April 17, 2015, at approximately 15:30 hours.

After communicating to the witness why I, the reporting officer, wanted to hear him, the witness made a statement in the English language, which was written down in the Dutch language by me, the reporting officer, which read as follows:

I understand why you want to interrogate me. I was interrogated by the police before. I also understand that the investigation is in full process and that the police wants to know what happened to the deceased.

I have known Kavya since last year May. This was when I started my study at the medical school here on the island of Saba. In fact, we were in the same class. I got to know her in those days and I can say that she is a very social person. By social I mean that she was always ready to help everybody and did not have any issues with the other students. She was loved by one and all.

Attachment 4

Last Tuesday, on April 14, 2015, I decided to go out. The reason for this was that my roommate, Mauricio Ortez, would be going to Miami for a number of weeks. As I stated before, we went to several places including, among others, Guido's. Here we met Kavya and friends. If I am not mistaken, this was around or after 23:00 hours.

I noticed and could tell that Kavya was a bit tipsy. I saw that she had a glass of wine in her hand. I cannot say how much she had already taken that evening, because I had not seen that.

At approximately 00:30 hours, I wanted to go home and there was no taxi service available at that moment. I then decided to ask Brianna if I could get a ride with them. My friend Mauricio was in conversation with a female friend and did not want to come along. Brianna did not mind me getting a ride with them. Brianna was the driver and the man Rene Torres sat next to her. Yassine was sitting on the backseat behind the driver, Kavya was sitting in the middle and Angelica was sitting on my lap.

We were all dropped off in close proximity of the church and Brianna drove off. Angelica, Kavya and I walked to the Kavya's home and Rene and Yassine did not walk together with us. All three of us entered her room and into her bedroom. I heard Kavya asking Angelica if she wanted to stay over. I heard Angelica say that she did not have her medicine with her. Then Kavya told me to take Angelica home.

Q: What was the reason that you went inside the apartment?
A: Actually, there is no reason, but I have been in her apartment before and for me it is normal.

Q: How long did you stay there?
A: About 5 minutes.
/
Q: Have you been in the kitchen?
A: I cannot remember. But I do not think so. It is all very small there.

Q: Have you been in the bathroom?
A: No. Actually, I was standing closer to the door leading to her bedroom.

Q: Was the air-conditioning on?
A: I do not know that, I did not pay any attention to that.

Q: Where were they standing in the bedroom?
A: They were standing next to the bed.

Q: Did you have a good view of her bed?
A: To be honest I did not pay any attention to that. But I know that when you walk into her bedroom, her bed is on the left side.

Q: Did you or all of you drink anything while you were at her apartment?
A: No, none of us. Angelica and Kavya hugged each other and I heard Kavya ask Angelica again to stay over. At that moment I was about to leave the apartment, in the assumption that Angelica was going to stay. Shortly thereafter, Mahek also came inside and walked past me into the bedroom. I heard Mahek tell Kavya that she wanted to talk to her since Mahek was leaving the island early in the morning.

Q: Who is Mahek?
V: Mahek is her neighbor.

Q: Did you see Mahek when you were hanging out?
A: No. She is of the Muslim faith and does not go out.

Q: Can you remember what Mahek was wearing?
A: She was wearing her white pajamas. I did not pay attention to this.

Q: How was Mahek behaving?
A: According to me she was normal, so just happy. I did not get the impression that she was angry or anything of the sort.

Q: After how many minutes did you leave there?
A: Almost right away. I did not hear what Mahek had to say to Kavy.

Q: Did you leave alone?
A: No, together with Angelica.

Q: What did you do after that?
A: I walked to Angelica's residence and we stayed talking outside on the wall. After that I was invited by her to come inside her apartment. I stayed with her until about 4 o'clock, I think. I cannot tell the time with certainty. Afterwards I walked to my apartment.

Q: When you walked to your home, did you pass Kavya's home?
A: No.

Q: When were you made aware of the death of Kavya?
A: It was at about 10:30 hours or 11:00 hours when I was informed by Omar's roommate, the guy by the name of Sam, that Kavya was found dead.

Q: How did you react to this news?
A: I was shocked and I had not eaten the rest of that day. At that moment, I was standing with Angelica and she collapsed when she heard the news.

Attachment 4

Q: What else did you hear up until today about Kavya's death?
A: Omar who said that he found her and said that she was blue and that her teeth were sticking out or something like that. But at that time we were all crying together. I wanted to go see her corpse, but was advised against doing that by Sam.

Q: Why did Sam discourage you from seeing the dead body?
A: He said she did not look good.

Q: So, if I understand you correctly, did Sam actually see the dead body?
A: I guess so. I do not know for sure.

Q: Why did you want to see Kavya's dead  body?
A: Because I could not believe it. It was 10 to 11 hours ago that we were together and now I hear that she was found dead.

Q: What do you think happened to Kavya that ended up dying?
A: I know she had trouble falling asleep and if she had taken sleeping pills, this can have a bad reaction that could lead to death.

Q: How do you know this?
A: If you drink alcohol, your body has to process it. This is done by enzymes. If you combine this with alcohol, then the same enzymes also have to process these and the combination of alcohol and medication can lead to an overdose.

Q: How do you know that Kavya had trouble sleeping?
A: She had told me so herself. She was also a little stressed out about the fact that her mother was ill.

Q: Did she take sleeping pills that evening?
A: I cannot answer this question, because I do not know, if she did.

Q: Are you aware whether she used sleeping pills in the past?
A: No, I do not know that.

Q: Then why do you think that she had taken sleeping pills?
A: I can remember a conversation between Angelica and Kavya about two weeks ago. Angelica refused to give her sleeping pills and told her that she did not have a good experience with the pills. And since she was stressed out, it makes me think that maybe she had still taken pills to sleep. This also has to do with exams and family issues with the illness of her mother.

Attachment 4

Q: Do you have anything else to add to your statement?
A: No.

S. Cejvan

After the reading and persisting in it, the witness signed his statement.

Interrogation concludes on Friday, April 17, 2015 at 17:00 hours.

Whereof this police report was drawn up under oath by me, the reporting officer, concluded and signed in The Bottom, Saba on Friday, April 17, 2015.

The reporting officer,

S.A.D. Senior
(Signed: *signature Illegible*)



*Official and True Translation into English of original Dutch document*
*(Official Report Hector Appendix 4)*
*Drs. L. A. Richardson, sworn translator*
*St. Maarten, 14 September 2016*



Appendix 5

**POLICE FORCE CARIBBEAN NETHERLANDS**
**Department:  Basic law enforcement service**
**Island        :  Saba**

**Official Report Number: 2015**
**Case Number : 2015/23**

## OFFICIAL REPORT
## INTERROGATION OF WITNESS

I, the reporting officer, Norma Stefany KERPENS, Senior police officer, employed at the Police Force Caribbean Netherlands, stationed at the Basic Law Enforcement Service on Saba, interrogated on Wednesday April 15, 2015 at 12:15 hours at the police station in The Bottom, Saba, a person as a witness, who declared to be:

**Witness**
Name            : THAPA (female)
First Name(s)    : Angelica
Date of Birth    : 06-17-1990
Place of Birth    : Moscow
Country of Birth  : Russia
Nationality      : US Citizen
Address          : 26013 Donovan Drive South Riding VA 20152 3418
Place            : Saba, Caribbean Netherlands
Temporary residence on Saba is at the Saegers family, the Promised Land.

The statement of the witness was taken in the English language and written down in Dutch.

After I, the reporting office,r KERPENS informed the witness why I wanted to interrogate her, she made the following statement:

**Statement Witness:**

I have known Kavya since I came to Saba at the end of August, 2014. I am studying at the Saba University School of Medicine. She was the person who was designated to show me and a few other newcomers around on the island.
From the first moment on, it clicked between us; she is a very sweet person.
We are of the same age.
I am residing at the residence of Steven Saegers at The Promised Land.
Kavya and I saw each other every day at school and after school. I used to call her 'Baby' or even 'Little Princess'.

Appendix 5

We loved each other like sisters; she was always there for me.

In the beginning I had some problems adjusting to school. She was there for me to help with guidance me and so on. Even when I broke my toe she was the one who constantly looked out for me and made sure I got something to eat and so on.

Kavya was planning to travel back to the USA this upcoming Saturday. Her mother is ill and Kavya wanted to donate her kidney to her mother to save her health.

Kavya herself has an ulcer problem in her stomach. That is the reason why she is not allowed to drink too much alcohol.

Yesterday, at around 21:50 hours, I went to Topogigo to be with Kavya and a few other girlfriends. This was on the occasion of Kavya's leaving the island. I was also supposed to be part of the group having dinner there, but I had been talking too long on the phone with my mother and was therefore running a bit late. I could not bring myself to end the conversation with my mother just like that. I had not spoken with my mother in two weeks and every time I wanted to hang up the phone, she would start a new subject in the conversation.

Brianna Shafier (fem), Yassar Kan (m), Vanessa Hoytfox (fem), Jose (m) and Kavya were having dinner when I arrived.  I ate some of Kavya's Quesadilla. I saw that there was an empty glass of wine in front of her on the table.

Kavya told me not to worry about it because she only taken one drink.

I am overly protective and was worried about the fact that she gets problems with her stomach and acid reflux. That is how I am and Kavya knew that right away when I looked at the glass. I do that with everyone that I care about.

Topogigo was empty so we decided to go to Scouts right after we finished eating. Brianna took us to Scout's Place from Topogigo. When we got to Scout's Place, I bought a glass of white wine for myself and one for Kavya.  Kavya even asked me what kind of garbage I had bought. Neither Kavya nor I emptied our glasses. Scout's Placed had closed early.

Then we all went to Guido and sat there for about an hour. Kavya was talking to the others. I was tired so I withdrew a bit from the rest of them. I did not notice if she had consumed any more alcohol. I was really tired. Personally, I use medication for cancer and therefore I cannot drink alcohol. I just wanted that she would get home safely.

At approximately 00:15 hours, Brianna brought us to The Bottom. I do not have a telephone, so I do not know what time it was exactly.

Brianna dropped us off in front of Kaya's residence. The turn to my home is a bit hazardous, so this was also the easiest option.

Senat, Kavya and I stepped out of the car. We walked her to her room to leave her there. When we got there, she asked me if I could stay and sleep over. She had asked me this earlier, but I

2

Appendix 5

had never done that before. I take medication and do not sleep well at night. I also told her so. I also told her that I had in my contact lenses, so that was not a good idea.

At that moment Kavya and I were standing inside her apartment and Senat was outside in the hallway. A young lady by the name of Mahek came up the hallway. She is Kavya's neighbor. I heard her saying to Kavya: "I have been waiting for you Kavya, I will be leaving tomorrow and I still would like to talk to you" or words to that effect.

I saw that Kavya reacted very spontaneously and said: "oh yes, of course, come inside". I looked to Kavya to see if everything was 'ok'. She said that everything was 'ok'. I told her to sms me in the morning to let me know if we would have breakfast together. She said that this was an excellent idea.

Kavya told Senat to see to it that I would get home safely. Then Senat and I left from there. Because of my broken toe I had difficulty coming down the stairs with ease. I knew that Kavya and Mehek were watching from the balcony.

Senat and I walked to my home which he entered. We sat and talked there for a good one and a half hour. I was not feeling very well so he walked me up the stairs.

When he was leaving to go home my neighbor, whose name is Kelly, saw him leave. I know this because Senat was teased this morning, Wednesday April 15th 2015, by Kelly about Senat and I having something with each other. But we do not.

Senat lives in the residence behind Kavya.

I wish I had stayed and slept over by Kavya. If only I had my medication with me.

After I, the reporting officer N.S. Kerpens, read out the statement to the witness, she persisted in her statement and signed it together with me, the reporting officer.

**N.S. Kerpens**                                    **A. Thapa**
(reporting officer)                                (witness)
Signed: *Signature illegible*                       Signed: *A. Thapa*

This official report was drawn up by me under oath, signed and concluded on Saba on Wednesday, April 15 2015.

**THE REPORTING OFFICER:**

**N.S. KERPENS**
**Police Superintendent**
(oath of office)



*Official and True Translation into English of original Dutch document*
*(Official Report Hector Appendix 5)*
*Drs. L. A. Richardson, sworn translator*
*St. Maarten, 14 September 2016*



3

Appendix 5

K

Appendix 6

# PRO–JUSTITIA
## POLICE FORCE CARIBBEAN NETHERLANDS

---

**Official Police report of second interrogation witness A.THAPA**

---

| | |
|---|---|
| Official Report Number | : 20150526.1910.202 |
| Investigation | : HECTOR |
| Re | : Official Police Report 2nd interrogation witness A. THAPA |
| Reporting Officers | : Vascoscelos Arlindo SILIEE, Senior police officer, employed at |
| | Police Force Caribbean Netherlands, Targeted Search |
| | Unit and Catharina Theodora Maria Goemans, Special |
| | Agent of Police in the Netherlands. |

---

We, the reporting officers, declare as follows:

On Tuesday, May 26, 2015 at approximately 19:10 hours, we, the reporting officers,
interrogated at the police station in Saba, a woman as a witness. The name of this woman is:

## WITNESS AND STRUCTURE OF INTERROGATION

| Witness: | |
|---|---|
| Name: | **THAPA** |
| First name: | Angelica |
| Date of birth: | June 17, 1990 |
| Place of birth: | Moscow |
| Country of birth: | Russia |
| Nationality: | US Citizen |
| Address: | 26013 Donovan Drive, South Riding, VA 20152, United States/ |
| | at Altagracia Zagers family, apartment # 3 |
| Place: | Saba |
| Telephone number: | +17034899721 |
| Email: | Angelica.thapa@gmail.com |
| Personal data according to: | US license |

### Remarks of Reporting Officers

- The witness is informed that the interview is being recorded by means of a recording device;
- The interrogation of the witness is taken in the English language and written down in Dutch.
- The interrogation is summarized as much as possible in the question and answer format:

Q : Question/note of reporting officers

A : Answers/note of witness

Appendix 6

**INTERROGATION**

**INTRODUCTION:**
V: Angelica, we appreciate you coming to the station. You are being interrogated for the second time as a witness within the context of the investigations initiated after the death of Kavya Lekha GUDA which took place between Tuesday, April 14, 2015 late at night and Wednesday, April 16, 2015 early morning.

On April 15th at 12:15 hours, you were heard as a witness in this investigation. As a result of your interrogation, the interrogation of other witnesses and other findings in this investigation, we have some additional questions. Besides that, the investigation team would like to know more about Kavya, so that we can form a better picture of her. We will also revisit the night of April 15th, 2015. On account of this, we kindly request you not to share the details of this interrogation with third parties, so that other witnesses can make their own statements.

We have quite a bit of questions. It is possible that a few questions may seem strange to you. We are informing you that all questions are relevant for this investigation. If you have any questions during this interrogation, you may also pose them. It is possible, that in the interest of the investigation we will not be able to answer all questions.

Q: Is this clear to you?
A: Yes.

Q: Do you have any questions beforehand for us?
A: Yes, I would like to feel safe on the island again. I want to know what really happened.

Q: In addition to the first interrogation, what are your experiences with the police or judicial authorities?
A: I do not have any experience with the police. I only came here once.

Q: To what extent do you have confidence in the police?
A: Yes, I have confidence in the police.

Q: What did you hear about the death of Kavya, since your first testimony on April 15, 2015?
A: When I was at the police station on April 15, 2015, the police told me that they needed to wait for the results of the autopsy to determine the cause of death. I flew back to the USA, to my parents, on April 16, 2015. Two day later, we left for Nepal. We went to Kathmandu for a family visit. When I was there, I experienced several earthquakes. We were evacuated out of Nepal. On May 4th, when I was back on Saba, I read on the internet that it had to do with a crime. I heard it on the "Saba news" site. Other than that, I know that another student is now living in the residence where Kavya used to live. No one really knows what had happened to her.

In my earlier statement, I stated that Kavya's mother of was ill, but I found out that this is not true.

Q: Who did you hear this from?
A: I heard this from different students. Even the professors are talking about this.

Q: How are you doing since Kavya's death? We understood that you were very close with her.
A: It was very difficult for me. Five days after that I had also experienced an earthquake. I did not have any time to be able to cope with it.

Q: How are you dealing with it?
A: At school there are psychologists whom I have spoken to. I also have to deal with the fact that I do not know how my family is doing. Since May 1, 2015 I have no contact with them anymore.

Q: Angelica, Kavya's body was examined by the Dutch Forensic Institute. They have determined that she did not die a natural death, but that she died as a result of a crime. With this, we want to emphasize that we are dealing with a very serious matter and that it is of utmost importance, especially for Kavya's family to get clarity of what happened. Do you understand that?
A: Yes.

Q: It is clear from the investigation that you were one of the last persons Kavya Guda saw and spoke to on that night of April 15, 2015. Therefore, we would like to point out, that for the investigation it is important that you tell us everything you still remember of that evening. If you do not know something, indicate that. Also, if you are not sure of something. Can we agree to that?
A: Yes.

### PERSONAL *CIRCUMSTANSES ANGELICA THAPA*

Q: Angelica, we are seeing you today for the first time. We have not met before. We would also like to know a little more about your personal circumstances. Who is Angelica THAPA. We know that you were born in Moscow, Russia. How did things transpired in your life after that?
A: After I was born (1990) I lived for two and a half year in Russia. After that (1992) we moved to Nepal and India. My parents are adventurers. When I was eight years old (1998), I moved to the United States of America. At first, I lived with cousins in Virginia. Then I went to live with my parents. In August 2014, I came to Saba. I have a brother of fourteen years old. His name is Akur.

Q: Do you currently have a relationship?
A: No. I had been engaged to Nathan Roberts. We broke up in February of 2015. He lives in the USA.
Q: Why was your relationship terminated?
A: In the beginning, we were good friends, after that we started fighting a lot with each other and we decided to put an end to the relationship. We had been in a relationship for five years.

Q: Who are the friends you mostly interact with?
A: They are the friends with whom I study and go out with, students.

Q: Angelica, we see you here before us, a young woman of 25 years. How would you describe yourself?
A: I am a young woman of 25 years old. I am 5 feet 5 inches tall (1.66m); the color of my skin is brown, I have long black hair and have a normal posture. I have a scar on my neck, as a result of surgery.

Q: What kind of surgery did you have?
A: Some years ago, I was diagnosed with "Thyroid Cancer". My lymph nodes were therefore removed. Every six months, I have to go to America to do a check-up and blood analysis. I take medication three times a day. I use the following medicines: Synthroid 100 mg, Levothyroxine 5 mg; Iron 130 mg; Calcium 5000 units and Vitamin D 1000 units.

Note: At about 19:51 hours, there was a bathroom break for the witness. The witness was also offered a cup of tea. The interrogation resumed at 19:59 hours.

**COMMUNICATION / TELEPHONE**
Q: Which phone(s) do you use?
A: I have a smartphone Galaxy Core Prime, which I use for internet. I use it to WhatsApp, skype and viber with my family. I cannot make calls with it anymore. I cannot receive calls. I have this smartPhone since I returned on May 4, 2015. Before this, I had a Nokia Lumia. The screen is broken at the moment, I have it at home.

Note: in your earlier statement you mentioned that you used your phone to send sms messages.
Q: Is this correct?
A: I mean WhatsApp. I cannot send text messages, because I do not have a local number.

Q: How else do you communicate?
A: I have a Dell laptop. It is now at school, in the library. I have this laptop since August 2014. I only use it for school purposes. Additionally, I also watch you-tube and I download photo's. I also used to make use of my laptop to Skype. I currently make use of mycellular phone to skype.

Note: Your cellular phone will be confiscated for further investigation.
Q: What is the password of your cellular phones?
A: That is alright. The password of the Samsung is 0423 and the password of the Nokia is 02261990 or 022690.

Q: How else do you communicate with others?
A: In person or by phone.

Appendix 6

**TRANSPORTATION**
Q: What means of transportation do you use?
A: None.

Q: How do you get around then?
A: I walk. I only left The Bottom three times. I take a ride with people passing by. On April 14 2015, I got a ride in Brianna's car to Windward side. On April 16, 2016, I got a lift with Vanessa HOYTFOX to the airport. Vanessa has a red car. I do not know what brand it is.

**KAVYA LEKHA GUDA**
Q: As we mentioned before, we have some additional questions as a result of your first testimony, particularly questions about Kavya. Who was she? With this it is possible, that we will be able to form a better image of Kavya GUDA. You might have already answered certain questions. It is important for everyone that it becomes clear what happened. Is that clear?
A: Yes.

Q: What did Kavya look like? Her description?
A: Kavya was short, about 5 feet tall (1.62m), she had long black hair, big brown eyes, normal posture. A bit thicker than me. I did not see any scars or tattoos on her.

Q: Do you have a picture of her in your smart phone?
A: No, I do not have a picture of her on my computer.

Q: What kind of picture do you have of her?
A: I only have pictures of her face, which she showed me.

Q: By what name or nicknames was she called by you but also by others?
A: Kavya.

Q: What did her daily routine look like?
A: We went to school all day long, to the library and after that we walked home. School starts at 08:00 hours and lasts until 15:45 hours. After that, we went home to shower and have dinner. After that we returned to school. We remained in the library until midnight. After the library, we went home.

**FAMILY**
Q: What can you tell us about Kavya 's family structure? Think about parents, brothers and /or sisters.
A: I know that she has a father, a mother and a little sister and that they live in California. Kavya had told me that her mother was ill and needed a kidney transplant. Just recently I heard from

her father that this was not true. Kavya showed me pictures of her parents and a house. It was a big house. I assumed that it was their house.

Q: When did you speak to her father?
A: On April 16, 2015 I telephoned her father. I had received an email message from him asking me to give him a call. Since my phone was not working well, I used someone else's phone. I asked him how his wife was doing and I said that Kavya had said that she was going to donate a kidney to her. I realized her father was surprised and he said that that was not the case.

Q: Why would Kavya lie about something like that?
A: I do not know.

Q: Where does Kayva 's family live?
A: She told me they live in California and that they are from India.

Q: When did Kavya leave India and where did she move to after that?
A: I do not know. I know that she was living in California all the time.

Q: According to you, how was the contact between Kavya and her family?
A: As far as I know, she spoke with them on a daily basis either by phone or on the computer.

Q: What can you say about Kavya's health, but also about the health of her immediate family members?
A: When she was in the 2nd semester the first time, she was coughing regularly. She had received antibiotics at the hospital. She then got allergic reactions to this. In the month of November 2014, she returned to the USA on account of those health issues. In January of 2015 she was back and joined my class.

**RELIGION/RELIGEOUS AFFILIATION**
Q: What can you tell us about Kavya's religion/religious affiliation?
A: I think she was Hindu.

Q: To what extent was she an active Hindu? In other words: What did she do with/about it ?
A: I do not think that she was deeply religious. I do not know if she prayed. We had never spoken about this. I only know she was a vegetarian. I do not know if that had anything to do with her religion.

**EDUCATION AND PLANS FOR THE FUTURE**
Q: What can you say about the education Kavya had received?
A: She had obtained her Bachelor's in the USA. We must receive a Bachelor degree before we are accepted here at school.

Q: Where did she pursue the Bachelor's program?
A: I do not know.

Q: What was her opinion of the Medical School in The Bottom?
A: She liked the class. She wanted to become a doctor. We never discussed what type of doctor. She wanted to help people.

Q: With whom did she have social intercourse with?
A: In our class I would say Anisa Benjamin. Outside our class, she also had contact with Omar, Samer and myself.

Q: How was her contacts with the professors and the deans?
A: She was friendly with everyone. She often went to the professor's lounge. Everyone has a professor as a personal counselor. I also have one, but I seldom speak with her.

Q: What do you know about her exam results?
A: She had never shown me her exam results, but she had told me that things were going well with her. Just recently, I found out that things were not going well with her and that was the reason she was going to leave.

Q: How do you know that?
A: This is generally talked about at school.

## PERSONAL CONTACT ANGELICA/KAVYA

Q: How well did you know Kavya?
A: We were very friendly with each other. We were caring to each other.

Q: Since when have you known her?
A: She was my group leader when I first arrived at school (August 2014). After that we used to greet each other whenever we bumped into each other. In the month of February 2015, I was having problems with the study. Kavya encouraged me to continue with my studies. That is how we came to spend a lot of time with each other.

Q: What did you think of her?
A: She was sweet and caring to everyone. I do not have the impression that she was neglecting herself. She thought she was on the heavy side and she wanted to lose weight, but did not do anything about it.

Q: How was the contact between the two of you? How did the two of you have in contact?
A: Most of the time, I had personal contact with her. Every now and then, when I was running late, I would send a WhatsApp message to her to let her know that I was running later.

Q: How often did you see each other?

A: We saw each other every day. In the weekends we saw each other in the library.

Q: What positive character traits does Kavya have?

A: Very nice, friendly and caring.

Q: Give an example.

A: She was very caring to me and to the other students. She inspired me when things were not going well with me at school. She also brought food for me. Last semester, I broke my toes and she was the one who advised me to have my toes checked. Then I went to a professor. When we were together in the library, she would fetch books for me when I needed a book.

Q: What are the negative, less positive character traits you know of her?

A: None.

Q: To what extent did you trust her?

A: I had complete trust in her. I entrusted her with my results. I had told her that I was sick.

Q: To what extent did she trust you?

A: I do not know now any more. She told me about her mother's illness and that she wanted to become a doctor to help people. We had talked about a lot of personal matters with each other. We had also spoken a lot about her mother and about relationships. She teased me that I did not have a boy-friend and that I did not want to date anybody. I told her that it was difficult to start a new relationship with someone, after a relationship of five years,.

Now that I found out that her mother is not ill, I cannot do anything more about that. My feelings about her have remained the same.

Q: What was it that would make her angry?

A: No I had never seen her angry. She would be stressed about her mother's illness.

Q: What would make her sad?

A: Whenever she spoke about her mother she was sad.

Q: Did you ever have a fight with her?

A: No.

## COMMUNICATION / TELECOM KAVYA GUDA

Q: Which phone(s) did Kavya use?

A: I know that she had an IPhone and another telephone..

Q: Which telephone numbers did Kavya use?

A: I have her number in my old Nokia.

Appendix 6

Q: By which name was Kavya's active on Facebook?
A: She made use of Facebook. I do not. I do not know if she used her first name and her surname. My housemate made a profile for me on Facebook, but I never used it yet.

Q: What were her user names for WhatsApp for example?
A: I noticed she used Kavya GUDA.

Q: Which other social media did Kavya make use of?
A: I do not know. I believe she made use of Skype to communicate with her parents.

Q: What email addresses did Kavya use?
A: I do not remember that, I never sent her an email message.

Q: What can you tell us about the passwords and/or access codes that were used by Kavya?
A: I know that she used passwords, but I do not know them.

Q: What can you say about Kavya's internet behavior? In other words, which sites did she visit?
A: I know that she visited YouTube and Facebook.

Q: Was she active on forums? If so, which ones?
A: I do not know.

**HOME AT KAVYA LEKHA GUDA**
Q: Did you ever visit Kavya's home?
A: Yes.

Q: How often did you visit her?
A: I was only there two or three times.

Q: What did you do there then?
A: The first time she invited me to dinner, the second time it was to greet her and the third time was on Wednesday, April 15, 2015 when I walked her to her home. I went inside with her.

Note: Ok, we will get back to this later, Angelica.

Q: Did Kavya ever visit your house?
A: No.

Q: What can you say about Kavya locking or not locking the apartment, when she left her home, but also in the evening and at night when she was at home and asleep?

Appendix 6

A; I know that she did not lock her door. When I took her home on Wednesday, April 15, 2015, I had her keys in my hand and was about to open the door. Kavya then said to me that the door was not locked. I also noticed that I was able to open the door. Kavya said that here on Saba you do not need to lock your doors.

Q: Did Kavya lock her doors in the evening hours when she was at home?
A: I do not know. Most people do not lock their doors when they leave their homes. I always lock my doors.

**FRIENDS/KAVYA RELATIONS**
Q: Who did Kavya interact with?
A: Samer, Omar, Anisa and me. Samer, Omar an Anisa were in her old class. During the previous semester Anisa and Kavya were with me in the same class. Anisa and Kavya had to repeat their semester.

Q: Who were her friends?
A: At school everyone is friendly with everyone. The persons I just mentioned are the persons she interacted with at school or went out with. I do not go out very much, so I do not know who all she went out with. I am a shy person and I have health issues. I cannot eat everything and so on.
Q: Did she have a best girl-friend or best boy-friend?
A: The group that I mentioned already. At home she also talked to Priya and Mehak.

Q: What about Kavya's steady relationships?
A: She said that she had been engaged to Jay and that they had broken up. I know that she interacted a lot with Samer and Omar. I know that she and Omar were very close with each other and that people were saying that there was something going on between Omar and her. Omar and Kavya never told me, that they had something with each other. They never did anything in my presence. I never saw them holding each other hands or kissing.

Q: What do you know about any other contacts of Kavya (one night stands)?
A: Kavya was dating Jay for a very long time. Personally, I had the impression that it was nothing for her. I never asked her about it.

Q: What do you know about Kavya's sexual orientation? Did she like men, did she like women or both men and women?
A: I think she was heterosexual. She was engaged to a man. She never told me that she liked women.

Q: How would you describe your relationship with Kavya?
A: We were friends and classmates.

Q: In what way was Kavya sexually active according to you?
A: We did not speak about that. Actually, I do not know that.

Q: Did she speak with others about it?
A: I do not know that either.

**INCOME AND EXPENDITURE**
Q: What do you know of Kavya's financial situation? How was she financially?
A: I had the impression that her father was rich. Kavya was busy applying for a loan, so she could pay for her studies herself. She asked me to help her fill in the forms for that.

Q: How did she receive money?
A: I know she had a bank account. I do not know how the money got into her account, whether it came from her father or from someone else.

Q: What did she spend her money on?
A: Here, on foodstuffs and groceries. Apart from that, there is nothing to do here to spend money on.

Q: What do you know of any debts Kavya had?
A: I do not know if she had debts.

Q: Did she borrow money to other people?
A: Not that I know. At any rate, not to me. As far as I know, each one of us bought our own groceries.

**HOBBY'S / LEISURE ACTIVITIES**
Q: What did KAVYA do in her free time?
A: Nothing, study. I know she used to practice Yoga before. That was before she came to Saba.

Q: We understood that Kavya had done martial arts as a sport. What do you know about that?
A: She had practiced Taekwondo. I know that she did that for a very long time. She had reached up to the red belt.

Q: In what way would Kavya have been able to defend herself?
A: I have been thinking about that. I do not know. I thought about that when people were saying that it was a homicide. I have stated before that I was with Kavya on that particular evening. I wished that I could have protected her that evening.

Q: What defense materials/articles did Kavya have at her disposal?
A: I thought she had pepper spray or a Taser. That is what Kavya told me. I never saw it.

Q: When Kavya went out, where did she go?
A: Here, there are a few places to go to. Kavya went to Topo's (Topogigo) The Bottom or to Scouts in Windward side. We did not have much time to go out, because we had to study a lot. At times we went out with the entire class. Then we also went to Topo's. The last semester we only went to Scouts once. As I just told you already, I did not always go along. Kavya did not go more often either, because there was not much to do and because she also had to study a lot.

Q: As you probably know, during the past period we have interrogated numerous persons, in particular students of the Medical School as witnesses. Also as a result of these interrogations, the investigation team got the impression that relationships emerged among the students. What can you say about this?
A: Everyone knew that Omar and Kavya were together a lot. There were also couples at school.

Q: What do you mean by that? What is the difference between being together a lot and being a couple?
A: When they are a couple you can them holding each other hands or kissing each other. I never saw that with Omar and Kavya.

Q: How open are students among each other about having a relationship with each other?
A: There are couples that openly admit that and there are other couples that do not. I do not dwell on that.

Q: Are there specific guidelines from the school about having a relationship?
A: Not really. There are no real rules about dating.

Q: What do you think about that?
A: I think that "if you find someone, you find someone" Then that is great. We are all at the school to study. It is possible, that you find someone.

Q: Which of the students are having a relationship?
A: I know of a few students in the higher grades, that they are couples. I know they show that on Facebook and I see that they walk hand in hand. I do not know their names.

Q: You just said that you are not on Facebook?
A: My housemate told me that and other also students speak about it. I do not know their names.

Q: How did Kavya feel about this?
A: The same way as I do. She also felt that everyone should do what he or she wanted.

14 – 15 APRIL, 2015

Q: During the interrogation on April 15, 2015, you also gave a statement about the evening of Tuesday April 14, 2015 and the following night of Wednesday April 15. What did you do on April 14, 2015 during the day? What did your daily schedule look like?

A: On Tuesday April 14, 2015 I went to school at approximately 7:30 hours. Kavya was there already. That day, I had an exam and got back the results of the exams I sat the previous Monday. I was very nervous about those results. On account of that I could hardly study for the exam of that Tuesday. Kavya had seen my results. She said that I passed.

On this Tuesday I had to take 2 exams. I took the first exam at approximately 10:30 hours. After that I had lunch. In the afternoon I had another exam. I finished taking that exam at around 17:30/ 18:00 hours. Subsequently, I went to the fitness center of the Medical School. I worked out for about 45 minutes. I think I got home at about 19:00 or 19:30 hours. I am not totally sure about that, because I did not pay much attention to the time. After the workout, I went to clean up my home. Because of the studies and the exams I had not done that for about a month. While I was cleaning, I was skyping with my mother. I had made an appointment with Kavya that I would be at her residence at 21:00 hours. I did not succeed in doing so on account of the cleaning. I really wanted my house to be clean before I left. That is why I sent Kavya a message that I would not be able to make it, and would come a little later. Kavya reacted to my message. She said she would go ahead with other persons. She was going to have dinner at Topogigo's in The Bottom, with Vanessa and Jose. I went there later on. When I arrived at Topo's, I noticed that Kavya was already there with Vanessa, Jose, Brianna and Yasir.

Q: You stated earlier that on that Tuesday evening, you left your home and arrived at Topogigo in The Bottom at about 21:50 hours. Is that correct?

A: Yes, I think it must have been about 21:45 hours when I got there. I think so because at that time, I had finished cleaning at that time. The conversation with my mother lasted very long; I think for some 2 hours. I cannot say exactly what time it was. I did not look at a phone, watch or clock for the time.

Q: How did you leave your house?
A: I walked.

Q: What did you all do at Topogigo?

A: I know that Kavya and the others had eaten there. I saw the Quesadilla on their table. I personally did not eat there.. It was not crowded. I walked in at the same time with a few other people. Besides our group, there was another group from the lower semester. Brianna told me that the others were at Scouts. Vanessa lives in Hell's gate. She drove past the Scout's Place on her way to The Bottom. She then noticed that there was a number of people there. Brianna asked me if I wanted to come along to the Scouts. Kavya and Yasir wanted to go there. This is also the reason why I went there with them.

Q: Did you visit Topogigo again after April 15, 2015?
A: Yes, I have been there since then. During the first week after I returned from the Spring break. I was there on Friday May 8. There was a welcome party for the students.

Q: You stated earlier that on Tuesday, April 14, 2015 at approximately 22:40 hours, you left from Topogigo together with YASIR, KAVYA, and THAPA to Scout's Place in Windwardside. How did all of you get there?
A: With Brianna, in her car. Yasir, Kavya and I got a ride with Brianna.

Q: Who else were at the Scouts?
A: A lot of students from our class. Almost everyone from our class.

Q: What did all of you do at Scouts Place?
A: There was music. I bought a glass of white wine for Kavya and for myself. I only drank half of my glass of wine, because I did not like the wine. Since the bar had just closed, the entire class left to go to Guido's.

Q: At what time did you leave Scouts Place?
A: I do not know that.

Q: How did you leave?
A: We left on foot.

Q: How often have you been to Scouts Place since April 15, 2015?
A: Not anymore.

Q: You stated earlier that you (KHAN, KAVYA and THAPA) arrived at Guido's in Windwardside at about 23:00 hours. Where is Guido's located?
A: I cannot remember what time it was anymore. Guido's is within walking distance from Scouts. It is just a few meters up the hill. We walked.

Q: What did you drink there?
A: I drank wine, but I did not empty the glass. I was so tired. I just wanted to be there, because Kavya was going to leave.

Q: What did Kavya drink there?
A: She also drank wine.

Q: We are showing you a Google Earth map. On it, you can see the map of Windwardside.  Can you point out where Scouts and Guido's place are located?

A: I find that very difficult. I know that when you come into Windward side, by the supermarket, you have to turn right. Scout's Place is located on the right side of the road. From Scout's Place, you first turn right and then go up the hill. That is where Guido's is located.

Q: How was the atmosphere at Guido's?
A: It was cozy. Everyone was happy because they had passed the exams. At least most of them. I do not know if there was music. Everyone was just talking with each other that evening.

Q: How much did you drink in total that evening?
A: I think that I drank in total only a few sips of wine. I was sitting down.

Q: What effect did this drink have on you?
A: None. I do not drink much anyway. When I drink I make sure that I am responsible. I like to stay in control of myself.

Q: Did you use any drugs and/or any substance that evening?
A: No.

Q: On April 15, 2015 you stated that you ordered a white wine for you and Kavya at Scouts. Furthermore, you also stated that you are not allowed to consume alcohol on account of the use of medication for cancer.
Q: Why did you still drink white wine at Scouts?
A: That day I had only taken my medicine in the morning. I am not allowed to drink a lot of alcohol in combination with the medicines. It is not a problem if for example I drink a glass of wine during a meal.

Q: Again here is another section of your first statement:
.....I was tired, so I withdrew a bit from the rest.....
In what way did you withdraw from the rest?
A: Everyone was standing and talking. At a certain moment I went to sit down on the chair in the vicinity of the 'island' at Guido's. I did not feel like talking anymore, that is why I went to sit down there.

Q: What was the reason that you were so tired?
A: On account of the studying and the exams. I had been under a lot of stress. I almost did not pass the exams.

Q: Who came up with the idea to leave Guido's?
A: I was extremely tired. I went to ask the others about taking a taxi. In the end, it appeared that there were no taxi's running. Kavya asked Brianna if she wanted to drive. Brianna said that she would drive.

Q: At what time did you all leave Guido's? How did that go?

A: I cannot remember what time it was. I do not have a watch. I know it was around midnight.

Q: Where was Brianna's car parked?

A: On the parking lot at Scouts. We walked to it. Brianna has a metallic silvergrey or blue car, with four doors. I cannot say whether it is a Sedan model or a Hatchback.

Q: With how many persons were you in Brianna's car?

A: Brianna asked who wanted a ride to the Bottom. Brianna was driving. Rene Torres sat next to her. Yasir, Kavya, Senad and I were seated in the back.

Q: Who was sitting where in the car?

A: Yasir was sitting behind the driver's seat. Next to him was Kavya. On her right was Senad. I was on the lap between Kavya and Senad. I held on with my hands to the front seat of Rene. I was leaning a bit forward.

Q: How did it go after that?

A: We drove straight to the Bottom. In front of the apartment complex where I live there is a side road. I will point it out to you on the Google Earth map of the Bottom. Halfway the road where Kavya lives, Brianna stopped the car. I had asked for that. Kavya's house is further down on the right.

Q: Why did you ask to stop there?

A: Because exactly in front of Kavya's home, there is not much room to turn the car. On the spot where she stopped now, we could all get out and walk to our own homes, so that Brianna did not have to bring everyone home. On that spot, she also had enough space to turn. Everyone got out on this spot. Yasir, Kavya, Senad and myself; Brianna drove back with Rene. I saw that while I was walking with Kavya in the direction to her home.

Q: From the investigation it became evident, that during the drive, Kavya asked to be dropped off at the Medical School. What do you know about that?

A: She did not tell me that. Neither did I hear that. I got out at her place, because I wanted to know for sure she would get home.

Q: How come? Why did you want to know that?

A: I just wanted to make sure that she got home safely. She was not drunk or anything like that. She was alright. I did that because she was my friend and I wanted to look out for her. Since she was going to leave in a few days. I often walked with Kavya when we got to her home.

Q: What happened then?

A: Together with Kavya, I walked up the stairs in front of her house. While going up the stairs, Kavya asked me if I wanted to sleep over by her. I told her that I could not do that because I did

not have my medication with me and because of my contact lenses. I went inside with Kavya. Inside the home Kavya asked me again, if I would like to sleep over. I repeated that I could not do that.

Q: How did she react to that?
A: She asked several times again. I told her that it was good that she was home. A while later Mehak also dropped in. She lives next to Kavya. I do not know in which apartment she lives. She came from the hallway to Kavya's home. I said that Kavya would speak with Mehak for a while. While I was with Kavya inside her home, Senad was also with us. He was standing in front of the door, he was not inside. I heard Kavya tell him a few times that Senad had to make sure I got home safely. Senad said that that was okay. After that I made an appointment with Kavya to have breakfast with her the following morning. I asked Kavya to send me a message when she woke up the next morning.
After that I said goodbye. In the meantime, I was outside of the house on the stairs. I left with Senad. Kavya was standing in the door opening. As far as I know now, at that moment Mehak was inside Kavya's house.

Q: And then?
A: Senad and I walked down the street in the direction towards his home. When we got near his home, I told him that I could walk the rest of the way by myself. On that spot, I stood talking with Senad for some time. I had never spoken with him for a long period. I was not well acquainted with him, even though he was my class mate. He used to tease me, because I did not know his name. Senad told me that he promised to take me home. After that we continued to walk in the direction of my home. While walking, Senad spoke about who he was and about his parents.

Q: How did you walk?
Note:  We show Angelica a map of Google Earth. On this she points out with a blue marker: Kavya's home, her own home, Senad's home, the route she walked with Senad and the spot where Brianna had stopped her car. This map is added as appendix 1 to this official report of the interrogation.

A: I will point it out on the map with a line. We walked down the street, we passed the Governor's house, behind the park. On the height of the park, we stopped for a while, because I was not feeling well. I was tired and was shaking a bit. I still had to take my medication. After that we continued walking. A bit further on, we stopped walking for a little while. I sat down on the low wall alongside the road, that was in the last bend of the road before my home.  Senad kept on talking to me about school. He also said he was having rough time, because he failed one exam. I told him that I also almost failed one exam. He then gave me some advice about studying during spring break. For example, he advised me which video's I should look at and which literature I should read. He said that I should go directly to the library the next morning. Since I was still shaking at that moment, during the walk, Senad said he wanted to take me

home. I was feeling cold, because I only had on a dress. Senad helped me up the stairs to my home. There is no support railing. Senad entered my home with me. Senad first asked me what I needed. I told him. Then he brought me my medicine. He got me a glass of water. I then took my medicine. Senad told me to sit down on the couch. He also sat down on the couch and asked me why I needed to take those medications. I then told him why I needed them. He was surprised and wondered how I was able to pursue the studies, while I have cancer. I told him that for two years I had waited for a treatment and that I no longer wanted to wait for it. I had needed to postpone my studies a few times because I needed treatment and the cancer had returned.

Q: What happened then?
A: I spoke with Senad about the study and about my illness. Senad told me that I was still young and had enough time to finish my studies. We continued to talk. I asked him how old he was. He said that he was 28 years old, almost 30. Senad further told me that he came from Bosnia and that he had had a very difficult time with his parents there.  We sat talking for a while. Senad and I were sitting on the couch next to each other. At a certain moment he suddenly kissed me on my mouth. I was surprised and told him that I did not want that. I told him also that I was not such a girl. I thanked him for dropping me home and told him that it was very interesting to talk to him. Nothing more. I said that I was tired and wanted to go to bed. Senad asked me if he could see me again after the 'break'. That would be when I returned on May 4, 2016. I told him that that was alright. Then Senad left. I did not see how he walked. At a certain moment I got up and locked the front door and looked through the tiny window of the front door. I assume that Senad walked back the same route we came walking. I think so, because I know for sure, that Senad could not take another route.

Q: Then what about the path on the other side of your house?
A: I do not think Senad took the other path. I think so, because I saw that Senad walked away from my front door, down the stairs. There are lamp-posts shining light on those stairs. I noticed that the light beam of the lantern was interrupted when he walked down. That is why I assumed that Senad took the same route back. Another reason is that Senad had never visited me before. I assume that he did not know that there was a gate on the other side of the building.  As a matter of fact, that gate is always locked at night. When I return from the library to my home in the evening, I always walk the route that I just described.

Q: Would you have in your possession any pictures or videos of that evening / night?
A: No, I did not take any pictures.

Q: Are there other persons who took pictures and / or videos that evening / night?
A: No, I do not think so.

Q: What clothing were you wearing that evening?
A: I was wearing a dress; color off-white. The dress was without sleeves and reached just above my knees. The bottom part was a bit flared.

Appendix 6

Q: How was Kavya dressed that evening?
A: She was wearing a pink dress with flowers on it. In any case, it was not a tight dress.

Q: How was she wearing her hair? What about jewelry?
A: She wore her hair loose. She never puts up her hair. I do not know if she had on any jewelry? I do not pay attention to that. I do not know either if she had on a watch.

**Omar Elkadry**
Q: Angelica, you referred to Omar Elkadry earlier. What can you state about him?
A: In August he will be 28. He is from Canada and he has 3 brothers and sisters. He has finished a study before and worked as an Oral Hygienist. Omar is currently 'Student Government President'.

Q: What does that mean?
A: He is sort of a bridge between the administration and the students. If for instance, I need any money for something, I can request it through him. He is the representative on behalf of the students.

Q: What does he look like? Give a description.
A: He is about 5 ft and 6 or 7 inches (1.80m) long. He has black hair, short and straight. On one side he has it shaven and on the other side it is a bit longer. His skin-colour is lighter than mine. He has a thin posture. Every now and then he has a few days a beard and mustache. That is mostly during exam time. Omar has a scar on his right cheek, a scratch.

Q: Where do you know him from?
A: We all know each other from school. He is an extreme family man. Omar is not in my class. He is in a higher class.

Q: Where does he live?
A: He lives close to the Medical School. Hill Side Dorms.

Q: With who does he live there?
A: Jose and Samer.

Q: What kind of house is that?
A: It is a single family dwelling with three bedrooms.

Q: How often have you been there?
A: When I was living in the dorms, I used to pass there every day. I visited him a lot these last 10 to 12 days.

Q: Why?
A: We are close friends. It is difficult for all of us to be back and attend school.

Q: Why is it difficult?
A: Because apparently one of our best friends was murdered. We do not know what happened.

Q: Then, when did you go to Omar?
A: I went to him after school. When Omar and I had been to the library, I went home with him afterwards. I also slept over.

Q: But today you were not at Omar's place?
A: Last week, we had exams and this week I have another exam on Thursday. Omar is finished with his exams. I slept at Omar's until Saturday May 23rd.

Q: Where did you sleep?
A: In Omar's room. I slept there with Omar and Samer. We had put a couch in Omar's room. I slept with Omar in his bed. Samer slept on the couch.

Q: Why didn't you sleep on the couch and Omar and Samer in the bed?
A: Samer cannot lie on a bed with anyone. He is a big boy and twists and turns in bed a lot.

Q: Whose idea was this?
A: It came from all of us. When we came back to school after the break, Omar first slept at my home. I was back on May 4th. He stayed the first week with me and also part of the following week. Then Samer had problems being alone. That is why the three of us went to sleep at Omar's house.

Q: If we ask Omar and Samer about this, what would they say?
A: The same thing like me.

Q: When you slept at Omar's, what did you do in the morning?
A: Then I went to my own home to pick up my things for school and for lunch. After that, I went back to school. We went to school the entire day, then to study in the library and then back to Omar's house.

Q: How did that work out with the couch when all of you returned to Omar's house in the evening?
A: It happened a few times that I slept with Omar in his bed. The last days Hassan also stayed over to study. Now they moved the couch into Samer's room, so that Hassan can sleep on it. When I slept at Omar's, all doors were always open, so that we could see or hear each other.

Q: Why do you say it like that? Why do you explain it like that?

A: Because you would otherwise think that something happened between Omar and I.

Q: That is because you yourself are now explaining it like that. If you had something with Omar, that would not be a problem? It is not forbidden to have something with him, to have sex with him?
A: I know that, But that is not the case.

Q: Because of what you are now telling us, we are getting the impression that there was more going on than what you stated about this before.
A: I insist that nothing happened between Omar and me.

Q: How is he doing at Medical school?
A: He is doing fine.

Q: What do you think of him?
A: He is a very good man. He is always ready to help everyone. He is like a kind of father to me, but also to other students. He was also like that to Kavya. When students ask him something, he always helps them.

Q: Does Omar have a relationship at the moment?
A: No

Q: What do you know about his previous relationships?
A: Nothing. I already said that he was close with Kavya. But I never saw them holding hands nor kissing. He once told me that he had a girlfriend some time ago.

Q: What did he think of Kavya? What was she to him?
A: Someone he cared for a lot.

Q: How much do you trust him?
A: Yes, in what way?

Q: His behavior, how he interacts with others?
A: Yes.

Q: How much does he trust you?
A: I think he does. You could ask him about that.

Q: What do you know about his phone usage?
A: He has one (1) IPhone. I do not know his number. It is in my Samsung Smartphone under his name Omar Elkadry.

Appendix 6

Q: What computer(s) does he use?
A: In his house he made use of a laptop which he also uses at school. According to me, it is an Apple.

V: What does he use that laptop for?
A: Only for school.

Q: How do you know that? Since you were not with him 24 hours a day?
A: Okay. When I was by him, he used the laptop for his studies.

**CLOSING**
Q: Are there any issues that we did not speak with you about today, but that you yourself think might be important?
A: No. I have told you everything. I do want to say something about the morning Kavya was found. On that morning of Wednesday April 15, 2015, I was on my way to school to pick up my exam results. When I was close to school I ran into Senad. Senad told me that he was going to the supermarket to do some shopping.  I said that I also needed groceries and that I still had to pay my electricity bill. After that I walked back with Senad. First we walked to the Saba Electric company. There I paid my bill of about US$ 90.00. After that, we walked to My Store. There I bought wine, chicken and cake stuff.  Then we walked to Senad's place. He had forgotten his wallet at home. He picked that up. We walked from Senad's place to Christina's. There I bought balloons. I still have them in my home.

Q: What did Senad buy in the supermarket?
A: Nothing.

Q: Nothing? He wanted to go to the supermarket when you ran into him near the school?
A: I know that. But he did not buy anything.

Q: What happened after Christina's?
A: When Senad and I left Christina's, and were just walking out of the door, with the stairs going down, we saw and heard the ambulance. We saw the ambulance driving up the same street where Christina's is. We saw that it drove in the direction of the campus, but after that we heard the ambulance stopped in the area.

Q: And then?
A: Senad and I walked via Senad's house to the street where Kavya lives. When we arrived in the street, we saw the ambulance standing in front of Kavya's home. Senad and I walked in that direction. He was carrying my grocery bags. At Kavya's home, Samar came walking towards us. Then I saw that the ambulance personnel brought a stretcher outside. Samer told me that Kavya was dead. After Samer told me this, I fainted.

Appendix 6

Q: And then?

A: I cannot remember what happened next. Samer picked me up. I said that I still wanted to see Kavya, but Samer said he did not want me to see her again. After that the ambulance left. A police car was also there. A bit later, I was taken by a police officer in another police car to the police station. That is where I made my first statement.

Q: What do you think happened to Kavya?

A: I do not know.

**End interrogation:**

The interrogation was terminated at 01:52 hours.

After the statement was read out to the witness, she persisted in it and signed it.

.

Witness A. THAPA

(Singed: *Angelica Thapa*).

Whereof this official report was drawn up under oath, signed and concluded on Saba on Tuesday May 26, 2015 on Saba.

The Reporting Officer(s),

Signed *(2 signatures Illegible)*

V.A.Siliee                                       C.T.M. Goemans



*Official and True Translation into English of original Dutch document*
*(Official Report Hector Appendix 6)*
*Drs. L. A. Richardson, sworn translator*
*St. Maarten, 14 September 2016*



Appendix 7

**PRO   -   JUSTITIA**
**Police Force Caribbean Netherlands**

### Police Report of interrogation witness A. Thapa

| | | |
|---|---|---|
| Official Police report number | : | 201506191600 Thapa |
| Investigation | : | Hector |
| Concerning | : | Official Report interrogation witness A. Thapa |
| The reporting officers | : | Gerrit Jan Kapsenberg and Robert den Hollander, respectively, police superintendent and police inspector, temporarily employed at the Police Force Caribbean Netherlands. |

### OFFICIAL POLICE REPORT

We, the reporting officers, state the following:

On June 19, 2015, at approximately 16:10 hours, we heard a woman as a witness who declared to be:

| Witness: | |
|---|---|
| Name: | **THAPA** |
| First name: | Angelica |
| Date of birth: | June 17, 1990 |
| Place of birth: | Moscow |
| Country of birth: | Russia |
| Nationality: | US Citizen |
| Address: | 26013 Donovan Drive, South Riding, VA 20152, United States / at Altagracia Zagers family, apartment # 3 |
| Place: | Saba |
| Telephone number: | |
| Email: | Angelica.thapa@gmail.com |
| Personal details according to: | US Driver's license |

The witness made her statement in the English language. The statement of the suspect was translated by us, the reporting officers, into the Dutch language.

Appendix 7

The witness stated as follows:

Q: Angelica, until shortly before the detention of Omar, you regularly spent the night with Omar. How did these nights go? For that matter, we do not mean whether any sexual contact took place between the two of you.

A:  Both Omar and I did not sleep well during that period. It seemed like he was having nightmares.

Q: What gave you the impression that he was having nightmares?

A: He was just tossing and turning and making violent movements. I do not know for sure, but I thought that he once called out the name "Kavya". However, I was asleep at the time, so I really do not know that for sure.

Q: Angelica, are you good at estimating the time?

A: No, actually since I was a child I was really bad at it.

After having read out the statement to the witness, A. Thapa, on June 19, 2015, the witness persisted in it and signed it.

Witness,

A. Thapa
(Signed: *Angelica Thapa*).

Whereof this official report was drawn up by us under oath, was concluded and signed on Sunday, June 19, 2015 on Saba.

The reporting officers,

G.J. Kapsenberg
oath

Signed: *(Signature Illegible)*
R. den Hollander
promise




*Official and True Translation into English of original Dutch document*
*(Official Report Hector Appendix 7)*
*Drs. L. A. Richardson, sworn translator*
*St. Maarten, 14 September 2016*

**Appendix 8**

## PRO   -   JUSTITIA
**Police Force Caribbean Netherlands**

### Official Police Report of findings

| | | |
|---|---|---|
| Official Police report number | : | 20150613.1430 PVB |
| Investigation | : | TGO Hector |
| Concerning | : | Investigation walking route witness A. Thapa following her statement on June 12, 2015 |
| The reporting officers | : | Gerrit Jan Kapsenberg. Superintendent of police and Robert den Hollander, police inspector, both employed at the Police Force Caribbean Netherlands, Incident Target Search Unit. |

#### OFFICIAL POLICE REPORT

We, the reporting officers, state the following:

Reason:
Witness A. Thapa was heard before in the investigation TGO Hector about the route she took between April 14, 2015 late at night and April 15, 2015 early morning. .
To get a clear idea of this route so that one would be able to indicate approximately how much time is needed to be able to cover this route, the following investigation was initiated:

On Friday, June 12, 2015, the witness A. Thapa was interrogated further. Prior to this statement, she reiterated which route she, accompanied by S. Cejvan, walked in the night of April 15, 2015, at approximately 01:00 hour, from the residence of the victim, K. Guda, on the Clement Sorton Street # 6, The Bottom, to her residence at the address Apartment Altagracia Zagers in The Bottom on Saba. This route was walked by us with the witness. While walking, she indicated at which locations she had rested on that particular night on account of her painful foot. Pictures were taken of several points on the route and of the situation of Thapa's residence. These pictures are numbered 1 to 7 and are attached as an appendix to this official police report.

The Witness showed the following route:
- From the residence of the victim K. Guda to the right;
- After about 100 meters (at the junction) to the right again;
- They stopped just past the entrance of the apartment where S. Cejvan was living (picture 1);
- After a few moments, they continue to the left and pass the residence of the governor (picture 2);
- Past the residence, they turn left and walk along the Wilhelmina Park in (pictures 3 and 4);
- On the small wall along this park the witness rested for a while (picture 5);
- Subsequently straight ahead (picture 6);

Appendix 8

-   At the end of the road, near the building to the apartment of witness Thapa, they stopped again and spoke with each other (picture 7);
-   After some time, they enter the residence of witness Thapa (picture 8).

The witness reiterated, that she assumed S. Cejvan, after visiting her, left her residence through the front door.
Based on this detail, it therefore seems logical that he took the route referred to, in the opposite direction.
It seems unlikely, that S. Cejvan left the residence from behind the residence. In order to provide clarity on the situation of the apartment complex, several pictures were taken.

Picture 9 and 10 show the possibility to go from the balcony of Thapa's residence to the "goat path" behind the apartment building. The balcony is only accessible through the kitchen door of Thapa's residence. S. Cejvan had left her residence through the front door.

Pictures 11 and 12 show the stairs from the ground floor to the front door of the residence of the witness Thapa.

Picture 13 shows the seat in the hallway right in front of the front door of Thapa's residence. On this picture one can also see the beginning of the stairs leading to the fence placed at the back of the apartment complex.
On picture 14 one can see the aforementioned fence.

On picture 15 this same fence is depicted, but then viewed from outside the apartment complex, with the beginning of the "goat path" mentioned before.

On picture 16 the end of the balcony of witness Thapa's residence can be seen. If someone wants to reach the "goat path" from the balcony, one will have to jump from the balcony. Then one will end up in the bushes of about 2.5 meters lower down.
On picture 17, the "goat path" referred to, which goes around the sport field towards the residence of S. Cejvan, can be seen.
Pictures 1 to 17 are added to this official report in appendix 1.

Whereof this official report was drawn up by us under oath/promise, which we concluded and signed on June 15, 2015 on Saba.

The reporting officers,
Signed                  *(2 signatures illegible)*
G.J. Kapsenberg                                              R. den Hollander
oath                                                         promise



●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●
*Official and True Translation into English of original Dutch document*
*(Official Report Hector Appendix 8)*
*Drs. L. A. Richardson, sworn translator*
*St. Maarten, 14 September 2016*

Appendix 9

## PRO - JUSTITIA
**Police Force Caribbean Netherlands**

### Official report of interrogation witness A. Thapa

| | | |
|---|---|---|
| Official Police report number | : | 201506121300. Thapa |
| Investigation | : | Hector |
| Concerning | : | Official Police Report witness A. Thapa |
| The reporting officers | : | Gerrit Jan Kapsenberg and Robert den Hollander, respectively Superintendent of Police and police inspector, bothemployed at the Police Force Caribbean Netherlands. |

### POLICE RECORD

We, the recording officers, state the following:

On June 12, 2015 at about 14:00 hours, we heard a woman as a witness who declared to be:

| Witness: | |
|---|---|
| Name: | **THAPA** |
| First name: | Angelica |
| Date of birth: | June 17, 1990 |
| Place of birth: | Moscow |
| Country of birth: | Russia |
| Nationality: | US Citizen |
| Address: | 26013 Donovan Drive, South Riding, VA 20152, United States/ at family Altagracia Zagers app 3 |
| Place: | Saba |
| Telephone number: | |
| Email: | Angelica.thapa@gmail.com |
| Personal details according to: | US driver's license |

The witness made her statement in the English language. The statement of the witness was translated by us, the reporting officers, into the Dutch language.

Appendix 9

The witness stated the following:

Q: Angelica, we confiscated two cellular phones from you. 1 of those phones had a broken screen. Apparently, this was your old phone and as we understand, you started making use of mya new phone shortly after the spring break. When did the screen of the old phone get broken?

A: Oh, that happened years ago. According to me, 6 days after I got the phone new, I dropped it and the screen got broken. I started using my new phone since April 29 or April 30, 2015.

Q: Angelica, on May 29, 2015, our colleagues saw you walking together with Vanessa Hoytfox, Jose Gomez Bautista and Carolina Ungs in the area of the small church close to the medical school and that Omar came running towards you all. Can you tell us what exactly happened there?

A: We were indeed walking in the area of the small church when Omar suddenly appeared. All of a sudden I felt a hand that was partly on my shoulder and partly on my neck. At first, I thought it was Vanessa who did that because she wanted to warn me for the traffic. However, when I looked around I saw that it was Omar. I do not know whether he put his hand on that spot on purpose or by accident, but Omar knows that this is a very sensitive spot for me.
This happened at a time when actually everybody who was close with Omar had turned away from him. I got very scared from Omar and told him I wanted to take some distance. Actually, Omar left right away after that.

Q: What did you think of Omar before Kavya's death?

A: We did not have a lot of contact, I thought he was a nice guy. He helped people and was a bit like the father of the group we were in. If you needed something, you just called Omar. Omar once paid a taxi for 13 persons or he paid for the coffee if we were sitting somewhere on a terrace. Actually, he did that with everybody.

Q: Did Omar have a lot of girlfriends?

A: I often studied at school with him until late. He also did well at school. Actually I never saw him holding a girl's hand or kissing a girl. Shortly after Kavya's death my friendly relationship with Omar improved. He once told me that he had a sexual abnormality and that it hurts when he got an erection and had sex with a girl. Furthermore, he told me that he could not get children. He told me further that he also had had his sperm frozen.

Q: When did you get to know that Kavya had a relationship with Omar?

A: Shortly after Kavya's death, I asked him about that. He told me that she was in love with him but he was not in love with her.

Appendix 9

Q: Did you never ask Kavya about this?
A: No, never. We did not discuss those kinds of things. We mostly talked about India, where my father was born, and our goals for the future. I never took note of the relationship between Omar and Kavya.

Q: Were you jealous of the relationship between Omar and Kavya?

A: No, I was not jealous of them.

Q: You have already spoken to us extensively about everything you did on the night of April 14, 2015. In Kavya's phone we found whatsapp conversations between you and Kavya. In the conversations we read practically exactly the same thing you stated to us earlier about your contact with Kavya and the appointment both of you made to go out later that evening.
We have also found the whatsapp conversations in Omar's cellular phone. Those are conversations between you and Omar. To our great astonishment, we read that actually on April 15, 2015, the day Kavya was found dead, you and Omar send each other messages containing: "I love you".
Can you explain that, since you indicated previously, that you did not have a relationship with Omar?

**Note reporting officer:** the whatsApp conversations between Kavya and Angelica as well as the whats-app conversations between Angelica and Omar are added to this police report as an attachment.

A: "I love you" does not necessarily mean that you are "in love". I did not only say "I love you" to Omar, but for example also to my friends Samer, Jose and Vanessa. With that, I did not mean to say, that I was in love with Omar. I considered them and the rest of my friends as family. It is simply an expression.

Q: We heard from several witnesses that Omar hated you before Kavya's death. Can you explain that?

A: Yes, I also heard so later on, after I had ended my friendship with Omar. In the period after Kavya's death, Omar was precisely the one that I trusted for 10,000%. He was nice, caring and actually knew exactly what I needed.
My girl-friend was dead, after that I found myself suddenly in the middle of an earthquake in Nepal and when I returned to school, I was totally not yet ready for that. I still had too many things going on in my mind. Omar was the one who picked me up in that period. He knew exactly what I was going through with my disease (cancer) and told me that his mother also had cancer. He knew, at least he pretended to know, exactly what I needed. He advised me to drink ginger. When I did that, I also felt better. We had also slept in the same bed together for a long period and nothing sexual ever happened. He won my trust by always saying the right things to me.
When we wished each other goodnight, I gave him a hug and a kiss, just as I did with Samer.

Q: When we read the whatsApp messages between you and Omar, we get the impression that he was not really down. How is that?

A: in the beginning, shortly after Kavya's death, I noticed that he, just like me, was very sad.

Q: Did you hear, at that time, that he was approaching fellow students to find out what they had stated to the police?

A: No, I did not hear that at that time. But I heard that afterwards. Look both Samer and I were a lot at Omar's in that period. Actually, this was also the case when those vicious emails were circulated amongst the students. Then I was totally down. I could also not sleep well anymore. At the tiniest sound, I woke up at night. That is the reason why we all slept together so often.

Even then, he knew what to tell me to get me to calm me down. On the evening that an email was sent indicating that someone was going to get stabbed, he told me that he would stand in between, if someone would come at me. That gave me a good feeling. Samer and I were not the only ones who looked up to him. Yassir Kahn is a guy with a low self-esteem. Everybody ignored him. Omar didn't. Omar talked to him, gave him compliments and tips. Yassir looked up to Omar as a god. For example, Yassir would come to Omar to ask him what he should do, eat and then shower or shower and then eat. Omar would answer for example, that it would be better for him to first take a shower and eat after. However, Yassir was totally devastated when Omar was detained.

In retrospect, Omar was just like an actor. He was so considerate, he would ask me "have you eaten", "how was school?" He could say the right things at the right moments to me and to others.

Afterwards, I realized that Omar never left Samer and me alone. Actually, he had us under control. To give an example, when I indicated that I had to go to the toilet, Omar would tell Samer to go with me. And Samer would actually do that.

To give another example of how he influenced me, he told me that he, just like me, came from an average family where one just had to work hard to make ends meet. My parents had sacrificed a lot to enroll me here at the Medical school on Saba. This in turn put pressure on me to graduate for this study. For, as an immigrant you have to work twice as hard. Omar recognized this and had full understanding for my situation. After all, he was in the same position. Omar told me that he did not have a lot of money and that he also felt the pressure. He wanted to graduate to be able to take care of his family. I later learnt, that apparently his parents were rich. They owned a big house and several cars. At least, that is what I heard. I also heard afterwards from Samer that a large sum of money was found in Omar's room.

I really regret that I believed in Omar in that period. He is a genius at manipulating people. He knows exactly how to strike the right chord, as a result of which you get an enormous sense of trust in someone.

Kavya was a girl who saw no evil. For example, she never locked her front door. I told her once that she must promise me to lock her front door.

Q: Do you know if the lock of Kavya's front door was broken?

A: Yes, that is correct, but that was months ago. Then it was fixed by her landlord.

Q: Did you often visit Kavya?

A: I visited her regularly, because her home is my the way home. Kavya never entered my home. I live a little in a remote corner of "The Bottom".

Appendix 9

After having read out the statement to the witness, A. Thapa, on June 19, 2015, the witness persisted in this and signed it.

Witness,

*(Signature Illegible)*
A. Thapa

Whereof this official report was drawn up by us under oath/promise and concluded and signed on Sunday, June 19, 2015 on Saba.

The reporting officers,

G.J. Kapsenberg                                           R. den Hollander
oath                                                              promise.



••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••
*Official and True Translation into English of original Dutch document*
*(Official Report Hector Appendix 9)*
*Drs. L. A. Richardson, sworn translator*
*St. Maarten, 14 September 2016*



Appendix 10

Pro-Justice
Police Force Caribbean Netherlands

**Police Report witness interrogation**

| | | |
|---|---|---|
| Minutes number : | : | 20150502.202 |
| Investigation | : | Hector |
| Regarding | : | Police Report interrogation witness E.K. OGBOMO |
| Reporting Officers | : | Vasconcelos Arlindo Siliee and Pierinina Annamaria Mercera |
| | | Head Officer and agent officer |

We, reporting officers working at The Police Force Caribbean Netherlands and assigned to the investigation office declare the following:

**WITNESS AND CONSTRUCTION OF THE INTERROGATION**

on Saturday, May 2nd around 10:20, we the reporting officers, interrogated, a man as witness. This man mentioned to be named:

Witness:
Name:                         OGBOMO
First name(s):               Efehi Kelly
Date of birth:              03 june 1985
Place of birth:             Nigeria
Country of birth:           Nigeria
Nationality:                Nigerian
Address:                    Promiseland at Steven Saegers Unit 4
Residence:                  Saba
Telephone number:
E-mail:                     kogbomo@yahoo.com
Personal credentials
According to:               driving license

the declaration of the witness was conducted in the English language and the Dutch in writing. The interrogation was done thru audio recording.

the interrogation of the witness has been performed by question and answer method. Thereby are the observations and questions of the reporting officers as the observations and answers of the witness given literally as much as possible. The following abbreviations have been used:
O: observation / information of the officers:
V: question by officers
A: answer by witness

Motive to the interrogation of this witness is because the fact that he would have seen that witness Senad Cejvan the night of Tuesday April 14 to Wednesday April 15 left at a certain moment from the house of the fellow witness Angelica THAPA.

'interrogation of witness E.K. OGBOMO

Appendix 10

**Interrogation**

**Introduction**

O: you will be heard as a witness in connection with the investigation "Hector". This investigation was started after the death of a student from the Medical School on Saba on the night of Tuesday April 14, 2015 to Wednesday April 15 2015.

As the investigation team we need to learn "who the victim was". Based on this interrogation and also through statements of other witnesses, we would like to create a picture of and about the victim and what happened around the death, of the victim. Considering this we would like to request you not to share the content of this interrogation with others, so that each one can tell us their own story.

It is important that you tell us what you know about the victim and about the circumstances around the death of the victim. There will be subjects discussed during this interrogation, that will be odd or seem peculiar to you. But rest assured that we ask you these questions with for a reason. Once again it is in the interest of the investigation that we can visualize the best possible image of and about the victim.

What we still want to inform you is that we will be asking you a lot of questions. We can also imagine that most possible you will also have a lot of questions for us. We are prepared to answer your questions, but in the interest of the investigation it might be possible that we will not be able or will not answer your questions. Therefor we hope for your understanding.

V: Is it so far clear to you?
A: Yes

V: Do you have beforehand questions to us?
A: No

O: as discussed with you, we would like to interrogate you about what happened in Saba on the night of Tuesday April 14, 2015 to Wednesday April 15, 2015.
V: What can you tell us in general about this happening?
A: I had an off day on Tuesday April 14, 2015 and I had to study for a test that I had to do on Wednesday April 15, 2015 and Thursday April 16, 2015. I studied the whole day and according to me I went about 00.00 hour to sleep. On Wednesday April 15, 2015 I waked up about 03:00 o'clock. I had to continue studying for the test that I had on that day. About 04.00 o'clock I left my home to go to school. Usually when it's broad daylight, I go through the shrubbery to school. That morning it was still dark outside and I went to school via the road. On the way I met a classmate named Senad. I greeted him and he asked me why I was awake so early. I told him that I was going to school to continue studying.

When I reached school I went to the "Fishbowl" to study. Fishbowl is a space where one can study. About 08:15 hour I had done my first test. After this I went to the "Dungin" to study for my second test. "Dungin" is part of the library.

Appendix 10

While studying in the "Dungin" a girl came in and said that someone had problems. She again went outside, followed by my classmates who were also studying there. On that moment I also decided to go outside to see what was going on. I followed them.
When arriving at an apartment building, I recognized the building as the apartment where some female students live. Further I recognized the apartment where the students went as Kavya's home.

I stayed in the living room, while Anisa, Omar en Samer went into the bedroom. While standing in the living room I could see Omar and he said twice: She's gone. She's gone. I went to stand by the bedroom door and stretched by the door to look at the bed that was behind the door. I saw Kavya laying on the bed. I saw that her face and her neck were blue. Or I can better say that her face color was darker than usual. I saw that her nose was squashed. I knew at that moment that she was dead. Her body was exactly as the corpse that we use at school for research. On that moment the students that were inside were crying. When I saw that I started to guide the students outside. After about 30 minutes I left to do my second test.

V: How did you see exactly the corpse?
A: I saw that she laid on her back. Further I cannot say much because I only had a glimpse of her and I focused on her face.

V: what did Kavya wear?
A: I don't know

V: how were her arms laying when you saw her?
A: I don't know

V: who all did touch the corpse?
A: I don't know, because I did not see it. I overheard Samer talking that they turned the corpse, but I don't know who.

V: Who first found Kavya dead?
A: I think that Anisa found her

V: Who all went to the apartment of Kavya when you left the school?
A: Syed and Ahsan were together with me in the Dungin. They ran outside and I went behind them. Now I remember that also MJ and Deedee were together with me in the Dungin. On the way to Kavya's home I cached up with MJ and Deedee. When arriving at the home of Kavya I met Anisa, Samer and Omar. Furthermore, were Priya, MJ, Deedee, a big fat boy and myself at the apartment of Kavya. Omar, Anisa and Samer were in the bedroom. According to me was the big fat boy also in the bedroom. The rest had not gone into the bedroom. The students were walking up and down, so I cannot say with certainty were everybody had been. I do remember that I took Priya, Deedee and MJ outside.

V: What did Omar, Anisa and Samer do in the bedroom?
A: I don't know, I only heard Omar saying that she is gone and Anisa was crying. After all I heard that the body of Kavya was turned. When I saw her she was laying on her back, that's why I could see her face.

Appendix 10

V: What did happen when you went out of the apartment?
A: I know that everybody was in shock. We went to stand all the way outside on the road across the entrance of the courtyard. I stood there together with Samer, Priya, MJ and Deedee. Then the Dean named Dr. Louis and the students Dean named Dr. Reed and Tarra arrived. Samer went to talk to them and told them what all he saw. Later the police arrived on the spot and had cordoned off the place.
V: The victim was a student from the Medical School in Saba. Do you know how the victim was named.?
A: Her name was Kavya. I do not know her full name.

O: The victim's full name is: Kavya Lekha GUDA. We will quote her from now on in our further conversation as Kavya.

## GENERAL ABOUT THE VICTIM KAVYA LEKHA GUDA
O: this interrogation is made on certain subjects. The first subject that we would like to discuss with you is among others the relationship between you and Kavya.

V: how well did you know Kavya?
A: We were all together in the first semester. We went further together to the second semester, but she did not make the last part of the second semester. I heard that she had health problems. I went hereafter to the third semester and Kavya had to repeat the second semester. I must say that I am not very good friends with her. I never went out with them. We only meet at school. When I am in the library, she would come often to say hello to her friends who also would be there. Occasionally I would ask her if I have to walk home together with her. She says that it is not necessary. I have only been once at her home. That was when we were together in the second semester. She had a gathering at home and had invited all students from the second semester to come and eat by her house.

I had the last contact with her two or three days before the incident. I had met her at school and she told me that, that semester would be the last semester at school. She told me that she would not come back anymore and that she is going to take care of her mother. I also told her that she is a smart girl and if she wants to continue studying, she can always come back.

V: Since when do you know her?
A: I know her since the month May of 2014. That is when I saw her for the first time in the first semester.

V: what did you think of her?
A: I find her a pleasant person. She always has a smile. She likes to make jokes.

V: How intense were you contact?
A: We did not have an intense contact

V: How often did you see each other?
A: We only saw each other at school

V: Which positive character traits could you mention about Kavya?
A: She is a happy person, who always laughs, would never hurts anyone and she is a person that would make your day, for example if you are sad. She is a top student.

Appendix 10

V: Why did you feel that?
A: Because of what I have seen.  I am a person that walks always very serious around.  When I meet her, she would always ask me why I am so serious and would tell me that I am smart.

V: Which negative, or maybe better said, less positive character traits do you know from Kavya?
A: I do not know
V: Which less positive experience and/or contact have you had with Kavya?
A: None

V: did you ever discussed with Kavya?
A: No, as I already said I do not see her much

V: which is the nickname of Kavya?
A: I do not know

V: How was she called by you, and also by others?
A: just Kavya

V: of which telephone numbers did Kavya make use according to you?
A: I do not know

V: Under which name was Kavya active on Facebook?
A: I do not remember.  She uses her name Kavya and some what

V: What were her usernames of for example whatsapp?
A: I do not know.  I do not have whatsapp from her

V: Of which other social media did Kavya make use according to you?
A: I do not know

V: Of which email addresses did Kavya make use?
A: I do not know

V: what can you explain about the passwords and/or access codes that were used by Kavya?
A: I do not know

V: What can you explain about the internet behavior of Kavya? In other words, which internet sites were visited by her??
A: I do not know anything about this girl.

**HOME AT KAVYA LEKHA GUDA**
V: Have you been at home by Kavya??
A: yes

V: how often did this happened?
A: Since I met her it happened 4 times

Appendix 10

V: when were you last at Kavyas home??
A: before the incident, it was in the second semester when I was last by her house

V: what was the reason of your visit?
A: I do not know what the reason was and I also do not know how I reached there. I know that there was food and that I went there.

V: Whom else where there present?
A: Omar, Samer, Priya, Samah, Duckers. Furthermore, was MJ or Deedee also there.

V: has Kavya been ever to your house?
A: No, nobody has been at my house. I am here to study I do not have time for that

**FAMILY**
V: How can you state Kavyas family structure?
A: Nothing

V: Where does the family of Kavyas reside?
A: I think in the United States

V: What can you state about the background of Kavya's family? Where are they from?
A: Nothing, however I can remember that she said that she is Hindu.

V: We know that Kavya is born in India. What can you state about that?
A: Nothing

V: When did Kavya leave India and where did she go?
A: I do not know

V: Who was according to you the contact between Kavya and her direct family members?
A: I do not know

V: How did they maintain this contact
A: I do not know

V: What can you state about the health of Kavya, but also about the health of her direct family members?
A: I do not know I noticed that she looked healthy

**PARTNERS/FRIENDS**
V: Now will follow a strong subject, but once again we want to point, that it can be of (great) importance for the investigation.

V: what can you state about the partners/friends of Kavya?
A: I do not have any idea about that.

Appendix 10

V: Who were her best and/or special friends?
A: From what I heard Omar and Samer are her best friends.  Omar and Samer are the ones that defend her

V: Why do Omar and Samer have to defend her?
A: I do not know if I used the correct word, but they were always in her presence

V: What was special about this friendship(s)?
A: I know they got along very good with each other. Furthermore, I know that Priya was good friend with her.  Priya lives next to her.

V: With whom according to you have Kavya a committed relationship?
A: I do not know

V: What can you explain about any ex-partners from Kavya? In other words, with whom did she had a relation?
A: According to me she told me that she had a friend abroad, but it was over between them.  According to me she was alone.

V: What can you state about the one night stands of Kavya?
A: I do not know

V: Want can you explain about the sexual nature of Kavya? In other words, did she liked men, women, or men and women??
A: I do not know

V: Did you have an intimate relation with Kavya or did ever a rapprochement take place between you two? If yes, what can you state about that.
A: No, I did not have an intimate relation with her

V: How can you explain how "faithfully" Kavya was about her relation??
A: Nothing

V: In which way according to you was Kavya sexually active?
A: I do not know

V: What do you know about the sexual preferences of Kavya?
A: I do not know

**RELEGION / FAITH**
V: What can you state about the religion / faith of Kavya?
A: I only know that she said that she is Hindu

V: To what extend was she active in this? In other words: what did she do herewith / about this
A: I do not know

Appendix 10

**EDUCATION AND FUTURE PLANS**
V: What can you say about the education that Kavya followed?
A: About the former education I do not know.  She was busy with medical study, same as I, at the Medical School.

V: What can you say about the current study results of Kavya?  In other words, how was she?
A: I never saw her results. Samer told me that she is smart.  Also I know that during the second semester she was tutor for the student of the first semester. I know that you have to have good results, to be a tutor.
V: What can you say about her test results?
A: I cannot say anything about that.

V: What can you say about the future plans of Kavya?
A: I only know that she was going to take care of her mother

**INCOME AND EXPENSES**
V: What can you say about the income of Kavya?
A: Nothing

V: In which way did she receive more money?
A: I do not know

V: What can you say about the expenses of Kavya?
A: Nothing

V: According to you on what did Kavya spend (lot) money?
A: I do not know

V: On which things according to you did Kavya spend less money?
A: I do not know

V: What can you say about the fix expenses of Kavya?
A: Nothing

V: What was for instance the rent of her apartment and by whom was it paid?
A: I do not know

V: What can you say about any debts of Kavya?
A: Nothing

V: What can you state about her income and expenditures?
A: Nothing

**HOBBY'S / LEISURE**
V: What can you say about the hobbies of Kavya?
A: Nothing

Appendix 10

V: What did she do in her leisure time?
A: I think studying

V: With whom did she associate?
A: I do not know

V: Of which association and/or foundation was she a member?
A: I do not know


V: What kind of sport did she practice?
A: I do not know

V: On which martial arts / defense sport is she or was she?
A: I do not know

V: We understood that Kavya did Taekwondo, what can you say about that?
A: nothing, she told me that she was tough

V: In which manner would Kavya be able to defend herself?
A: I think that she would kick someone in the crotch

V: What kind of defense tools / items had Kavya in her disposal
A: I do not know

V: According to you did she have a weapon in her possession?  We give as an example a gun, pepper spray, baton, knife, taser or knuckel-duster
A: I do not know

V: If Kavya went out, where did she go?
A: I do not know.

**OWN OBSERVATIONS ON THE NIGHT OF APRIL 14 TO APRIL 15-2015**
V: Can you still clearly remember the night of Kavya's death?
A: yes, I know that I was studying that day, that about 00:00 hour I went to sleep and that I met Senad on the way to school.

V: What did you noticed that night?
A: I did not notice anything I was only astonished to see Senad.  I think that he also was astonished to see me.

V: Where did you precisely see Senad?
A: I met him on the way

O: The witness tried to explain via a drawing where he had met Senad.  I Siliee, told him that I would print a map from the bottom for him, so that he could indicate where he had met Senad.

Appendix 10

The witness outlined where he had walked and where he had met Senad. Furthermore, he also indicated which route he walked during the day. He explained that he cannot take the route at night thru the grove because it is dark and beside that there is a gate that is being locked by Julio after 19:00 hours. Now and then he leaves it open but mostly after 19:00 hours he will lock it.

V: What kind of clothes did Senad wear on the night of April 15-2015?
A: I do not remember

V: At what time exactly did you meet Senad?
A: I arrived at school between 4:00 and 4:05 hour so I met Senad 5 to 10 minutes before.

V: How do you know that you arrived at school between 4:00 and 4:05 pm
A: I looked at my watch

V: Who is Angelica Thapa?
A: She is my neighbor

V: How and since when do you know her?
A: She moved into the apartment complex where I live in the month of January 2015.  Then I got to know her.  I had seen her previously at school.  She started in the month September 2014.

V: how is your relationship with her?
A: We had a neighbor's relationship.  Now and then when her roommate had baked a cake Angelica brought cake for me.  I realized now that she is a distraction for me.  I just say hello to her.

V: Why do think that Angelica is a distraction for you
A: She takes things very easy. She likes to start a conversation and I do not have time for that.

V: Who is Senad Cejvan?
A: The first semester was Senad my roommate.

V: How and since when do you know him.
A: I know him since May 2014

V: how is your relationship with him?
A: He is someone that I cannot get along with.  We had once a discussion, but we were again good with each other.  He had once also accused me of taking his eggs. If we meet at school, we do not start a conversation.  We say hello to each other.

O: Out of the conversation we suspect that you saw your neighbors Angelica Thapa and Senad Cejvan the night of Kavya's death.  What can you explain about this?
A: No I did not see them together.  I had only seen Senad on the way to school.

Appendix 10

O: Your neighbor Angeica Thapa stated that the night of Kavya's death you would have seen your neighbor Senad leaving her house.
V: How is that possible?
A: That is not true, totally incorrect

O: You would have said that they have together a relationship?
V: What can you say about this?
A: That is not true.  I only saw her alone after the incident at Kavya's house when I was talking to the other students.  I saw Angelica and Senad arriving together.

V: Did you talk to Angelica on Wednesday April 15?
A: No I did not talk to her

O: So you would have seen Senad Cejvan on the night of Kavja's death coming out the house of your neighbor Angelica Thapa.
V: Is this true?
A: No, that is not correct

V: did you also see and / or heard when your neighbor came home that evening / night?
A: My windows are always open, when people are talking outside I can hear their voices.  That night I did not hear anything.

V: Did you also see when Senad Cejvan arrived at the house of your neighbor
A: No

V: By Angelica and Senad is declared that before they entered Angelic'as house, they first, talked for more or less 15 minutes in front of the house.
V: What can you explained about this?
A: I cannot declare anything about this

O: Apparently you told Senad a little harassed that you know that he has a relationship with your neighbor Angelica.
V: how did he react when you told him that?
A: On Wednesday April 15 after I had done my first test, I was talking to Andre, Adam and Eric and I saw Senad arriving.  I walked towards him and asked him why I met him in the night.  On this he told me that he went out the night before and that Angelica was sitting on his lap when they were coming back home in the car.  Senad also said that he together with Angelica came to my apartment complex and Angelica had shown him my apartment.  Then I asked him if he had something with Angelica.  Senad smiled and said nothing

V: What makes you think that both have a relation together?
A: I did not ask him if they had a relation together.  Because Senad told me that he went out with Angelica, that Angelica sat on his lap and that they went home together, I asked him if there was something going on between them.

Appendix 10

V: where did u go on the evening of April 14 to the morning of April 15, 2015?
A: I was till late in the evening in the Dungin and after I went straight home.

V: whom else were in the Dungin?
A: I cannot remember

V: what time did you go home?
A: I went home around 21:00 hours or 22:00

V: did you then still meet Kavya?
A: on that Tuesday I did not see her

V: Did you still meet Angelica and/or Senad Cejvan?
A: I only saw Senad when I met him the night of April 15-2015

V: Did you see Senad in the Dungin on Tuesday April 14-2015
A: I cannot remember. I know that Anisa came in and shout Omar, Omar.

**GENERAL**
V: Which persons according to you are of importance to be also interrogated by us? In other words: Who could tell us more about Kavya or about her death?
A: I have in my mind that Senad is the one that you have to interrogate. From what I heard they went out together, he and Angelica were by our apartment complex and that I met that night.

V: are there subjects that we did not discussed with you today but which you think could be of any interest? In other words, did we forget something?
A: No

V: did you understand us good?
A: Yes, I understood everything

O: as enclosure a Google Map, photo of the Bottom will be added to this police report.
On this picture the witness indicates where he met Senad the night of April 15-2015

**Witness**
E.K. EGBOMO

**CLOSING**
The interrogation closed on Saturday May 02-2015 at 14:30

This Police Report is made by us under oath, closed and signed at on May 02, 2015 at Saba.


The Officer
V.A. Siliee

Bijlage 10



Bylage 1

Appendix 11

Pro-Justice
Police Force Netherlands Caribbean

**Police Report from findings**

| | | |
|---|---|---|
| Minutes number | : | 20150519.1100 |
| Investigation | : | Hector |
| Regarding | : | Findings witness E.K. OGBOMO |
| Reporting Officers | : | Sander Konijnenberg and Pierinina Annamaria Mercera |
| | | Respectively Head Officer and agent officer, working at |
| | | The Police Force Netherlands Caribbean |

## *Police Report*

We, police officers, declare the following:

On April 15, 2015 was found in the apartment on the Clement Sorton street 6 in Saba, the deceased Kavya Guda, as part of the investigation into the death of the victim were during this investigation several witnesses interrogated. On May 2, 2015 was the following witness interrogated:

**Efehi Kelly OGBOMO,** borne on June 3rd 1985 in Nigeria and residing at the apartment complex Promiseland (by Steven Saegers) unit 4 Saba.

In his statement the witness indicated that in the early morning hours of April 15, 2015 he walked to school from his apartment to go studying. He would had left his house shortly before 04:00 hrs. on his way to school would he have met a student named Senad Cejvan.

To get a better picture which route precisely was walked by the witness Ogbomo and where he exactly had seen Cejvan, we de officers went to walk this route on Tuesday May 19, 2015 together with the witness Ogbomo. As enclosure to these minutes 2 plans have been added. Herein is exactly mentioned how Ogbomo walked and where he saw Cejvan. Prior to take this route Ogbomo mention that he normally would take this pathway via the shortest "goat path" from his apartment complex along the playfield. But because of the fact that the gate to this path is locked in the evening and at night, he walked another road, whereby he passed the house of Ceyvan. Ogbomo presumed that that night the gate was closed and took without checking the longest route to school.

During the walk thru the route Ogbomo told exactly what happened when he saw Cejvan. Cejvan asked him what he was doing up so early. Ogbomo told him that he was going to study. Cejvan answered on this: "You are crazy". Ogbomo did not asked Cejvab what he was doing there. He could neither remember what Cejvan was wearing. Later that day he still asked Cejvan, upon which Cejvan told a story about the fact that he went out and that Angelica sat on his lap. After that he would have been together with her in her house. Ogbomo got the idea that Cejvan and Angelica had a relation.

Appendix 11

This Police Record was made by us under oath which we closed and signed on May 20, 2015 at Saba.

The Reporting officers,

S. Konijnenberg                                        P.A. Mercera

Bijlage 11





Appendix 12

Pro-Justice
Police Force Netherlands Caribbean
Office of Investigation

**Police Report from Witness J.C. Victor Rombley**

| | | |
|---|---|---|
| Minutes number | : | 20150505.1610.202 |
| Investigation | : | Hector |
| Regarding | : | Article 302 c.q. article 300 of the Penal Code BES |
| Reporting Officers | : | Vasconcelos Arlindo Siliee, Head Officer |

### **Police Report**

I officer, who works at the Police Force Caribbean Netherlands and assigned to the Office Detection declares the following:

On Tuesday May 05, 2015 around 16:10 hour, I the Officer, interrogated at the Police Office at The Bottom, in Saba, a man as witness, who told me he was:

| Witness: | Last Name | : | VICTOR ROMBLEY |
|---|---|---|---|
| | First Names | : | Julio Cesar |
| | Born | : | June 04, 1980 in Dominican Republic |
| | Address | : | The Bottom |
| | Residence | : | Promiseland app. Steven Saegers |
| | Telephone | | |
| | Number | : | 4166404 |

The statement of the witness was conducted in the Spanish language and put into Dutch on writing.

After we, the reporting officers had informed the witness about what we wanted to interrogate him he stated the following:

V: where do you work?
A: I work at the apartments of Steven Saegers

V: what kind of work do you perform?
A: I work in maintenance

V: What else do you do?
A: I only work by them, I am not allowed to work elsewhere